1  MICHAEL R. SHERWOOD, CA Bar No. 63702
   GREGORY C. LOARIE, CA Bar No. 215859
2  Earthjustice
   426 17th Street, 5th Floor
3  Oakland, CA 94612
   Tel. (510) 550-6725 / Fax (510) 550-6749
4
   PATRICK GALLAGHER, CA Bar No. 146105
5  Sierra Club Environmental Law Program
   85 2nd Street, 4th Floor
6  San Francisco, CA 94109-3441
   Tel. (415) 977-5709
7
   ERIC E. HUBER, CO Bar No. 700024, *Pro Hac Vice*
8  Sierra Club Environmental Law Program
   2260 Baseline Road, Suite 105
9  Boulder, CO 80302
   Tel. (303) 449-5595
10
   DAVID B. EDELSON, CA Bar No. 104390
11 840 Grizzly Peak Boulevard
   Berkeley, CA 94708
12 Tel. (510) 527-4116

13 *Counsel for Plaintiffs*
   *Sierra Forest Legacy, et al.*
14

15             IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF CALIFORNIA
16                    SACRAMENTO DIVISION

17

18 SIERRA FOREST LEGACY, *et al.*,        )  Case No:  05-0205 MCE-GGH
                                          )
19            Plaintiffs,                  )
                                          )
20      v.                                 )  THIRD AMENDED COMPLAINT
                                          )  FOR DECLARATORY AND
21 MARK REY, in his official capacity as Under )  INJUNCTIVE RELIEF
   Secretary of Agriculture, *et al.*,     )
22                                         )
            Defendants.                    )
23                                         )
        and                                )
24                                         )
   TUOLUMNE COUNTY ALLIANCE FOR            )
25 RESOURCES & ENVIRONMENT, *et al.*;      )
   CALIFORNIA SKI INDUSTRY ASS'N; QUINCY   )
26 LIBRARY GROUP, *et al.*; and CALIFORNIA )
   CATTLEMEN'S ASS'N,                      )
27                                         )
            Defendant-Intervenors.         )
28 _____ )

**INTRODUCTION**

1.     In January 2001, after ten years of planning and with the broad support of the conservation community, the United States Forest Service ("Forest Service") adopted the Sierra Nevada Forest Plan Amendment (also known as the "Sierra Nevada Framework" and referred to herein as the "2001 Framework"), which amended the management plans for the eleven national forests in California's Sierra Nevada mountain range.

2.     Under a new administration, the Forest Service decided in January 2004 to replace the 2001 Framework with a new management plan (the "2004 Framework") that triples the amount of logging allowed throughout the Sierra Nevada at the expense of wildlife and old forest conservation. The 2004 Framework represents a major step backward in the development of Forest Service management plans and policies for the Sierra Nevada's national forests.  It reverses a decade of Forest Service planning for these forests and threatens the viability of native wildlife, including the California spotted owl, Pacific fisher and American marten.  There is no sound basis in law or policy for this abrupt change of position, nor is there new information or altered circumstances that would warrant such sweeping changes.

3.     The 2004 Framework substantially weakens the 2001 Framework, despite the fact that the Chief of the Forest Service found that the 2001 Framework satisfied all legal requirements, was based upon the best available science, and struck a careful balance among competing considerations.  The 2004 Framework greatly increases both the amount and intensity of planned logging in the Sierra Nevada's national forests, even though leading scientists both inside and outside the Forest Service have expressed grave concerns about the 2004 Framework's adverse impacts on sensitive and imperiled wildlife.  Moreover, the 2004 Framework will fully implement the controversial Quincy Library Group pilot project in the northern Sierra Nevada, despite the fact that both the Forest Service and the U.S. Fish and Wildlife Service have concluded that doing so poses a serious risk to the long-term viability of the California spotted owl, Pacific fisher and American marten.

4.     Plaintiffs allege that in adopting the 2004 Framework, defendants Mark Rey, *et al.* ("defendants" or "the Forest Service") failed to comply with the National Forest Management Act

("NFMA"), 16 U.S.C. § 1604, and NFMA's implementing regulations in numerous respects, particularly by failing to insure the viability and distribution of imperiled wildlife and by failing to monitor wildlife populations.  Plaintiffs further allege that the 2004 Framework has no substantial basis in the record and is therefore arbitrary and capricious within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Plaintiffs also contend that the final supplemental environmental impact statement ("final supplemental EIS") for the 2004 Framework fails adequately to assess and disclose the 2004 Framework's adverse environmental impacts, contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and is otherwise inadequate.  Plaintiffs therefore ask this Court to set aside the 2004 Framework and reinstate the 2001 Framework.

5.      Plaintiffs also challenge through this action the Forest Service's decisions to implement the illegal 2004 Framework through the development and approval of numerous site-specific logging projects, including, but not limited to, the Basin, Freeman, Slapjack and Empire Projects in Plumas National Forest.  Plaintiffs ask the Court to set aside and enjoin such site-specific logging projects because they rely on the 2004 Framework and are inconsistent with the 2001 Framework.

6.      Plaintiffs also challenge the Basin Project based upon independent violations of NFMA and NEPA as set forth below.

**JURISDICTION**

7.      This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 (action arising under the laws of the United States) and 5 U.S.C. § 702 (Administrative Procedure Act).

8.      As described below, plaintiffs have exhausted all administrative remedies available to them, pursuant to 36 C.F.R. § 217.17(g) and 36 C.F.R. § 215.18(c).

9.      The defendants' violations of NEPA and NFMA alleged herein are subject to judicial review under the APA, 5 U.S.C. § 702.

**VENUE AND INTRADISTRICT ASSIGNMENT**

10.      Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred here, many of the Sierra

Nevada national forests affected by the 2004 Framework are located here, the Quincy Library Group Act pilot project is located here, the Basin, Freeman, Slapjack and Empire Projects are located here, and several of the plaintiffs and defendants are based here.

11.     Assignment to the Sacramento Division of this judicial district is proper by virtue of L.R. 3-120(b) because the action arises here.  Specifically, the Regional Forester for Region 5 is headquartered in Vallejo, Solano County; the Plumas Forest Supervisor is headquartered in Quincy, Plumas County; the Basin, Freeman, Slapjack and Empire Projects are located in the Plumas National Forest in Plumas County; and the Quincy Library Group Act pilot project encompasses portions of Butte, Lassen, Nevada, Plumas, Shasta, Sierra, Tehama and Yuba Counties.

**PARTIES**

12.     The plaintiffs in this action are:

a.     SIERRA FOREST LEGACY ("Legacy").  Legacy is a Sacramento-based coalition of over 80 local, regional and national environmental organizations dedicated to protecting and restoring the Sierra Nevada's national forests.  Formed in 1996 as the Sierra Nevada Forest Protection Campaign, the Legacy works to protect and restore the ancient forests, wildlands, wildlife and watersheds of the Sierra Nevada through scientific and legal advocacy, public education and outreach, and grassroots forest protection efforts.  Among other things, Legacy has sought to achieve greater protections for the California spotted owl, Pacific fisher, American marten and other old forest dependent species.  Since the late 1980s, the Legacy's founding members have been involved in major policy decisions and research initiatives relating to Sierra Nevada national forest management and species conservation, including the California Spotted Owl Sierran Province Interim Guidelines of 1993, the Sierra Nevada Ecosystem Project of 1996, the Quincy Library Group Act (1998) and pilot project (1999), the 2001 Framework, and the 2004 Framework. Legacy strongly supported the 2001 Framework and appealed the 2004 Framework as well as the Basin, Freeman, Slapjack and Empire Projects and is also actively tracking, commenting on and appealing numerous other planned projects that implement the 2004 Framework.

b.     CENTER FOR BIOLOGICAL DIVERSITY ("Center").  The Center is a non-profit corporation based in Tucson, Arizona, with California offices in San Francisco, Idyllwild and

San Diego.  By combining conservation biology with litigation, policy advocacy and an innovative strategic vision, the Center works to secure a future for animals and plants hovering on the brink of extinction.  Since its founding over ten years ago, the Center has fulfilled its mission by preparing and publishing scientific articles, participating in state and federal administrative proceedings, disseminating educational information through newsletters, alerts, the world-wide web and media releases, and petitioning and litigating both to list numerous species as threatened or endangered and to designate their critical habitat under the ESA.  The Center has submitted petitions pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq*., to list the California spotted owl and the Pacific fisher, among other imperiled Sierra Nevada species.  The Center's members and representatives actively participated in the development of the 2001 Framework.  In addition to joining the other plaintiffs in their appeal of the 2004 Framework, the Center has commented on numerous specific logging projects implementing the 2004 Framework.  The Center has more than 12,000 members, many of whom reside in California and live and recreate in the Sierra Nevada.

