UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SIERRA NEVADA FOREST PROTECTION
CAMPAIGN,[1] CENTER FOR BIOLOGICAL
DIVERSITY, NATURAL RESOURCES
DEFENSE COUNCIL, SIERRA CLUB,
and THE WILDERNESS SOCIETY,
non-profit organizations,

      Plaintiffs,

   v.

MARK REY, in his official
capacity as Under Secretary of
Agriculture, DALE BOSWORTH, in
his official capacity as Chief
of the United States Forest
Service, JACK BLACKWELL, in his
official capacity as Regional
Forester, Region 5, United
States Forest Service, and
JAMES M. PEÑA, in his official
capacity as Forest Supervisor,
Plumas National Forest,

      Defendants.

No. 2:05-cv-0205-MCE-GGH

MEMORANDUM AND ORDER

----oo0oo----

---

[1] The Court is advised that on March 1, 2007, Plaintiff
Sierra Nevada Forest Protection Campaign changed its name to
Sierra Forest Legacy.

1

Plaintiffs Sierra Forest Legacy, et al., seek a preliminary injunction on grounds that the Slapjack, Basin and Empire Projects (all within the Plumas National Forest) risk irreparable harm to old forest habitat and imperiled wildlife including California spotted owls, Pacific fishers and American martens. Because certain timber contracts associated with these projects were due to be awarded on or about October 1, 2007, the Court entered an order shortening time permitting the injunction request to be heard on September 21, 2007.  The Court denied Plaintiffs' Motion for Preliminary Injunction from the bench at the conclusion of the September 21, 2007 hearing.  This written order expands upon that ruling.

**BACKGROUND**

The Sierra Nevada region comprises some eleven million acres of National Forest Service land, approximately eight million of which are in a state of unnatural forest density, creating a risk of catastrophic wildfire. SNFPA 3198-99.[2]  At the same time, however, the overgrown areas provide desired habitat for certain old-growth species like the California Spotted Owl ("owl") and the Pacific Fisher and American Marten ("fisher" and "marten"), both of which are small forest carnivores.

///

---

[2] Citations to the eight-volume administrative record for the 2001 and 2004 Sierra Nevada Framework are referenced by the bates-stamped number of the referenced page.  Citations to the administrative records of the Basin, Slapjack and Empire projects are similarly denoted by the project name followed by a bates-stamped number.

The Forest Service is confronted with a vexing problem in attempting to simultaneously balance fire danger while at the same time protecting habitat preferred by the owl, fisher and marten.

In the late 1980s, the Forest Service began developing a comprehensive strategy for managing the myriad resources found within the overall Sierra Nevada region.  In 1995, the Regional Forester for the Pacific Southwest Region of the Forest Service issued a draft Environmental Impact Statement ("EIS") outlining its management proposal.  SNFPA 229.[3]  After extensive public participation and the preparation of a Final EIS responding to public concerns, the Regional Forester issued, in 2001, a Record of Decision ("ROD") which adopted management objectives in five major areas: old forest ecosystems, aquatic, riparian, and meadow ecosystems, fire and fuels, noxious weeds, and hardwood ecosystems on the lower westside of the Sierras.  Id. at 231-35.  As indicated above, among the thorniest issues confronted by the ROD was striking the appropriate balance between balancing the excessive fuel buildups occasioned by decades of fire repression and conserving key habitat for wildlife species dependent on old forest environments.  The 2001 Framework included a network of "old forest emphasis areas" across about 40 percent of all national forest land in the Sierra Nevada that was designed to provide a contiguous network of old forest ecosystems conducive to old-growth species preferring such habitat.  SNFPA 236.

///

---

[3] Documents found within the first eight-volume record are cited as SNFPA, followed by the Bates-stamp number.

In order to protect old forest conditions within its specific areas of emphasis, the 2001 Framework generally prohibited logging that would remove trees over 12 inches in diameter or logging that would reduce canopy cover by more than 10 percent. SNFPA 328.  Even within the "general forest" areas, the 2001 Framework prohibited logging of trees over 20 inches in diameter. SNFPA 336.  It was only within the intermix zones that no canopy restrictions were imposed and logging of trees up to 30 inches was permitted.  SNFPA 333, 315.

Although the Forest Service ultimately affirmed adoption of the 2001 ROD despite receipt of approximately 200 administrative appeals, it nonetheless directed the Regional Forester to conduct an additional review with respect to specific concerns like wildfire risk and the Forest Service's responsibilities under the Herger-Feinstein Quincy Library Group Forest Recovery Act ("HFQLG Act"), a congressional mandate which established a pilot program for fire suppression through a combination of fire breaks, group selection logging and individual logging.  SNFPA 1918.  A management review team was assembled by the Regional Forester for this purpose.

In March 2003, the team concluded that the 2001 ROD's "cautious approach" to active fuels management had limited its effectiveness in many treatment areas, and that revisions to vegetation management rules would decrease flammable fuels while protecting critical wildlife habitat by guarding against the risk of stand-replacing wildfire.  See SNFPA 1918, 1926.