       c.      NATURAL RESOURCES DEFENSE COUNCIL ("NRDC").  NRDC is a non-profit environmental organization with approximately 400,000 members nationwide, including approximately 84,000 members in California.  NRDC's purpose is to safeguard the Earth:  its people, its plants and animals and the natural systems on which all life depends.  NRDC works to restore the integrity of the elements that sustain life — air, land and water — and to defend endangered natural places.  NRDC seeks to establish sustainability and good stewardship of the Earth as central ethical imperatives of human society and strives to protect nature in ways that advance the long-term welfare of present and future generations.  For more than a decade, NRDC has advocated extensively for the protection of the nation's forest resources and wildlife, including the California spotted owl and other Sierra Nevada old-growth dependent species.  NRDC strongly supports the 2001 Framework and joined the other plaintiffs in appealing the 2004 Framework.

       d.      SIERRA CLUB.  The Sierra Club is a nationwide non-profit conservation organization formed in 1892, with over 700,000 members, approximately 185,000 of whom reside in California.  The Sierra Club's purposes are to explore, enjoy and protect the wild places of the Earth, to practice and promote responsible uses of the Earth's ecosystems and resources, to educate and

1    enlist humanity in the protection and restoration of the quality of the natural and human environment

2    and to use all lawful means to carry out those objectives.  For many years the Sierra Club and its

3    members have advocated for the protection of forest ecosystems throughout California.  These

4    advocacy efforts have included forest mapping and identification of remaining ancient forest areas,

5    lobbying for and achieving funding for numerous forest conservation efforts, and urging protection

6    for imperiled species, including the California spotted owl.  Since the late 1980s, the Sierra Club has

7    actively tracked and participated in major policy decisions and research initiatives relating to Sierra

8    Nevada national forest management and species conservation, including the California Spotted Owl

9    Sierran Province Interim Guidelines of 1993, the Sierra Nevada Ecosystem Project of 1996, the

10    Quincy Library Group Act (1998) and pilot project (1999), the 2001 Framework, and the 2004

11    Framework. The Sierra Club strongly supported the 2001 Framework and appealed the 2004

12    Framework as well as the Basin, Freeman, Slapjack and Empire Projects.  It is also actively tracking

13    and commenting on numerous other planned projects that implement the 2004 Framework.

14            f.      THE WILDERNESS SOCIETY.  The Wilderness Society is a non-profit

15    conservation organization with approximately 200,000 members nationwide, including

16    approximately 39,000 members in California.  Founded in 1935, The Wilderness Society works to

17    protect America's wilderness and wildlife and to develop a nationwide network of wildlands.  The

18    Wilderness Society fulfills its mission through public education, analysis, and advocacy.  The

19    Wilderness Society and its members have a long history of involvement in the management and

20    administration of the native forest ecosystems of the Sierra Nevada and the wildlife and other natural

21    resources dependant upon those ecosystems.  This involvement has included sponsoring public

22    workshops about the Sierra Nevada, publishing a series of economic profiles for eastern Sierra

23    counties, and pressuring the Forest Service to implement protections for the California spotted owl.

24    The Wilderness Society was involved in the 2001 Framework planning process from beginning to

25    end.  Representatives of The Wilderness Society attended public meetings regarding the 2001

26    Framework, submitted ecological and economic information for the record, and met with Forest

27    Service personnel numerous times, including the Chief of the Forest Service and Under Secretary of

28

Agriculture, to discuss implementation of the 2001 Framework.  The Wilderness Society strongly supports the 2001 Sierra Nevada Framework, and it appealed the 2004 Framework.

13.     As described above, the plaintiff organizations and their respective members have been and will continue to be actively involved in efforts to protect and restore national forests in the Sierra Nevada.  Among other things, some or all of the plaintiffs commented upon the draft and final environmental impact statements for the 2001 Framework; commented upon and filed an administrative appeal of the 2004 Framework; commented on and filed administrative appeals of logging projects authorized by the 2004 Framework, as well as the 2004 Giant Sequoia National Monument Management Plan; and submitted petitions to list various imperiled Sierra Nevada species pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.*

14.     Each of the plaintiff organizations described above has members who live and/or work in communities located near or adjacent to the national forests in the Sierra Nevada, and specifically near the site of the Basin, Freeman, Slapjack and Empire Projects in the Plumas National Forest.  Plaintiffs' members use these national forests for a variety of purposes, including, but not limited to, hiking, backpacking, photography, scientific study, wildlife observation, hunting and fishing.  They intend to continue to do so on an ongoing basis in the future.  Plaintiffs' members derive recreational, spiritual, professional, aesthetic, educational and other benefits and enjoyment from these activities.

15.     The Forest Service's decision to replace the 2001 Framework, and to approve the Basin, Freeman, Slapjack and Empire Projects, in violation of NFMA, NEPA, the APA, and the Quincy Library Group Act as alleged below, has harmed and injured, and is continuing to harm and injure, the above-described interests of plaintiffs and their members by causing irreversible harmful effects to the Sierra Nevada national forests and to the imperiled species that depend upon those forests.  These decisions deprive plaintiffs and their members of the recreational, spiritual, professional, aesthetic, educational and other benefits they presently derive from these forests.  Additionally, defendants' actions deny plaintiffs' members their right to have the laws of the land implemented and enforced, and the satisfaction and peace of mind associated with witnessing the enforcement of this nation's environmental protection laws.

16.     Consequently, plaintiffs and their members have been, are being, and will continue to be adversely affected and irreparably injured by the Forest Service's approval of the 2004 Framework and approval of the Basin, Freeman, Slapjack and Empire Projects pursuant to the 2004 Framework.  These injuries are actual and concrete and would be redressed by the relief sought herein.  Plaintiffs have no adequate remedy at law.

17.     The defendants in this action are:

a.     MARK REY.  Mr. Rey is Under Secretary of Agriculture for Environment and Natural Resources, with jurisdiction over the United States Forest Service.  He reviewed the 2004 Framework pursuant to 36 C.F.R. § 217.7.  He is sued in his official capacity.

b.     ABIGAIL KIMBALL.  Ms. Kimball is Chief of the Forest Service.  On November 18, 2004, her predecessor, Dale Bosworth, denied plaintiffs' appeals from the Regional Forester's approval of the 2004 Framework and final supplemental EIS.  She is sued in his official capacity.

c.     BERNARD WEINGARDT.  Mr. Weingardt is Regional Forester for Region 5 of the Forest Service, which encompasses the eleven Sierra Nevada national forests affected by the 2004 Framework.  Mr. Weingardt is sued in his official capacity.

d.     ALICE CARLTON.  Ms. Carlton is the Forest Supervisor in Plumas National Forest.  Ms. Carlton is sued in her official capacity.

## FACTUAL BACKGROUND

18.     The Sierra Nevada's eleven national forests contain some of our Nation's most diverse and spectacular public lands.  Covering approximately 11.5 million acres, these forests provide habitat for many sensitive and imperiled species, including, among others, the California spotted owl, Pacific fisher and American marten.

19.     Over a century of logging, livestock grazing, road construction, development, and related activities have taken a heavy toll on the Sierra Nevada's natural resources.  For example, the abundance of older forests has declined significantly since European settlement, and the key structural aspects of such forests, including large trees, large snags (standing dead trees), and large down logs, have been greatly depleted.  As a result, species such as the California spotted owl,

Pacific fisher and American marten that inhabit the Sierra Nevada's remaining older forests have declined and are at risk.

20.     The California spotted owl is closely associated with the structural attributes of older forests in the Sierra Nevada, including medium and large trees, dense canopy cover, and large snags and down logs.  Preferred habitat for the California spotted owl consists of mixed conifer forests dominated by trees larger than 24 inches in diameter and with 70 percent or greater canopy cover for nesting and roosting and 50 percent or greater canopy cover for foraging.  Recent studies within the Sierra Nevada have estimated significant population declines for the owl, ranging from 6 to 11 percent annually.  The most recent report, which summarized available research on the owl's status, concluded that "all the demographic evidence available . . . suggest[s] substantial caution in owl conservation and management efforts."