///

///

4

Moreover, with respect to the California Spotted Owl, the team
felt that the 2001 ROD had unnecessarily "took a worst case
approach to estimating effects" on the owl.  SNFPA 1968.[4]  In
addition to citing recent research indicating that habitat losses
resulting from fuel treatments were less than previously
believed, the team further found that the 2001 ROD's extensive
reliance on maintaining extensive canopy cover was impracticable
to implement.

     Following receipt of the team's findings, the Regional
Forester ordered that management strategy alternatives in
addition to those considered in the 2001 FEIS be considered.  A
draft supplemental environmental impact statement ("DSEIS") was
thereafter released to the public in January 2004.  While the
same five areas of concern were targeted in the DSEIS as in its
2001 predecessor, in 2004 a new action alternative was identified
(Alternative S2), in addition to the alternative selected by the
2001 Framework (Alternative S1) and the seven alternatives that
had previously been considered before adoption of the 2001
Framework (Alternatives F2-F8).[5]
Following the public comment period after dissemination of the

_____

[4] The 2001 Framework's California Spotted Owl analysis was
largely predicated on a July 1992 report (the "CASPO Report")
that recommended establishment of a 300-acre Protected Activity
Center ("PAC") around all known owl nest sites, a complete
prohibition of logging within the PACs, more limited logging
prohibition of trees over 30 inches in diameter in all habitat
suitable for owl nesting and foraging, and a prohibition on
logging that would reduce canopy cover below 40 percent in owl
nesting habitat.  SNFPA 1037-40.

[5] The DSEIS also considered seven additional alternatives in
addition to those considered in detail but eliminated the seven
from extensive consideration because they were found to be
inconsistent with the purpose and need of the DSEIS. SNFPA 3163-65.

DSEIS, the SEIS in final form also included response to various issues raised, including comments by the United States Fish and Wildlife Service, by the United States Environmental Protection Agency, by California resources protection agencies, and by the Science Consistency Review ("SCR") team.[6]

By adopting the SEIS on January 21, 2004, the Regional Forester replaced the 2001 ROD with its 2004 successor and amended the forest plans for all eleven national forests situated in the Sierra Nevada.  SNFPA 2987-3061.  The 2004 ROD reasoned that the 2001 Framework "prescribed technical solutions that do not produce needed results, or offered methods we often dare not attempt in the current Sierra Nevada."  SNFPA 2995.  The 2004 Framework reasoned that the methods as adopted in 2001 fail to reverse the damage, and growing threat, of catastrophic fires quickly enough.  Id.

Through the present lawsuit, Plaintiffs allege that the 2004 Framework as ultimately adopted runs afoul of both the NFMA and NEPA on a programmatic basis.  Specifically, Plaintiffs contend that the 2004 Framework violates the NFMA both because it fails to maintain viable populations of owls, as well as fishers and martens.  Moreover, Plaintiffs also argue that the 2004 Framework runs afoul of NEPA because it was adopted without either adequate disclosure of its significant environmental impacts or consideration of reasonable alternatives to the selected approach.

---

[6] The SCR consisted of eleven scientists convened by the Pacific Southwest Research Station in Davis, California, and included experts in fire and fuels management, forest ecology, and species viability.  SNFPA 3503.

1    The merits of Plaintiffs' overall programmatic challenge has
2    not yet been adjudicated.  Cross-motions for summary judgment
3    remain pending.  During the pendency of those motions, however,
4    Plaintiffs now request a preliminary injunction to stop three
5    site-specific projects within the Plumas National Forest (the so-
6    called Basin, Slapjack and Empire Projects), all of which are
7    part of the HFQLG Act, a pilot program involving 1.5 million
8    acres within the Plumas, Lassen, and Tahoe National Forests.  By
9    combining various vegetation management techniques, that Act
10   represents an attempt to  1)determine the efficacy of measures
11   protecting the landscape from high intensity wildfires;
12   2)encourage the development of a more fire resilient ecosystem by
13   promoting the growth of larger and more fire-resistant tree
14   species; and 3) facilitate the economic stability of local
15   communities dependent on harvesting activities.  Litigation
16   challenging logging has reduced compliance with the HFQLG Act.
17   During fiscal year 2007, for example, only fifteen percent of
18   HFQLG Act objectives have achieved within the Plumas National
19   Forest.  See Second Decl. of Nancy Francine, ¶ 4.

20   Consistent with the mandates of the HFQLG Act, the Basin,
21   Empire and Slapjack projects entail a combination of fuel
22   management techniques.  Defensive Fuel Profile Zones (DFPZs)
23   entail removal of trees in small narrow strips, mainly along
24   ridgelines, in an effort to stop the spread of high intensity
25   crown fires and control fire spread by reducing ladder fuels.
26   See Slapjack EIS at 3-4.  In addition, the projects at issue
27   employ two uneven-aged methods of timber harvest: group selection
28   and the harvest by selection of individual trees.