21.     The Pacific fisher is a forest carnivore that currently inhabits dense, older forests in the southern Sierra Nevada, a small portion of its historic range in the Sierra Nevada.  The U.S. Fish and Wildlife Service ("FWS") concluded in 2004 that the west coast population of the fisher warrants listing under the Endangered Species Act.  69 Fed. Reg. 18769 (April 8, 2004).  According to the FWS, "preliminary analyses indicate West Coast fisher populations, particularly in the southern Sierra, may be at significant risk of extinction."  *Id.* at 18789.  The FWS cites logging as one of the primary causes of fisher decline in the Sierra Nevada.  *Id.* at 18778.  The loss of structurally complex forests has contributed to the apparent extirpation of the fisher from the central and northern Sierra Nevada.

22.     The American marten, a smaller relative of the Pacific fisher, is also closely associated with dense, older forests.  The marten is highly sensitive to forest openings and fragmentation caused by logging, road construction and related activities.  A significant gap exists in the marten's current distribution in the northern Sierra Nevada, particularly outside of national parks and wilderness areas.  The apparent absence of the marten in this portion of its historical range increases the likelihood that remaining populations are isolated and makes them more prone to extirpation as a result of increased logging.

23.     As described below, the 2004 Framework allows increased logging of medium and

large trees, reduction in forest canopy cover, and reduction of large snags and down logs, all of which are important structural attributes of habitat for the California spotted owl, Pacific fisher and American marten.  As a result, implementing the 2004 Framework is likely to reduce the amount and quality of habitat for these species, threatening their continued viability and distribution in the Sierra Nevada.

## PROCEDURAL BACKGROUND

24.     Beginning in the late 1980s, the Forest Service has developed land and resource management plans ("forest plans") for each of the national forests in the Sierra Nevada pursuant to the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604.  Many of these forest plans were administratively challenged by environmental groups and others on numerous grounds, including the failure of the plans to provide sufficient habitat to ensure the viability of imperiled Sierra Nevada species, including the California spotted owl, Pacific fisher and American marten.

25.     A comprehensive Forest Service study of the status of the California spotted owl in 1992 entitled *The California Spotted Owl: A Technical Assessment of its Current Status* ("the CASPO Report") concluded that the owl thrives mainly in older forests characterized by medium and large trees, dense canopy cover, and large standing dead trees (snags) and down logs.  The Forest Service concluded that these key habitat elements are declining in the Sierra Nevada, and recommended an interim approach to protect owl habitat, particularly large trees, pending further research and the development of a long-term management strategy.

26.     In 1993, the Forest Service issued an environmental assessment and decision notice adopting many of the CASPO Report's recommendations, commonly referred to as the 1993 CASPO Interim Guidelines.  These interim guidelines amended the forest plans for each of the eleven Sierra Nevada national forests by restricting logging within spotted owl habitat.  For example, the 1993 CASPO Interim Guidelines prohibited logging of trees greater than 30 inches in diameter, required maintenance of a minimum of 40 percent canopy cover in preferred owl habitat, and protected other elements of owl habitat.

27.     At the same time that the Forest Service adopted the 1993 CASPO Interim Guidelines, it initiated a process for developing a long-term management strategy to protect the owl.

In 1995, the Forest Service issued a draft environmental impact statement ("EIS") for a long-term management plan for the California spotted owl in the Sierra Nevada national forests.  The Forest Service subsequently decided to revise the draft EIS, in part to incorporate the results of a new study, the Sierra Nevada Ecosystem Project ("SNEP") Report, released in June 1996.

28.  The SNEP Report, which was authorized by Congress, contained significant new information concerning the status of Sierra Nevada forests.  Among its conclusions and recommendations, the SNEP Report found that the amount of late-successional (*i.e.*, old growth) forests in the Sierra Nevada is far below that which existed before European settlement and that the remaining older forests "may be inadequately distributed to support plant and biodiversity needs or to be protected against catastrophic loss."  Although the SNEP Report did not endorse a specific strategy for protecting and restoring old forests, it did state that "a point of consensus" among resource specialists is that an effective strategy should include protection for the best remaining stands of old forest as "core areas" in any plan.

29.  The Forest Service subsequently prepared a revised draft EIS for managing California spotted owl habitat in Sierra Nevada national forests.  Before release of the revised draft EIS, however, the Secretary of Agriculture in May 1997 chartered a California spotted owl Federal Advisory Committee to review the document to assess whether it reflected the best available information and was scientifically sound.

30.  The Federal Advisory Committee released its report in late 1997.  The report concluded that the revised draft EIS was insufficient as a management plan for either the California spotted owl or the broader Sierra Nevada ecosystem.  The report identified a number of "critical shortcomings" in the revised draft EIS, including "inadequate protection for the spotted owl," the failure to consider the unique importance of older forests or to include a plan to protect such forests, and the failure to ensure viability for the Pacific fisher and American marten.

**The 2001 Framework**

31.  Based in part on the Federal Advisory Committee's report, the Forest Service in 1998 initiated a process to develop new management direction for several urgent problem areas with Sierra Nevada-wide significance, including: old forest ecosystems and associated species; aquatic,

1    riparian, and meadow ecosystems and associated species; and fire and fuels management.  Thus, the

2    Forest Service launched the Sierra Nevada Framework for Conservation and Collaboration.

3         32.    The Forest Service convened public meetings and workshops throughout the state,

4    and in November 1998 published a notice of intent to prepare an EIS on the proposed Sierra Nevada

5    Forest Plan Amendment (*i.e.*, the 2001 Framework), an amendment to the forest plans for the eleven

6    national forests in the Sierra Nevada and the Modoc Plateau, as well as the Regional Guides for the

7    Pacific Southwest and Intermountain Regions.  The Forest Service undertook a collaborative

8    approach in developing the EIS, with active involvement by the U.S. Fish and Wildlife Service, the

9    U.S. Environmental Protection Agency, and numerous other state and federal agencies.

10        33.    The Forest Service held approximately 60 public meetings as part of the scoping

11   process for the EIS for the proposed 2001 Framework, and approximately 60 additional public

12   meetings between release of the draft and final EIS.

13        34.    On January 12, 2001, the Forest Service released its final EIS for the proposed 2001

14   Framework, and Regional Foresters Bradley E. Powell (Pacific Southwest Region) and Jack

15   Blackwell (Intermountain Region) signed the Record of Decision adopting Modified Alternative 8 in

16   the final EIS as the 2001 Framework.

17        35.    The 2001 Framework amended all eleven Sierra Nevada national forest plans.  It was

18   designed to protect and restore old forest ecosystems and aquatic, riparian, and meadow ecosystems

19   throughout the eleven Sierra Nevada national forests, while also addressing concerns regarding the

20   risk of catastrophic wildfire.

21        36.    The 2001 Framework struck a careful balance between reducing the risk of

22   catastrophic wildfire and protecting old forests and wildlife.  The 2001 Framework emphasized

23   logging of small trees (generally less than 12-20" diameter), which contribute the most to wildfire

24   risk, while protecting medium and large trees (generally greater than 20" diameter), which are most

25   important for wildlife like the California spotted owl, Pacific fisher and American marten.  To

26   protect species associated with old forests, the plan required that logging projects should maintain at

27   least 50 percent canopy cover in most westside forests, and prohibited the reduction of preexisting

28   canopy cover by more than 20 percent.

37. The 2001 Framework established a system of "Old Forest Emphasis Areas" covering approximately 40 percent of national forest lands in the Sierra Nevada, which would be managed specifically to protect and restore old forest habitat, and spotted owl "Home Range Core Areas" which would be managed according to the Old Forest Emphasis Areas standards. The 2001 Framework provided for implementation of the Quincy Library Group Act pilot project, but required that logging pursuant to the pilot project comply with the 2001 Framework's standards and guidelines for protecting old forests and wildlife. Finally, to reduce the risk of loss of life and property from severe wildfire, the 2001 Framework allowed more intensive logging, including removal of trees up to 30 inches in diameter on 320,000 acres within one-quarter mile of homes and communities, and also called for prescribed fire to reduce accumulated fuel loads.

**Administrative Appeal of the 2001 Framework**

38. The 2001 Framework was administratively appealed to the Chief of the Forest Service (defendant Bosworth) by the timber industry and other organizations. On November 16, 2001, the Chief denied the appeals in their entirety, finding that the 2001 Framework "met the minimum requirements of Federal law and regulation."

39. With respect to imperiled species such as the California spotted owl, Pacific fisher and American marten, the Chief found that the 2001 Framework was based upon the best scientific information available.