Group selection techniques remove certain larger, generally shade tolerant trees in an effort to promote the growth of more fire resilient species like douglas fir and ponderosa pine.  <u>Id.</u> Group selection mimics forest openings caused by natural disturbances.  Both group and individual tree selection is intended to promote more fire resiliency by removing ladder fuels and increasing spacing between tree crowns.  The goal is to create a vigorous, healthy, all-aged, multistory, fire resilient forest while contributing to the local community as mandated by HFQLG.

    In attempting to halt the Basin, Slapjack and Empire projects through their request for a preliminary injunction, Plaintiffs primarily argue that implementation of the projects will reduce canopy cover to 40 percent or less, remove many large trees between 20 and 30 inches in diameter, and create widespread forest openings that will degrade old forest areas currently providing suitable habitat for owls, martens and fishers. Plaintiffs also contend that each of the challenged projects will, both independently and cumulatively, result in irreparable harm to these species.  (See Pls.' Opening Mem., 4:3-8).  The viability of Plaintiffs' present Motion rests on the strength of these assertions.

///

///

///

///

///

///

The site-specific areas proposed for treatment appear to be at significant danger of stand-replacing catastrophic fire. Approximately 70 percent of the project areas for the Slapjack and Empire proposals, for example, are comprised of forest acreage categorized as Fire Condition Class 3, which denotes the highest possible danger rating and means that the natural fire regime has been significantly altered from its historic range, with a high risk of losing key ecosystem components in the event of fire.  Slapjack EIS 3-61 to 3-65; Empire SEIS at 3-71. Treatment planned for the 34,725 acre Slapjack area, however, includes only 3,671 acres of DFPZs, 219 acres of group selection, and 148 acres of individual tree selection.  Slapjack FEIS at 2-4.  Eighty-nine percent of existing owl habitat is undisturbed. Of 19,905 acres of suitable fisher denning and roosting habitat, only 1,597 acres will be affected.  Slapjack FEIS at 3-285.

The Basin and Empire Projects also entail relatively little disturbance to the projects areas as a whole.  Contemplated treatments in Basin include only 1,215 acres of group selection and 80 acres of individual tree selection, with the total area of affected habitat being only 3.6 percent of the total project area.  Basin 3669.  Similarly, in Empire 90 percent of existing owl foraging habitat and 88 percent of existing nesting habitat is unaffected.  Empire ROD at 11.

///

///

///

///

///

1    None of the three projects permits logging within the owl
2   Protected Activity Centers ("PACs") or Spotted Owl Home Areas
3   ("SOHAs").[7]  Logging within the buffer Home Range Core Areas
4   ("HRCAs") which surround the PACS is less than 2,500 acres for
5   all three site-specific projects.[8]  For the fisher and marten,
6   impacts appear to be even less.  As stated above, Slapjack is
7   estimated to affect only 1,597 acres of fisher denning and
8   roosting habitat.  The 38,893 acre Basin area impacts only 400
9   acres involving movement habitat for fishers and martens.  Basin
10  3575.

11   These effects must be analyzed in the context of overall
12  species data.  The 2004 Framework analyzed owl population data
13  from five different demographic studies conducted over the past
14  seven to twelve years.  SNFPA 3152, 3214-3215.  In addition, with
15  regard to the Plumas National Forest where all three site-
16  specific projects at issue herein are located, survey data was
17  collected in 2004 which contained information concerning 40 owl
18  sites within the study area.  This data was "thoroughly reviewed
19  with rigorous standards for protocol compliance and data
20  quality."  Basin 4577.

21  ///
22  ///
23  ///

24

25   [7] Confirmed owl nesting sites are surrounded by a 300-acre
    PAC, which in turn is surrounded by an additional 700-acre Home
26  Range Core Area (HRCA).  SOHAs (Spotted Owl Habitat Areas) are
    areas delineated in forest plans for providing nesting and
27  foraging habitat for spotted owls.

28   [8] HRCAs affected by the projects include 1,621 acres for
    Slapjack, 405 for Basin and 353 for Empire.

A Meta analysis[9] was also prepared in April 2003 based on an additional ten years of study and review following the 1992 CASPO report discussed above.  This demographic data (assessed by sixteen scientists using information gathered by five different owl studies) showed that the owl is, within a 95 percent confidence level, a stable population, and not declining as previously believed.  Basin 3720, SNFPA 3213.  Significantly, post-1992 research indicated that owls utilize a wider variety of foraging habitats than previously thought.  SNFPA 3099.

Perhaps even more importantly, in May of 2006 the United States Fish and Wildlife Service ("USFWS") considered a more recent 2006 Meta analysis and concluded, based on that analysis as well as all other relevant evidence, that owl populations in the Sierra Nevada are stable or increasing and that adult survival rates show an increasing trend.  See 71 Fed. Reg. 29886, 29894 (May 24, 2006).  The USFWS study opined that the vegetation management treatments envisioned by the HFQLG Act (which include the three projects presently at issue) would not adversely affect the owl, and stated unequivocally 1) that catastrophic wildfire appears to be the greatest potential threat to the owl, with fuel-reduction treatments being necessary to reduce that threat; and 2) that the contemplated treatments will not threaten the continued existence of the owl.  Id. at 29897.