40. With respect to wildfire, the Chief found that the 2001 Framework conformed with the National Fire Plan, that "the record supports the Regional Forester's decision to implement the fuels strategies" in the 2001 Framework, and that the 2001 Framework was "expected to reduce losses of old forests from severe wildfire."

41. Overall, the Chief upheld the Regional Forester's finding that the 2001 Framework struck "the best balance between providing for the production of timber, grazing and other resources and the long-term protection and restoration of the environment."

42. In denying all administrative appeals of the 2001 Framework, the Chief directed the Regional Forester to undertake a limited review of the 2001 Framework with respect to three elements: fuels treatments, consistency with the National Fire Plan, and implementation of the

Quincy Library Group Act pilot project.  The Chief emphasized that only "certain aspects of the decision [should] be subject to additional review and analysis" and that the purpose of the review was to seek "opportunities . . . for refining the decision," rather than revamping it in its entirety.

**The 2004 Overhaul of the 2001 Framework**

43.    Rather than undertaking a limited review, however, the Regional Forester ordered a major overhaul of the 2001 Framework.  On December 12, 2001, the Forest Service formed a review team to reevaluate the 2001 Framework and to propose changes.  In March 2003, the review team released a final report in which it concluded that the 2001 Framework was overly restrictive and recommended revising it to permit increased logging, grazing, and other activities.

44.    The Forest Service conducted no scoping process and held no publicly noticed meetings in developing the 2004 Framework, and its notice of intent to develop a supplemental EIS stated that "the Forest Service is not inviting comments at this time."  68 Fed. Reg. 16758 (April 7, 2003).

45.    The Forest Service released for public comment a draft supplemental EIS analyzing the review team's proposed revisions in June 2003.  The final supplemental EIS and record of decision were released in January 2004.

46.    As acknowledged in the Record of Decision for the 2004 Framework, the new plan represents a "significant forest plan amendment" and completely supplants the 2001 Framework.

47.    The 2004 Framework substantially weakens the 2001 Framework's protection for old forests and associated species.  Compared to the 2001 Framework, the 2004 Framework allows larger trees to be logged (up to 30" diameter in most land allocations) and allows greater reductions in canopy cover (to 40 percent and less in spotted owl habitat).  The 2004 Framework eliminates all the legally binding standards and guidelines that were included in the 2001 Framework to protect Old Forest Emphasis Areas and spotted owl Home Range Core Areas, and allows such areas to be logged pursuant to the less protective guidelines for general forest areas.  Finally, the 2004 Framework allows full implementation of the Quincy Library Group Act pilot project and eliminates the restrictions on logging within the pilot project area that the 2001 Framework had imposed.

48.    As a result of the above-described changes, the Forest Service estimates that the 2004

Framework will allow approximately three times the amount of logging allowed by the 2001 Framework.

49.     Leading scientists, including experts on the California spotted owl, Pacific fisher and American marten, submitted comments criticizing the 2004 Framework and concluding that implementation of the new plan is likely to reduce the population viability of these species and to contribute to the need for their listing under the Endangered Species Act.

50.     Internal Forest Service reviews were also highly critical of the 2004 Framework.  For example, the September 2003 Final Science Consistency Review Report on the draft supplemental EIS concluded that the 2004 Framework "incurs greater risk" to the California spotted owl, and the Forest Service's Director of Watershed, Fish, Wildlife, Air and Rare Plants stated that "one can only conclude that standards in [the 2004 Framework] are a prescription for continued owl population declines."

**Administrative Appeal of the 2004 Framework**

51.     Plaintiffs filed a timely administrative appeal of the 2004 Framework and final supplemental EIS to the Chief of the Forest Service.

52.     On November 18, 2004, the Chief denied plaintiffs' appeal in all respects.  However, the Chief also found that "managing habitat to maintain viable populations of the California spotted owl, the Pacific fisher, and American marten can only be assured by using . . . [an] adaptive management and monitoring strategy," and that the 2004 Framework failed to include an adequate adaptive management and monitoring strategy.  The Chief therefore directed the Regional Forester "to fully develop" an adaptive management and monitoring strategy within six months.

53.     However, the Chief did not stay implementation of the 2004 Framework pending development of this strategy, and the Forest Service is now implementing the 2004 Framework despite the fact that no adequate adaptive management and monitoring strategy currently exists.

54.     On December 23, 2004, the Under Secretary of Agriculture (defendant Rey) announced that he would undertake a discretionary review of the Chief's decision on the appeals of the 2004 Framework pursuant to 36 C.F.R. § 217.7.

55.     The appeal regulations provide that the Under Secretary "shall conclude the review

within 30 days of the date of the notice issued to participants that the lower decision will be reviewed," in this case by January 24, 2005.  36 C.F.R. § 217.17(f).  The regulations further provide that the Under Secretary "shall send a copy of the review decision to all participants," *id.*, and that "[i]f a discretionary review decision is not issued by the end of the 30-day review period, appellants and intervenors shall be deemed to have exhausted their administrative remedies for purposes of judicial review."  *Id.* at § 217.17(g).

56.     The Under Secretary did not complete his discretionary review of the Chief's decision on the 2004 Framework appeals until March 21, 2005.  On that date, the Under Secretary issued a short decision memorandum, in which he declined to alter the Chief's appeals decision regarding the 2004 Framework.

**Implementation of the 2004 Framework**

57.     Defendants have begun to implement the 2004 Framework by authorizing specific logging projects pursuant to it, including, but not limited to, the Basin, Freeman, Slapjack and Empire Projects.  Additional logging projects implementing the 2004 Framework have been approved or are in the process of approval.

### The Basin Project

58.     On August 25, 2004, the Forest Service Supervisor for the Plumas National Forest approved the Basin Group Selection Project ("Basin Project") on the Plumas National Forest in the northern Sierra Nevada.  The Basin Project involves, among other things, group selection and individual tree selection timber harvest in portions of a 38,893-acre area, pursuant to the standards and guidelines of the 2004 Framework.  The Basin Project authorizes approximately 800 one-to-two-acre group selection clearcuts totaling 1,215 acres in which trees up to 30 inches in diameter will be removed, in addition to individual tree-selection timber harvest on approximately 80 acres.

59.     Numerous special status wildlife species occur or potentially occur in the Basin Project area that will be affected by the project, including several management indicator species and Forest Service designated sensitive species.  For example, the group selection logging planned under the Basin Project is likely to impact 24 California spotted owl nest sites and will render unsuitable 943 acres of owl nesting habitat and 247 acres of foraging habitat, including 405 acres within spotted

owl Home Range Core Areas ("HRCAs").  The Basin Project will also result in the logging of habitat that is potentially important for the Pacific fisher and American marten.

60.  Plaintiffs Sierra Forest Legacy and Sierra Club filed an administrative appeal of the Basin Project to the Regional Forester on October 12, 2004.  The Regional Forester denied the administrative appeal on November 24, 2004, and affirmed the Forest Supervisor's decision to implement the Basin Project.  The Regional Forester authorized the Forest Supervisor to implement the decision 15 days following the November 24, 2004 decision.  Consequently, no legal obstacle now prevents the Forest Service from awarding timber sale contracts pursuant to the Basin Project, and logging can begin in the spring of 2005 as soon as snow conditions permit.

**The Freeman Project**

61.  The Forest Service approved the Freeman Project in Plumas National Forest on September 13, 2006.  The Freeman Project implements the 2004 Framework's management standards and guidelines at issue in this litigation.  Specifically, it calls for the construction of defensible fuel profile zones ("DFPZs") across 3,037 acres; the logging of 1/2- to 2-acre "group selection" units on 160 acres; and the removal of individual trees up to 30 inches in diameter throughout an additional 2,211 acres.  As contemplated by the 2004 Framework, trees up to 30 inches in diameter will be cut within DFPZs, and the canopy cover will be reduced to an average 40 percent.  Within group selection units, trees up to 30 inches in diameter will be logged and little if any canopy cover will be left.

62.  The Freeman Project will render unsuitable 3,037 acres of California spotted owl foraging habitat and 379 acres of nesting habitat, including 631 acres that are located within spotted owl HRCAs.  The Freeman Project will also render unsuitable approximately 1,549 acres of Pacific fisher and American marten denning habitat.

63.  Plaintiffs Sierra Forest Legacy and Sierra Club filed a timely administrative appeal of the Freeman Project on November 20, 2006, which the Regional Forester denied on January 3, 2007.  No legal obstacle now prevents the Forest Service from awarding timber sale contracts.