///

---

[9] A Meta analysis is an analytic tool to evaluate population status and trend over time.  SNFPA 3213.  Its power lies in the "ability to combine information from several studies to achieve greater sample size" and perhaps investigate sources of variation and potential correlations otherwise unavailable from a single study.

1  Significantly, too, the spotted owl population within the Plumas

2  National Forest appears particularly strong, with the 2005

3  estimated numbers, at 218 pairs, 49 unconfirmed pairs and 29

4  single birds, well above the numbers projected by the Plumas

5  National Forest Long Range Management Plan during the time period

6  in question.  See QLG Opp'n, 9:12-10:10.

7      Any impact on either the Pacific Fisher or the American

8  Marten by the site specific plans is even more attenuated than

9  potential effects regarding the owl.  While Plaintiffs appear to

10  argue that logging would increase fragmentation and create

11  barriers to the movement of these forest carnivores, the simple

12  fact is that neither species appears to be present within the

13  project areas.[10]  No marten sightings have ever been reported

14  within any of the three project locations; in fact, marten

15  generally prefer habitat at higher elevations than the lands at

16  issue here.  In addition, no scientifically validated sightings

17  of fisher within 200 miles of any of the projects has occurred

18  within the last 40 years.  Numerous surveys have failed to find

19  any fisher on Forest Service lands in the area between Mount

20  Shasta and Yosemite National Park.  SNFPA 3011, 3313.

21      Despite this apparent lack of presence within the project

22  area, a 17,000-acre carnivore habitat network has been

23  established within the Plumas National Forest.  Basin 3575, 3699.

24  ///

25  ///

26

27      [10] Approximately half of the Plumas National Forest has been
surveyed according to agency protocols for forest carnivores, and
protocol level surveys of the Basin Project area in the winter of

28  2003-04 found no sign of their presence.  Basin 3554, 3694.

12

1  The projects sought to be enjoined have only a minimal impact on
2  that network; the Basin project, for instance, affects only 400
3  acres of the carnivore movement habitat corridor.  In addition,
4  the plans call for surveys to be conducted prior to logging
5  operations, and if a den is discovered, the agency would develop
6  a plan of action and determine whether to delay or interrupt
7  operations.  Id.

8       In sum, then, available data shows that habitat effects upon
9  owls are minimal, with the vast majority of habitat being
10 unaffected by the projects in question and with the owl
11 comprising a stable population in any event.  Protections
12 affecting potential forest carnivore habitat are also largely
13 unaffected by the projects even though virtually no individual
14 carnivore specimens have been detected.  Plaintiffs' key concern
15 is that the 2004 Framework, and the specific projects currently
16 at issue in this request for preliminary injunction, may decrease
17 canopy cover within DFPZs to 40 percent as opposed to the 50
18 percent levels envisioned by its 2001 predecessor, which
19 disallowed any logging of trees in excess of twenty inches in
20 diameter, whereas the 2004 Framework allows trees up to thirty
21 inches to be taken in some instances.  See SNFPA 336-337.  The
22 Forest Service argues that the logging of larger diameter trees
23 is necessary both to reduce fire risk (either directly through
24 construction of DFPZs or indirectly through the promotion of more
25 fire-resilient forest species requiring more sunlight and less
26 shady undergrowth) and to permit the economic viability of
27 vegetation management efforts.
28 ///

13

It argues that relatively few larger trees will be logged in any event, with the vast majority of timber coming from smaller diameter trees.  Only six percent of group selection in the Basin Project, for instance, would involve trees more than 24 inches in diameter.  Second Decl. Of Nancy Francine, ¶ 17a.

Plaintiffs, on the other hand, argue that economic considerations cannot supplant the public interest in protecting the environment.  They contend that the loss of potential habitat alone constitutes an irreparable injury justifying the cessation of any project activities by way of a preliminary injunction.

The fire danger in the Plumas National Forest remains clear despite the respective validity of these two opposing viewpoints. This summer's Antelope Fire burned 23,000 acres, impacted six owl PACs and completely burned three.  Observation following the Antelope Fire showed that fire activity slowed and moderated when reaching a DFPZ.  See Second Francine Decl., ¶ 14.  DFPZs have hence been proven effective in reducing fire intensity, controlling fire spread, and protecting ecological resources like habitat.  In addition, the Moonlight Fire, which has only recently been contained, has burned 65,000 acres and impacted at least 21 owl PACs and HRCAs on over 21,000 acres.  The blaze has threatened 2500 homes and came within six miles of town of Taylorsville and within eight miles of the nearest treatment unit contemplated by the Empire Project.

Fire protection through vegetation management in these areas is therefore important both from the standpoint of wildlife and humans.  For wildlife, unchecked wildfire may completely destroy habitat.  For humans, both lives and property are at stake.