**The Slapjack Project**

64.  The Forest Service approved the Slapjack Project in Plumas National Forest on

September 13, 2006.  The Slapjack Project implements the 2004 Framework's management standards and guidelines at issue in this litigation.  It calls for 4,419 acres of DFPZ logging, 219 acres of group selection logging, and 148 acres of individual tree selection logging.  The DFPZ logging would remove trees up to 30 inches in diameter and would reduce canopy cover to an average 40 percent.  The group selection logging would remove all trees up to 30 inches in diameter and reduce substantially canopy cover in openings ranging from 1/2 acre to 2 acres in size.

65.   The Slapjack Project area contains 7,886 acres of suitable California spotted owl foraging habitat and 13,317 acres of suitable nesting habitat, much of which will be logged.  The Slapjack Project will render this habitat largely unsuitable and may threaten viability in the planning area.  The Slapjack Project is also within the historic range of the Pacific fisher and contains 19,905 acres of habitat that is suitable for denning and resting as well as 4,549 acres that are suitable for foraging and dispersal.  The planned logging, especially group selection, will adversely impact this habitat by reducing canopy cover.

66.   Plaintiffs Sierra Forest Legacy and Sierra Club's administrative appeal of the Slapjack Project was denied by the Regional Forester on December 20, 2006.  No legal obstacle now prevents the Forest Service from awarding timber sale contracts pursuant to the Slapjack Project.

**The Empire Project**

67.   The Forest Supervisor approved the Empire Project on May 21, 2007.  The Empire Project is located in the Mt. Hough Ranger District of Plumas National Forest and is designed to implement the 2004 Framework's management direction.  It calls for 5,033 acres of fuel treatments, including DFPZs**,** 1,157 acres of group selection, and 2,219 acres of individual tree selection.

68.   The Empire Project would result in an overall loss of 3,507 acres of owl foraging habitat and 1,472 acres of nesting habitat in the analysis area.  The Project will also degrade 353 acres of habitat within eight spotted owl HRCAs, with six HRCAs to be treated at relatively high intensities.  In addition, the Empire Project would reduce forest carnivore denning habitat on 1,596 acres and foraging habitat on 3,664 acres.  FSEIS at 3-160.

69.   The Regional Forester denied Legacy's administrative appeal of the Empire Project on August 28, 2007.  No legal obstacle now prevents the Forest Service from awarding timber sale

1    contracts pursuant to the Empire Project.

2    **The Herger-Feinstein Quincy Library Group Forest Recovery Act Pilot Project.**

3        70.    The Basin, Freeman, Slapjack and Empire Projects implement not only the 2004

4    Framework, but also the Quincy Library Group Act.  The Quincy Library Group Act, enacted on

5    October 21, 1998, directs the Forest Service to conduct a five-year pilot project (extended for five

6    years on February 20, 2003, *see* Pub. L. 108-7, Div. F, Title III, § 338, 117 Stat. 278 (16 U.S.C. §

7    2104 note)) on approximately 1.5 million acres within the Plumas and Lassen National Forests and

8    the Sierraville Ranger District of the Tahoe National Forest.  Pub. L. 105-277, Title IV, Section

9    401(b).  The stated purpose of the pilot project is to implement and demonstrate the effectiveness of

10   certain resource management activities including "construction of a strategic system of defensible

11   fuel profile zones" and "utilization of group selection and individual tree selection . . . to achieve a

12   desired future condition of all-age, multistory, fire resilient forests."  *Id.* at § 401(b), (d).

13       71.    As required by the Quincy Library Group Act, in August 1999, the Forest Service

14   published a final environmental impact statement and a Record of Decision on the pilot project.

15       72.    In the Quincy Library Group Act pilot project Record of Decision, the Forest Service

16   calculated that full implementation of the pilot project would reduce the amount of California

17   spotted owl nesting and foraging habitat by 15.5 percent.  The Forest Service acknowledged that,

18   unless mitigated, this amount of reduction of suitable owl habitat "could pose a serious risk to the

19   viability of the California spotted owl in the planning area."  The U.S. Fish and Wildlife Service

20   similarly concluded that fully implementing the Quincy Library Group Act pilot project "poses a

21   significant threat to the long-term viability of the California spotted owl, Pacific fisher, and

22   American marten due to the loss, degradation, and fragmentation of suitable habitat."

23       73.    Consequently, the Forest Service imposed as a mitigation measure a condition that

24   logging projects conducted pursuant to the Quincy Library Group Act pilot project "will be designed

25   and implemented to completely avoid suitable California spotted owl habitat, including nesting

26   habitat and foraging habitat."  This mitigation measure was to remain in effect until the Forest

27   Service adopted a new owl management strategy for the Sierra Nevada, and it expired when the

28   Forest Service adopted the 2001 Framework.

74.     In the 2001 Framework, the Forest Service determined that logging of spotted owl habitat could occur within the Quincy Library Group Act pilot project area, but only pursuant to the 2001 Framework's standards and guidelines for protecting old forest habitat and California spotted owl Home Range Core Areas.  In the 2004 Framework, however, the Forest Service determined that the Quincy Library Group Act pilot project should be fully implemented, without the protective restrictions contained in the 2001 Framework.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of NFMA and the APA:**
**Failure to Maintain Viability of Forest Species**

75.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

76.     NFMA requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."  16 U.S.C. § 1604(a).  These land and resource management plans ("forest plans") "guide all natural resource management activities" on the national forests.  36 C.F.R. § 219.1(b).

77.     As required by NFMA, 16 U.S.C. § 1604(g), in 1982 the Forest Service promulgated regulations implementing the planning provisions of NFMA.  36 C.F.R. Part 219 (1982).  In 2000, during the Clinton administration, the Forest Service adopted a rule revising the Part 219 planning regulations.  65 Fed. Reg. 67414 (Nov. 9, 2000).  However, in 2002 the Bush administration suspended the 2000 rule revising the Part 219 regulations, pending new revisions to the regulations. 67 Fed. Reg. 35431 (May 20, 2002).

78.     The 2002 rule suspending the 2000 NFMA planning regulations provided that Forest Service officials "may elect to continue or to initiate new plan amendments or revisions under the 1982 planning regulations in effect prior to November 9, 2000 . . . or the responsible official may conduct the amendment or revision process in conformance with [the 2000 revised planning regulations]."  36 C.F.R. § 219.35(b) (2002).  This provision was in effect during the time defendants adopted the 2004 Framework, and defendants elected to conduct the 2004 Framework

1   amendment process pursuant to the 1982 planning regulations.  Accordingly, the 1982 NFMA

2   planning regulations govern defendants' actions in this case.  All subsequent references in this

3   complaint to 36 C.F.R. Part 219 are to the 1982 regulations.

4   79.   Forest plans promulgated pursuant to NFMA must, among other things, "provide for

5   diversity of plant and animal communities based on the suitability and capability of the specific land

6   area in order to meet overall multiple-use objectives . . . ."  16 U.S.C. § 1604(g)(3)(B).

7   80.   To carry out NFMA's diversity requirement, the 1982 regulations placed an

8   affirmative obligation on the Forest Service to manage fish and wildlife habitat so as "to maintain

9   viable populations of existing native and desired non-native vertebrate species in the planning area."

10   36 C.F.R. § 219.19.  A "viable population" is "one which has the estimated numbers and distribution

11   of reproductive individuals to insure its continued existence is well distributed in the planning area.

12   In order to insure that viable populations will be maintained, habitat must be provided to support, at

13   least, a minimum number of reproductive individuals and that habitat must be well distributed so that

14   those individuals can interact with others in the planning area."  *Id.*

15   81.   The 2004 Framework fails to comply with 16 U.S.C. § 1604(g)(3)(B) and 36 C.F.R.

16   § 219.19 by threatening the viability and distribution of numerous imperiled species associated with

17   old, closed-canopy forest, including the California spotted owl, Pacific fisher and American marten.

18   82.   The 2004 Framework threatens the viability and distribution of the California spotted

19   owl in numerous ways, including but not limited to:

20   a.   Allowing the logging of trees throughout the Sierra Nevada in excess of 20 inches in diameter;

22   b.   Allowing canopy cover to be reduced to less than 50 percent in owl habitat and the simplification of multi-layered canopies;

23   c.   Allowing increased removal of large snags and down wood;

24   d.   Allowing increased logging within spotted owl Protected Activity Centers;

25   e.   Weakening protection for spotted owl Home Range Core Areas and Old Forest Emphasis Areas;

27   f.   Allowing increased logging within spotted owl "areas of concern"; and

g.   Mandating full implementation of the Quincy Library Group Act pilot project, despite the Forest Service's own determination that the pilot project poses a significant risk to the viability of the owl.