14

1   Both the Slapjack and Empire Projects squarely address that risk.

2   Ninety-eight percent of the Slapjack Projects is situated within

3   Wildfire Urban Interface zones ("WUIs") that are home to between

4   5,000 and 7,000 people.  Second Francine Decl. at ¶ 12a.   Empire

5   similarly treats some 2,500 acres within WUIs immediately

6   adjacent to five communities, including the town of Quincy.

7   Empire SEIS at 3-67; Second Francine Decl., ¶12b-c.

8

9                             **STANDARD**

10

11       A preliminary injunction is an extraordinary remedy, the

12   entitlement to which the moving party must prove by clear and

13   convincing evidence.  <u>See</u> <u>Granny Goose Foods, Inc. v. Teamsters</u>,

14   415 U.S. 423, 442 (1974).

15        Certain prerequisites must be satisfied prior to issuance

16   of a preliminary injunction.  Under the so-called "traditional"

17   standard, an injunction may be had if the court determines that

18   (1) the moving party will suffer the possibility of irreparable

19   injury if the relief is denied; (2) there is a strong likelihood

20   that the moving party will prevail on the merits at trial;

21   (3) the balance of potential harm favors the moving party; and

22   (4) the public interest favors granting relief.  <u>Johnson v. Cal.</u>

23   <u>State Bd. of Accountancy</u>, 72 F.3d 1427, 1430 (9th Cir. 1995).

24   ///

25   ///

26   ///

27   ///

28   ///

1   Under the "alternative" standard, an injunction properly issues
2   when a party demonstrates either: (1) a combination of probable
3   success on the merits and the possibility of irreparable injury
4   if relief is not granted; or (2) the existence of serious
5   questions going to the merits combined with a balancing of
6   hardships tipping sharply in favor of the moving party.  Id., *see*
7   *also* Idaho Sporting Congress, Inc. v. Alexander, 222 F.3d 562,
8   565 (9th Cir. 2000); Earth Island Institute v. U.S. Forest
9   Service, 442 F.3d 1147, 1158 (9th Cir. 2006).  The requirement
10  for showing a likelihood of irreparable harm increases or
11  decreases in inverse correlation to the probability of success on
12  the merits, with these factors representing two points on a
13  sliding scale.  United States v. Nutri-cology, Inc., 982 F.2d
14  394, 397 (9th Cir. 1992).

15      No presumption for issuance of a preliminary injunction
16  solely on grounds that environmental statutes have been violated.
17  Amoco, 480 U.S. 531, 545.  A NEPA violation is subject to
18  traditional standards in equity for injunctive relief and does
19  not require an automatic blanket injunction against all
20  development.  Northern Cheyenne Tribe v. Norton, 2007 WL 1595476
21  at *3 (9th Cir. Sept. 11, 2007).

22

23                              **ANALYSIS**

24

25      The underlying lawsuit challenges the 2004 Framework through
26  the prism of site-specific projects, initially Basin and, through
27  recent amendments to the complaint in this matter, now also
28  Empire and Slapjack.

                              16

The cross-motions for summary judgment filed by the parties with respect to the overall legality of the 2004 Framework remain under submission.  During the course of that briefing, that parties agreed that issues pertaining to remedy should be reserved until after an underlying decision on the merits, through summary judgment, had been made.  The relief now sought through Plaintiffs' preliminary injunction requests as to the three site-specific projects unquestionably relates to remedy as opposed to liability.  Therefore, in analyzing the propriety of injunctive relief at this point, the Court will focus on the site-specific issues rather than risk being drawn into any wholesale decision addressing the overall merits of the underlying Framework.

**A.   Probability of Success on the Merits**

Under any formulation assessing the merits of preliminary injunctive relief a consideration of the requesting party's probability of success must be addressed.  Plaintiffs claim here that there is a likelihood of success on the merits because the 2004 Framework, on which the projects are modeled, violates the NFMA by failing to ensure species survival and failing to implement required monitoring data for management indicator species ("MIS").  Plaintiffs further assert NEPA violations on grounds that the Forest Service, in adopting the 2004 Framework, failed to take a hard look at environmental impacts, failed to adequately respond to opposing scientific viewpoints, and failed to adequately assess other alternatives as required by NEPA.

17

1   Turning first to the alleged NFMA violations, Plaintiffs
2   argue that 36 C.F.R § 219.19(a)(6), a regulation enacted in 1982,
3   requires that population trends of management indicator species
4   will be monitored and relationships to habitat changes
5   determined." Section 219.26 goes on to require that "inventories
6   shall include quantitative data...." Plaintiffs contend that
7   this regulation requires that population monitoring be performed.