83.   The 2004 Framework threatens the viability and distribution of the Pacific fisher in numerous ways, including but not limited to:

a.   Weakening protection for currently occupied habitat;

b.   Weakening protection for Old Forest Emphasis Areas and smaller old growth stands;

c.   Allowing substantial degradation of fisher denning and nesting habitat;

d.   Failing adequately to protect suitable fisher habitat on the east side of the Sierra Nevada; and

e.   Weakening protection for fisher habitat in the central and northern Sierra Nevada, particularly within the Quincy Library Group Act pilot project area.

84.   The 2004 Framework threatens the viability and distribution of the American marten in numerous ways, including but not limited to allowing logging that adversely affects key attributes of suitable marten habitat such as large trees, canopy cover and large snags and downed logs, and by mandating full implementation of the Quincy Library Group Act pilot project, which will reduce marten habitat, increase forest openings, and allow new roads in the northern Sierra Nevada, where the marten's population is already imperiled because of a significant gap in its distribution.

85.   In denying plaintiffs' administrative appeal of the 2004 Framework, the Chief of the Forest Service acknowledged that "[p]redicting species viability for the California spotted owl, the Pacific fisher, and the American marten is uncertain due to the lack of information about effects of the probable management practices . . . on populations."  Thus, the Forest Service has admitted that, at the time it approved the 2004 Framework, it lacked a foundation for its viability findings.

86.   The Chief nonetheless affirmed the Regional Forester's viability determinations.  The Chief found that "managing habitat to maintain viable populations of the California spotted owl, the Pacific fisher, and American marten can only be assured by using subsequent site-specific evaluations and the adaptive management and monitoring strategy," and that "the NFMA requirement to manage habitat to provide for viable populations can be met" through the development of such a strategy.

87.     The Chief determined, however, that only the "initial steps" of an adaptive management and monitoring strategy are included in the 2004 Framework and directed the Regional Forester (defendant Blackwell) to "fully develop" such a strategy within six months.  However, the Chief did not stay implementation of the 2004 Framework pending full development of the adaptive management and monitoring strategy, and defendants are implementing the 2004 Framework without such a strategy in place.

88.     The Chief's appeals decision and the Under Secretary's March 21, 2005 decision memorandum violate 36 C.F.R. § 219.19, which requires the Forest Service to develop management plans that "maintain viable populations" and not to develop plans, such as the 2004 Framework, with uncertain effects on viability and then monitor them afterwards during implementation to determine their effect on viability.

89.     The 2004 Framework is also inconsistent with previous findings by the Forest Service and the U.S. Fish and Wildlife Service that full implementation of the Quincy Library Group Act pilot project would threaten the viability of the California spotted owl; with previous findings by the Forest Service in the administrative appeals of the 2001 Framework; and with the management prescriptions of the 2001 Framework on spotted owl Protected Activity Centers, Home Range Core Areas, and Old Forest Emphasis Areas.

90.     Defendants' failure in the 2004 Framework to insure the viability of the California spotted owl, Pacific fisher and American marten as described above violated and is continuing to violate NFMA, 16 U.S.C. § 1604(g)(3)(B), and 36 C.F.R. § 219.19.  This failure, and defendants' conclusions in the Record of Decision for the 2004 Framework regarding viability for these species, were also arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

91.     In addition, defendants are now implementing the 2004 Framework through site-specific actions such as the Basin, Freeman, Slapjack and Empire Projects, which allow logging of old forest areas that provide habitat for the California spotted owl, Pacific fisher and American marten.  Defendants' implementation of the 2004 Framework by their approval of the Basin, Freeman, Slapjack and Empire Projects also violated and is contrary to NFMA, 16 U.S.C.

§ 1604(g)(3)(B), and 36 C.F.R. § 219.19, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**

**Violation of NFMA and the APA:**
**Failure to Monitor and Inventory Management Indicator Species and**
**Inconsistency with Framework Monitoring Requirements**

92.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

93.     36 C.F.R. § 219.12(d) requires, among other things, that "[e]ach Forest Supervisor shall obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction."

94.     36 C.F.R. § 219.26 further provides that "[f]orest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple use objectives of the planning area.  Such diversity shall be considered throughout the planning process. *Inventories shall include quantitative data* making possible the evaluation of diversity in terms of its prior and present condition" (emphasis added).

95.     36 C.F.R. § 219.19(a)(1) provides that "[i]n order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as *management indicator species*. . . .  These species shall be selected because their population changes are believed to indicate the effects of management activities" (emphasis added).

96.     36 C.F.R. § 219.19(a)(2) requires that "[p]lanning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species."

97.     36 C.F.R. § 219.19(a)(6) requires that "[p]opulation trends of the management indicator species *will be monitored* and relationships to habitat determined" (emphasis added).

98.     To comply with the above provisions of 36 C.F.R. Part 219, the Forest Service has designated management indicator species at the Sierra Nevada regional level as well as individually

for each of the eleven national forests.  The Forest Service has not, however, followed the above regulations regarding management indicator species analysis and inventories.  This failure has occurred at the regional level and at the level of each individual national forest in the region. Baseline, trend and/or current inventory data for many management indicator species do not exist or have not been maintained.

99.     In the record of decision for the 2001 Framework, the Forest Service acknowledged that "[m]any uncertainties exist about the status and fate of [management indicator species] and species at risk.  Basic information on distribution, population status, and habitat relationships is lacking for most [management indicator species] and species at risk, creating uncertainties about the adequacy of and necessity for various conservation measures. . . .  Uncertainty exists as to if and how these species can serve this role [as ecosystem indicators], because they have not been tested or validated."  This lack of "basic information" has continued through the planning process for the 2004 Framework.

100.    For example, the final supplemental EIS for the 2004 Framework lists six regional management indicator species as having "Insufficient Data."  Three of these, the northern goshawk, great gray owl and willow flycatcher, have suitable habitat in the Basin Project area, and the northern goshawk and willow flycatcher are known to occur there.

101.    The final supplemental EIS further notes that population data is "generally lacking" for management indicator species other than game species and those covered in breeding bird surveys.  Among those species where some data is available, one regional management indicator species is listed as having a "negative" population trend, and seven others as either "possibly decreasing" or "likely decreasing."  Three additional management indicator species show a "decreasing tendency."

102.    Defendants did not adequately monitor and did not obtain inventory information on management indicator species during the analysis for the 2004 Framework, as required by 36 C.F.R. §§ 219.12(d), 219.19(a)(2), 219.19(a)(6) and 219.26.  Nor has the Forest Service updated such information as required by these regulations.

103.    In sum, defendants established, and are implementing, the 2004 Framework without

1   complying with the monitoring and inventory requirements for management indicator species set

2   forth in 36 C.F.R. §§ 219.12, 219.19 and 219.26.  Defendants' failure to do so violates NFMA and is

3   also arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and

4   without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. §

5   706(2).

6          104.    The lack of required management indicator species monitoring exists region-wide,

7   forest-wide, and with respect to specific projects.  For example, defendants did not obtain forest-

8   specific or project-specific quantitative data for management indicator species before approving the

9   Basin Project, and did not otherwise comply with 36 C.F.R. §§ 219.12, 219.19 and 219.26 prior to or

10  in connection with their approval of the Basin Project.  In many cases, the Forest Service's analysis

11  consisted of habitat analysis in lieu of actual population data, although the Forest Service lacked the

12  underlying data that would permit such an analysis.  Defendants' approval of the Basin Project

13  therefore violated NFMA and its implementing regulations, and was arbitrary and capricious, an

14  abuse of discretion, or otherwise not in accordance with law, and without observance of procedure

15  required by law, within the meaning of the APA, 5 U.S.C. § 706(2).

16         105.    In addition, the final EIS for the 2001 Framework required annual "population

17  monitoring" of certain designated management indicator species and species at risk in all Sierra

18  Nevada national forests.  This requirement was adopted in the 2004 Framework.  However,

19  defendants have not conducted the required population monitoring for many species.  For example,

20  the Biological Evaluation for the Basin Project reports no population monitoring for the golden

21  eagle, pileated woodpecker, gray squirrel, pallid bat, Townsend's big eared bat and western red bat.