8   The 1982 regulations upon which Plaintiffs rely were deleted
9   from the Code of Federal Regulations in November of 2000. Under
10  the discretion conferred by § 219.35 of the interim rules, the
11  Forest Service elected to prepare the 2004 Framework under the
12  provisions of the 1982 regulations. See Earth Island Inst. v.
13  U.S. Forest Serv., supra, 442 F.3d at 1173. Once those interim
14  rules were superseded by new planning rules in January of 2005,
15  however, the 1982 rules ceased to have legal force and effect and
16  cannot be presently enforced by the Court in the context of these
17  site-specific projects. See 70 Fed. Reg. 1023, 1052 (Jan. 5,
18  2005). Under Landgraf v. USI Film Products, 511 U.S. 244 (1994),
19  courts are directed to apply the rules in effect at the time of
20  judicial review, because application of the current 2005 rules to
21  the site-specific plans would not impair vested rights, increase
22  the liability for past conduct, or impose new duties on the
23  Federal Defendants.  See Southwest Center for Biological
24  Diversity v. USDA, 314 F.3d 1060, 1062 (9th Cir. 2002). Here,
25  Plaintiffs had no vested rights under the old regulations, since
26  even an expectation of success in litigation does not constitute
27  the sort of settled expectation subject to exception under
28  Landgraf.  Id. at 1062 n.1.

18

1    The 2005 rules state that, for forest plans "developed,

2  amended, or revised" under the 1982 rules:

3        The Responsible Official may comply with any
         obligations relating to management indicator species by

4        considering data and analysis relating to habitat
         unless the plan specifically requires population

5        monitoring or population surveys for the species.  Site
         specific monitoring or surveying of a proposed project

6        area are not required.

7  36 C.F.R. 219.14(f) (2005).  "Monitoring populations at the site

8  of individual projects is not part of this requirement.

9  Therefore, the transition language in § 219.14 clarifies that MIS

10 monitoring... is not required within individual project or

11 activity areas."  70 Fed. Reg. 1052 (Jan. 5, 2005).  Thus,

12 Section 219.14, and not deleted Section 219.19, applies to these

13 site specific projects and it: 1) does not require wildlife

14 monitoring before commencement of a site-specific project; and

15 2) does allow reliance on existing "habitat" data instead of

16 attempting to count secretive wildlife.

17    In this case, habitat data with respect to all three species

18 targeted by this preliminary injunction supports a finding that

19 the provisions of the NFMA have not violated with respect to

20 species viability.  All three projects leave the vast majority of

21 (upwards of 90 percent) of owl habitat undisturbed.  Moreover,

22 the most recent Meta analysis of spotted owl populations in the

23 Sierra Nevada indicate, as discussed above, that the species is

24 stable.  In addition, with regard to the fisher and the marten,

25 as stated above both species are virtually unknown within the

26 Plumas National Forest where these projects are slated to occur.

27 ///

28 ///

19

1  Nonetheless, large amounts of suitable habitat for these forest
2  carnivores will be maintained, including a habitat connectivity
3  corridor which will be only minimally affected by the projects.
4  Under those circumstances, none of the three site-specific
5  projects is likely to have any impact on the fisher and marten
6  whatsoever, let alone an impact triggering the protections of the
7  NFMA.

8      The Court is similarly unpersuaded that Plaintiffs can
9  demonstrate any likelihood of success with regard to their NEPA
10  claims.  The NEPA challenges primarily revolve around the claim
11  that adverse environmental impacts were not adequately disclosed
12  so that the requisite "hard look" was taken, either in the 2004
13  Framework or in the individual site-specific projects.  First,
14  the Forest Service took a "hard look" at the available data
15  concerning the impact of its proposal on the owl, recognized
16  opposing opinions, and provided a reasoned discussion of its
17  findings.  See Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291
18  (W.D. Wash. 1994) (the agency having engaged in numerous studies
19  and analyses of the owl satisfied NEPA's requirement to take a
20  "hard look" at available data).  The Forest Service assessed the
21  most recent owl meta analysis (SNFPA 2086-89), assessed published
22  research (SNFPA 2638-57), and evaluated the Scientific
23  Consistency Review Team's findings (SNFPA 2578-2589).  In
24  addition, although the 2004 Framework concluded that its fuels
25  treatment prescriptions would benefit both the fisher and the
26  marten in the long run, it also assessed short-term impacts to
27  both species (SNFPA 3314 (marten); SNFPA 3323-3330 (fisher)).
28  ///

1  Moreover, at the project level, which is the most cogent
2  consideration in evaluating Plaintiffs' request for preliminary
3  injunction, detailed environmental impact statements ("EISs")
4  were prepared for both the Slapjack and Empire projects that also
5  considered available habitat for all three species and the impact
6  any recommended logging would have on that habitat.  See Slapjack
7  EIS at 3-1 to 3-304.  Moreover an environment assessment ("EA")
8  was prepared by the Basin project.  Basin 3657-3749.

9      Plaintiffs would also appear unsuccessful in arguing that
10  the cumulative effects of the three projects at issue have not
11  been properly considered.  The cumulative effect of all HFQLG
12  vegetation management projects, including the projects at issue
13  here, were assessed in the 2004 Framework, to which the
14  individual projects may tier.  See Basin 3720.  Moreover, the
15  fact that so little habitat is slated to be affected in any event
16  would appear to make any cumulative effects improbable on their
17  face.