22  Moreover, the final supplemental EIS for the Quincy Library Group Act pilot project states that

23  population numbers and trends for pileated woodpeckers and blue grouse are unknown in the Quincy

24  Library Group Act pilot project area.

25         106.    Timber sales, logging and related activities, and the permits, contracts and other

26  instruments associated with them, must be consistent with the forest plan applicable to that particular

27  national forest.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).  The Basin Project is not consistent with

28  the forest plan for the Plumas National Forest, however, because the Forest Service has not complied

with the management indicator species and species at risk population monitoring requirements of the 2001 Framework final EIS as adopted by the 2004 Framework (which constitutes an amendment to the forest plan for the Plumas National Forest).  Defendants' approval of the Basin Project therefore violated NFMA, 16 U.S.C. § 1604(i), and was also arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF

**Violation of NFMA and the APA:**
**Failure to Comply With Planning Requirements**

107.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

108.    NFMA authorizes the Forest Service to amend forest plans.  16 U.S.C. § 1604(f)(4).  When a plan amendment is determined to be "significant," the Forest Service is required to "follow the same procedure as that required for development and approval of a forest plan."  36 C.F.R. § 219.10(f).

109.    The Regional Forester (defendant Blackwell) determined that the 2004 Framework represents "a significant plan amendment."  However, in approving the 2004 Framework, defendants failed to follow important procedural requirements required when developing and approving a forest plan.  For example, defendants failed to conduct a public scoping process on the proposed 2004 Framework and failed to comply with other planning requirements set forth at 36 C.F.R. § 219.12, including, but not limited to, preparation of an "analysis of the management situation," inclusion of planning benchmarks, and analysis of alternatives in terms of present net value.

110.    Defendants' failure to comply with the procedural and planning requirements for significant plan amendments violated and is continuing to violate 16 U.S.C. § 1604(f)(4) and 36 C.F.R. § 219.10(f), and is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706(2).

### FOURTH CLAIM FOR RELIEF

**Violation of the APA:**
**2004 Framework is Not Supported by the Record and is Arbitrary and Capricious**

111.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

112.    The 2001 Framework was the result of over ten years of scientific and public input.

113.    In his decision denying all appeals of the 2001 Framework, the Chief of the Forest Service found that the 2001 Framework was based upon the best available scientific data and information relating to fire risk reduction and the impacts of logging on forest species such as the California spotted owl, Pacific fisher and American marten.

114.    No new scientific information regarding the impacts of logging on forest species such as the California spotted owl, Pacific fisher and American marten, and on the habitat requirements for these species, has been developed since the Chief approved the 2001 Framework to justify the changes made by defendants in the 2004 Framework.

115.    The changes made by defendants in the 2004 Framework have no substantial basis in the record and are arbitrary and capricious and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2).

**FIFTH CLAIM FOR RELIEF**

**Violation of NEPA and the APA:**
**Failure of 2004 Framework Final Supplemental EIS**
**to Analyze Impacts on Old Forest Species**

116.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

117.    NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1.  Among other things, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement ("EIS").

118.    The EIS process is intended "to help public officials make decisions that are based on understanding of environmental consequences" and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b)-(c).

119.    NEPA requires that an EIS analyze "direct effects," which are "caused by the action and occur at the same time and place," as well as "indirect effects which . . . are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8.

120.    The final supplemental EIS on the 2004 Framework fails adequately to analyze or take a hard look at the 2004 Framework's likely impacts on the California spotted owl and its habitat.  For example, the final supplemental EIS underestimates the likely short-term reduction in owl habitat and fails to analyze impacts to the owl and its habitat either at the home range or the landscape scale.  Similarly, the final supplemental EIS inadequately analyzes the long-term impacts of the 2004 Framework's revised logging limits on owl habitat, and fails to examine the impacts to the owl and its habitat of the 2004 Framework's shift from legally binding standards (for logging in Old Forest Emphasis Areas and owl Home Range Core Areas, canopy retention, and snag and down log retention) to significantly weakened guidelines.

121.    The final supplemental EIS fails adequately to analyze the 2004 Framework's likely impacts on the Pacific fisher and its habitat.  For example, the final supplemental EIS ignores or underestimates the short-term impacts of logging on fisher habitat, and fails to consider the cumulative impacts on fisher habitat of implementing the Giant Sequoia National Monument Management Plan and the Kings River Administrative Study, and of logging on private timberlands.

122.    The final supplemental EIS also fails adequately to analyze the 2004 Framework's likely impacts on the American marten and its habitat.  For example, the final supplemental EIS fails to disclose or analyze the implications of a significant gap in the marten's distribution in the northern Sierra Nevada, fails to analyze the impacts of additional forest openings on the marten, and ignores or underestimates the short-term impacts of logging on the marten and its habitat.

123.    The final supplemental EIS also fails adequately to analyze the 2004 Framework's likely impacts on Sierra Nevada forest species because it evaluates effects of the proposed action on wildlife and wildlife habitats by estimating the effects on certain management indicator species.  As set forth above, however, defendants' management indicator species monitoring and analyses were inadequate and otherwise insufficient to support the conclusions of the final supplemental EIS and 2004 Framework.

124.    Defendants' failure in the final supplemental EIS to consider and evaluate the direct and reasonably foreseeable indirect impacts to Sierra Nevada forest species of the 2004 Framework violated and is continuing to violate Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, and was also arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

**SIXTH CLAIM FOR RELIEF**

**Violation of NEPA and the APA:**
**Failure of 2004 Framework Final Supplemental EIS**
**to Analyze Cumulative Impacts**

125.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

126.    NEPA requires that an EIS consider the cumulative impacts of the proposed federal agency action together with past, present and reasonably foreseeable future actions, including all federal and non-federal activities.  40 C.F.R. § 1508.7.  Cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present or reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.*

127.    The final supplemental EIS on the 2004 Framework fails adequately to analyze the cumulative impacts of logging permitted by the 2004 Framework together with logging on private lands adjacent to and interspersed with Sierra Nevada national forest lands, logging in the Giant Sequoia National Monument permitted by the 2004 Giant Sequoia National Monument Management Plan, and logging pursuant to the Quincy Library Group Act pilot project.

128.    Defendants' failure in the final supplemental EIS to consider and evaluate the cumulative impacts of logging as described above, violated and is continuing to violate Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, and was also arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

**SEVENTH CLAIM FOR RELIEF**

**Violation of NEPA and the APA:**
**Failure of 2004 Framework Final Supplemental EIS**
**to Analyze a Reasonable Range of Alternatives**

129.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

130.     The alternatives analysis is considered the "heart" of an EIS.  40 C.F.R. § 1502.14. An EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear choice among options by the decisionmaker and the public."  *Id.*  The Forest Service is required to "rigorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), and must "devote substantial treatment to each alternative . . . so that reviewers may evaluate their comparative merits."  40 C.F.R. § 1502.14(b).

131.     The final supplemental EIS for the 2004 Framework analyzes in any detail only two alternatives:  S1, the "no action" alternative, described as "continu[ing] management in the eleven Sierra Nevada national forests consistent with the [2001 Framework]"; and S2, the proposed action. This falls short of the reasonable range of alternatives required by NEPA.

132.     The final supplemental EIS acknowledges that its sections containing detailed analysis of alternatives address only two of the nine alternatives identified in the final EIS for the 2001 Framework.  The final supplemental EIS justifies this by citing to the detailed analysis of the seven other alternatives in the 2001 final EIS.  The alternatives analyses contained in the 2001 final EIS and in the 2004 final supplemental EIS are not equivalent, however, because the methodologies for examining issues such as wildlife viability and efficacy of fuel treatments are different.  Thus, the final supplemental EIS does not provide substantially similar analyses of the nine alternatives it purports to examine, rendering an accurate evaluation of their comparative merits impossible.  In failing to treat comparably those alternatives that are described, the final supplemental EIS fails to meet the requirements of 40 C.F.R. § 1502.14.

133.     In addition, the final supplemental EIS did not evaluate as an alternative the "limited review" requested by the Chief in his November 16, 2001 decision upholding the 2001 Framework.

134.     Moreover, a number of reasonable alternatives were suggested during the public comment period on the draft supplemental EIS but were not analyzed in the final supplemental EIS. For example, the U.S. Environmental Protection Agency, the California Resources Agency, and the California Attorney General's Office suggested specific alternatives that would change the proposed plan's standards and guidelines to reduce environmental impacts.  None of these alternatives was evaluated in the final supplemental EIS.