18      Plaintiffs' NEPA claim that the Forest Service failed to
19  consider a reasonable range of alternatives is also not
20  compelling.  While the 2004 SEIS specifically considered only the
21  new treatment option that was ultimately adopted in conjunction
22  with the plan adopted by its 2001 predecessor, the 2004 SEIS by
23  definition was, by definition, supplemental to the 2001
24  Framework, which considered and analyzed seven different
25  treatment variants (Options F2-F8) in depth.  With respect to the
26  site-specific projects themselves, the Slapjack EIS considered
27  six action alternatives and one no-action alternative.  Slapjack
28  EIS at 2-1 to 2-18.

21

1   In addition, the final SEIS issued for the Empire project

2   analyzed in detail the no action alternative, a proposed action

3   and four other alternatives.  See Empire SEIS at 2-10 to 2-14.

4       Finally, with respect to the Basin EA, Plaintiffs make the

5   argument that Plaintiffs contend that because the draft EA for

6   the Basin Project was not specifically disseminated for public

7   consideration and comment, the approval of the EA violates the

8   public disclosure mandate of NEPA.  EAs, however, are by

9   definition simpler documents not subject to the same rigorous

10  scrutiny as an EIS.  EAs are designed to reduce government costs,

11  paperwork and delay through a "concise" public document.  40

12  C.F.R. § 1500.4(q), 1500.5(1), 1508.9.  While the EA itself was

13  not circulated, it appears undisputed that a summary plan

14  description was provided to the public for comment.  Public

15  meetings concerning the Basin Plan were also conducted.  This

16  satisfies NEPA.  See, e.g., Sierra Nevada Forest Prot. Campaign

17  v. Weingardt, 376 F. Supp. 984, 991 (E.D. Cal. 2005) (draft EA,

18  in contrast to EIS, need not be expressly circulated to the

19  public for comment as long as information provided is otherwise

20  disseminated).

21

22       **B.  Irreparable Harm**

23

24       As indicated above, the projects at issue impact relatively

25  little owl habitat, and virtually no fishers or martens have been

26  observed within any of the targeted areas.

27  ///

28  ///

1  Nonetheless the projects preserve core owl habitat, as well as

2  habitat connectivity for the forest carnivores should they return

3  to the Northern Sierra.  With respect to the owl, which is the

4  only  species realistically present in the project areas at issue

5  in this Motion, there is no solid evidence of population impact

6  within the Plumas National Forest, where the owl appears to be

7  thriving.  Even if individual birds could be affected by

8  selective logging, that does not amount to irreparable harm since

9  irreparable harm in this context depends on a demonstrable impact

10 to the species as a whole.  See, e.g., Water Keeper Alliance v.

11 U.S. Dep't of Def., 271 F.3d 21, 34 (1st Cir. 2001).

12     On the evidence of the evidence before it, the Court

13 believes that a greater danger of irreparable harm exists in not

14 vigorously addressing the overforested conditions that are

15 present within the Plumas National Forest.  This danger is not

16 speculative but very real, as evidenced by the large wildfires

17 that ravaged the Plumas this very summer.  As discussed above,

18 the 2007 Antelope and Moonlight fire together burned some 88,000

19 acres and either impacted or destroyed at least 27 owl PACS and

20 HRCAs.  In sum, according to Nancy Francine, the Plumas National

21 Forest Ecosystem Staff Officer, during 2007 to date there have

22 been almost 628 fires impacting some 123,000 acres of Forest

23 Service land in Northern California.  Second Francine Decl. at

24 ¶ 8.  The long-term benefit of preventing stand replacing fires

25 which completely destroy habitat is preferable over any short-

26 term benefits derived from retaining dense forest structure

27 preferred by old growth species.  Native Ecosystems Council v.

28 U.S. Forest Service, 428 F.3d 1233, 1251 (9th Cir. 2005).

1  Courts can and should take account of the short and long terms
2  effects of both action and inaction.  Wildwest Inst. v. Bull, 472
3  F.3d 587, 592 (9th Cir. 2006).  As already indicated, the 2006
4  USFWS study concluded that catastrophic wildfire is a far greater
5  risk to spotted owl viability than any short-term effects of fuel
6  management activities on owl habitat, which is minimal in
7  comparison to overall habitat area remaining available.  See 36
8  Fed. Reg. 29897 (May 24, 2006).  Similarly, the greatest concern
9  for forest carnivores is the danger of further habitat
10 fragmentation due to large, stand-replacing fires like those that
11 are likely to result if overforested conditions are ignored.
12 See, e.g., Empire SEIS at 3-162; Slapjack EIS at 3-284.  In Bull,
13 the Ninth Circuit held that the district court did not abuse its
14 discretion in denying a preliminary injunction on grounds that
15 fuel reduction project would reduce the risk of severe wildfire
16 in the next 10-15 years.  Wildwest Inst. v. Bull, supra, 472 F.3d
17 at 592.