135.     Defendants' failure in the final supplemental EIS to consider and evaluate all reasonable alternatives to the chosen action violated and is continuing to violate Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

## EIGHTH CLAIM FOR RELIEF

### Violation of NEPA and the APA:
### Failure to Conduct a Public Scoping Process
### for 2004 Framework Final Supplemental EIS

136.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

137.     NEPA requires that once a federal agency decides to prepare an EIS on a proposed action, "[t]here shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action."  40 C.F.R. § 1501.7.  Defendants conducted such a scoping process for the 2001 Framework EIS, but failed to conduct a public scoping process for the final supplemental EIS on the 2004 Framework.

138.     Regulations implementing NEPA provide that an agency shall revise the scoping determinations made for an EIS "if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts."  40 C.F.R. § 1501.7(c).

139.     Defendants have made substantial changes in the 2004 Framework from the 2001 Framework.  Consequently, the scoping process that took place for the 2001 Framework EIS was not adequate for the 2004 final supplemental EIS, and a new scoping process was required.  Defendants'

failure to conduct a new scoping process deprived plaintiffs and the public of the opportunity to shape the EIS process and insure that the Forest Service considered important issues.

140.    Defendants' failure to conduct a public scoping process for the final supplemental EIS on the 2004 Framework violated and is continuing to violate Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and 40 C.F.R. § 1501.7, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

### NINTH CLAIM FOR RELIEF

#### Violation of NEPA and the APA:
#### Failure of Basin Project EA to Analyze Direct, Indirect and Cumulative Impacts

141.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

142.    The Basin Project environmental assessment ("Basin Project EA") fails adequately to analyze or take a hard look at the Basin Project's likely direct and indirect impacts on the California spotted owl, Pacific fisher and American marten and their habitat.  For example, approximately 92 percent of the Basin Project area constitutes suitable habitat for the California spotted owl, which will be rendered unsuitable due to Basin Project logging.  Roughly one-third of the Basin Project's planned group selection units are in spotted owl Home Range Core Areas associated with 24 documented owl nest sites and/or the Forest Carnivore Network established to protect habitat connectivity for the fisher, marten and other carnivores.  However, the Basin Project EA fails to discuss or analyze the effects of these actions on forest species.

143.    In addition, the Basin Project EA evaluates effects of the proposed action on wildlife and wildlife habitats by estimating the effects on certain management indicator species.  As set forth above, however, defendants' management indicator species monitoring and analyses were inadequate and otherwise insufficient to support the conclusions of the Basin Project EA.

144.    The Basin Project EA also fails to consider and evaluate the cumulative impacts of the Basin Project together with numerous other past, present and reasonably foreseeable future projects comprising parts of the Quincy Library Group Act pilot project that have been or will be

proposed both in the immediate Basin Project area and in the larger Quincy Library Group Act pilot project area.

145.    Defendants' failure in the Basin Project EA to consider and evaluate the direct, indirect and cumulative impacts to Sierra Nevada forest species of the Basin Project violated and is continuing to violate Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

## TENTH CLAIM FOR RELIEF

### Violation of NEPA and the APA:
### Failure to Prepare EIS on Basin Project

146.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

147.    Defendants' approval of the Basin Project was a major federal action significantly affecting the human environment within the meaning of 42 U.S.C. § 4332(2)(C) for at least the following reasons:

a.    The Basin Project affects public health or safety within the meaning of 40 C.F.R. § 1508.27(b)(2);

b.    The effects of the action on the quality of the human environment are likely to be "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4);

c.    The possible effects on the human environment are "highly uncertain" and involve "unique [and] unknown risks" within the meaning of 40 C.F.R. § 1508.27(b)(5);

d.    The action "may establish a precedent for future actions with significant effects" within the meaning of 40 C.F.R. § 1508.27(b)(6); and

e.    The action is "related to other actions with individually insignificant but cumulatively significant impacts" within the meaning of 40 C.F.R. § 1508.27(b)(7).

Consequently, defendants were obligated to prepare an EIS on the Basin Project before approving it.

148.    Defendants' failure to prepare an EIS before approving the Basin Project violated and is continuing to violate Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5

U.S.C. § 706(2).

## ELEVENTH CLAIM FOR RELIEF

### Violation of the Quincy Library Group Act and APA:
### Failure of Basin Project to Prescribe Group Selections that Will Achieve
### Fire Resilient Forests

149.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

150.    The Quincy Library Group Act provides that group selection activities in any pilot project action must "achieve a desired future condition of . . . fire resilient forests."  Pub. L. 105-277, Title IV, Section 401(d)(2).

151.    The group selection logging planned for the Basin Project will not achieve fire resilient forests because it will result in the removal of large fire-resistant trees and the virtual elimination of the forest canopy in most cases, which in turn will create hotter, drier conditions on the ground, will allow increased wind speeds, and will accelerate the growth of flammable brush and of dense, flammable stands of small conifers.  These conditions will not result in a more fire resilient forest but instead will increase the potential for and risk of severe fire in the Basin Project area.

152.    Defendants' failure to prescribe group selections in the Basin Project that will achieve fire resilient forests violated and is continuing to violate Section 401(d)(2) of the Quincy Library Group Act, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

## TWELFTH CLAIM FOR RELIEF

### Violation of NEPA and the APA:
### Failure to Circulate the Basin Project EA for Public Comment

153.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

154.    NEPA requires that federal agencies, such as the Forest Service, involve the public in preparing and considering environmental documents that implement the Act.  40 C.F.R. § 1506.6. The CEQ regulations require federal agencies to "insure that environmental information is available to public officials and citizens before decisions are made."  40 C.F.R. § 1500.1(b).  The regulations

further require federal agencies to "involve environmental agencies, applicants, and the public, to the extent practicable, in preparing" EAs.  40 C.F.R. § 1501.4(b).  The Ninth Circuit has held that NEPA and the CEQ regulations require that the public must be given an opportunity to comment on EAs.  *Citizens for Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961 (9th Cir. 2003).

155.    In this case, the Forest Service failed to circulate the Basin Project EA for public comment, in either draft or final form.  The Forest Service failed to provide information regarding the environmental impacts of the Basin Project to the public before the final decision was reached and failed to involve the public in the preparation or consideration of the EA.  As a result, plaintiffs had no opportunity to respond to the Forest Service's information and analysis regarding the environmental impacts of the Basin Project before the administrative appeal stage.

156.    The Forest Service's failure to circulate the Basin Project EA for public comment or otherwise to involve the public in the preparation and consideration of the EA violates NEPA and the CEQ regulations.  The decision is therefore arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, contrary to the APA.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

A.    Issue a declaratory judgment that:

1.    The 2004 Framework and final supplemental EIS fail to comply with the National Forest Management Act and the National Environmental Policy Act and their implementing regulations;

2.    Defendants' approval of the 2004 Framework and final supplemental EIS was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; was without observance of procedure required by law; and was unsupported by substantial evidence, in violation of the APA, 5 U.S.C. § 706(2);

3.    The Basin Project fails to comply with the National Forest Management Act and the National Environmental Policy Act and their implementing regulations, and also fails to comply with the Quincy Library Group Act;

4.      Defendants' approval of the Basin Project violated NFMA and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; was without observance of procedure required by law; and was otherwise in violation of the APA, 5 U.S.C. § 706(2);

B.      Hold unlawful and set aside the 2004 Framework and enjoin its implementation, including but not limited to the Basin, Freeman, Slapjack and Empire Projects and any other specific actions taken pursuant to it, with the exception that activities that are consistent with the 2001 Framework and all other applicable laws may proceed;

C.      Order defendants to reinstate the 2001 Framework;

D.      Order defendants to prepare an EIS for any new proposed Sierra Nevada Forest Plan Amendment that fully complies with NEPA;

E.      Hold unlawful and set aside the Basin Project and enjoin its implementation, including but not limited to any timber sales awarded pursuant to it;

F.      Award plaintiffs their costs and expenses (including reasonable attorney, expert witness and consultant fees); and

G.      Award plaintiffs such further relief as the Court deems appropriate.

Respectfully submitted,

Dated:  September 10, 2007

/s/  Gregory C. Loarie
MICHAEL R. SHERWOOD
GREGORY C. LOARIE
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612

PATRICK GALLAGHER
Sierra Club Environmental Law Program
85 2nd Street, 4th Floor
San Francisco, CA 94109-3441

ERIC E. HUBER
Sierra Club Environmental Law Program
2260 Baseline Road, Suite 105
Boulder, CO 80302

DAVID B. EDELSON
840 Grizzly Peak Boulevard
Berkeley, CA 94708

*Counsel for Plaintiffs*
*Sierra Forest Legacy, et al.*