18
19     **C.  Balancing of Hardships**
20
21     As indicated above, the imminent danger of catastrophic
22 wildfire which has completely destroyed large swaths of old
23 forest habitat this very year must be balanced against the
24 immediate risk or eliminating some suitable habitat in the short
25 term.
26 ///
27 ///
28 ///

1  With respect to the three projects at issue, this balancing does
2  not tip in Plaintiffs' favor, let alone strongly favor Plaintiffs
3  as required under the "alternative" test for granting a
4  preliminary injunction where serious questions on the merits have
5  been raised.   This conclusion is even more compelling when the
6  human component of not addressing overloaded forest conditions is
7  considered.   As indicated above, fires in the area at issue
8  during the Summer of 2007 threatened numerous homes and entire
9  communities.   The Empire Project will treat 2,500 acres in the
10 Wildland Urban Interface "immediately adjacent to five
11 "communities at risk": Quincy, Massack, Greenhorn, Keddie and
12 Butterfly Valley.   Second Francine Decl. at ¶ 12b and 12c.
13 Similarly, some 98 percent of the Slapjack project is within the
14 Wildland Urban Interface surrounding the communities of
15 Brownsville, Challenge, Clipper Mills, Dobbins, Feather Fall,
16 Forbestown, and Strawberry Valley, which collectively are home to
17 between 5,000 and 7,0000 people.   <u>Id.</u> at 12a.   The
18 congressionally mandated HFQLG Act directs that fire suppression
19 measures, including DFPZs, group selection, and individual
20 logging, be implemented to mitigate these risks.   Observation
21 following recent fires appear to indicate that DFPZs are useful
22 in reducing fire speed and intensity.   <u>Id.</u> at ¶ 14.   While
23 Plaintiffs argue that any fuel reduction projects must be
24 modified to reduce the logging of larger diameter trees, the
25 number of such large trees appears to be minimal.   As noted
26 above, only 6 percent of group selection for the Basin Project
27 involves trees more than 24 inches in diameter.   Id. at ¶ 17a.
28 ///

1   Additionally, Table 3-56 of the Slapjack EIS shows that very few
2   trees of that size will be taken, with the majority of logging
3   involving smaller trees, particularly poles between six and
4   eleven inches in diameter at breast height.  Slapjack EIS at 3-
5   200.  Important too is the fact that without the inclusion of
6   larger diameter trees the proposed logging efforts would not be
7   commercially viable and the important fuel reduction purposes
8   they serve could not be undertaken by the Forest Service.  See,
9   e.g., Empire ROD at 2 ("without the sale of commercial wood
10  products, it is not currently possible to accomplish enough fuels
11  reduction to achieve our objectives").

12      Significant too is the fact that the HFQLG Act further
13  directs that the economic stability of local communities be
14  considered.  The NFMA directs the Forest Service to develop a
15  land and resource management plan for each unit of the system to
16  provide for multiple uses and sustained yield of various forest
17  resources, including timber and wildlife.  See 16 U.S.C.
18  § 1604(a)(e); Forest Guardians v. Dombeck, 131 F.3d 1309, 1312
19  (9th Cir. 1997).  Not only are there economic benefits to logging
20  in this area, but halting further logging may also weaken the
21  local infrastructure necessary for vegetation management
22  activities in the future.  See Second Francine Decl. at ¶ 6-7.
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

26

While the Court realizes that avoiding irreparable environmental
injury outweighs mere economic concerns (<u>Lands Council v. McNair</u>,
494 F.3d 771, 780 (9th Cir. 2007), here economic considerations
are not the decisive factor but instead, when considered in
conjunction with the irreparable harm associated with taking no
action, simply tip the scales further in favor of not granting
the requested injunctive relief.  In this case the risk of
catastrophic, stand-replacing fire is both proven and palpable,
and goes beyond the circumstances confronted by the <u>McNair</u> court,
which examined a project designed to ameliorate general tree
stand health and vigor decline by attempting to return the forest
towards "historic conditions".  <u>Id.</u> at 774-75.  The overwhelming
fire risk involved here goes beyond any "speculative harm"
rejected as inadequate by <u>McNair</u>.

**D.  Public Interest**

     In cases where the public interest is affected, that element
should also be addressed in determining whether to grant
injunctive relief, even though the inquiry is often subsumed into
the balance of relative hardships.  <u>See, e.g.</u>, <u>Caribbean Marine
Servs. Co. v. Baldrige,</u> 844 F.2d 668, 674 (9th Cir. 1988).
///
///
///
///
///
///

1    Here, the public interest in accomplishing the fuel management
2    envisioned by the Slapjack, Basin and Empire projects, which are
3    designed to both immediately reduce fire risk and promote the
4    long-term development of more fire-resilient forests, together
5    with the public interest in providing protection and economic
6    stability to local communities, outweigh any short-term impact to
7    the owl, fisher and marten as discussed above.

8

9                                **CONCLUSION**

10

11        For all the foregoing reasons, Plaintiffs' Motion for
12   Preliminary Injunction is hereby DENIED.
13        IT IS SO ORDERED.

14

15   Dated: October 15, 2007

16

17   _____

18   MORRISON C. ENGLAND, JR.
     UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28