1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11  SIERRA NEVADA FOREST PROTECTION          No. 2:05-cv-00205-MCE-GGH
    CAMPAIGN, CENTER FOR BIOLOGICAL
12  DIVERSITY, NATURAL RESOURCES
    DEFENSE COUNCIL, SIERRA CLUB,
13  and THE WILDERNESS SOCIETY,
    non-profit organizations,
14
            Plaintiffs,
15
        v.                                   <u>MEMORANDUM AND ORDER</u>
16
    MARK REY, in his official
17  capacity as Under Secretary of
    Agriculture, DALE BOSWORTH, in
18  his official capacity as Chief
    of the United States Forest
19  Service, JACK BLACKWELL, in his
    official capacity as Regional
20  Forester, Region 5, United
    States Forest Service, and
21  JAMES M. PEÑA, in his official
    capacity as Forest Supervisor,
22  Plumas National Forest,

23          Defendants.

24      and

25  TUOLUMNE COUNTY ALLIANCE FOR
    RESOURCES & ENVIRONMENT, et al.;
26  CALIFORNIA SKI INDUSTRY ASS'N';
    QUINCY LIBRARY GROUP, et al.;
27  and CALIFORNIA CATTLEMEN'S ASS'N,

28          Defendants-Intervenors.

                               1

1    The Plaintiffs in this case, a group of environmental

2 organizations, challenge the 2004 Sierra Nevada Forest Plan

3 Amendment ("SNFPA"), commonly known as the 2004 Framework, along

4 with Basin, a site-specific forest management project promulgated

5 following adoption of the 2004 Framework.  Defendants are sued in

6 their official capacities as representatives of the United States

7 Forest Service ("Forest Service").  Plaintiffs contend that both

8 the 2004 Framework and the Basin Plan, as promulgated by the

9 Forest Service, run counter to the provisions of the National

10 Forest Management Act ("NFMA") and the National Environmental

11 Policy Act of 1969 ("NEPA").  Presently before the Court are

12 cross-motions for summary judgment filed on behalf of both the

13 Plaintiffs and Defendants.

14

15                          **FACTUAL BACKGROUND**

16

17    The Sierra Nevada contains some 11.5 million acres of

18 National Forest Service land with eleven National Forests and

19 encompasses "dozens of complex ecosystems each with numerous,

20 inter-connected social, economic and ecological components."

21 SNFPA 1920.  In the late 1980s, the Forest Service began

22 developing a comprehensive strategy for managing the myriad

23 resources found within the region.  In 1995, the Regional

24 Forester for the Pacific Southwest Region of the Forest Service

25 issued a draft Environmental Impact Statement ("EIS") outlining

26 ///

27 ///

28 ///

1   its management proposal.  SNFPA 229.[1]  After extensive public

2   participation and the preparation of a Final EIS responding to

3   public concerns, the Regional Forester issued, in 2001, a Record

4   of Decision ("ROD") which adopted management objectives in five

5   major areas: old forest ecosystems; aquatic, riparian, and meadow

6   ecosystems; fire and fuels; noxious weeds; and hardwood

7   ecosystems on the lower westside of the Sierras.  Id. at 231-35.

8      Among the thorniest issues confronted by the ROD was striking

9   the appropriate balance between balancing the excessive fuel

10   buildups occasioned by decades of fire repression and conserving

11   key habitat for wildlife species dependent on old forest

12   environments.  The 2001 ROD included a network of "old forest

13   emphasis areas" across about 40 percent of all national forest

14   land in the Sierra Nevada that was designed to provide a

15   contiguous network of old forest ecosystems conducive to species

16   preferring such habitat like the California Spotted Owl, the

17   American Marten and the Pacific Fisher.  SNFPA 236.  Aside from

18   other areas slated for specific treatment (like a limited "urban

19   wildland intermix" designed to create a buffer between developed

20   areas and the forest), the 2001 Framework specified a "general

21   forest" land allocation intended to increase the density of large

22   old trees and the continuity and distribution of old forests

23   across the landscape.  SNFPA 236-37.

24      In order to protect old forest conditions within its

25   specific areas of emphasis, the 2001 Framework generally

26   prohibited logging that would remove trees over 12 inches in

27   _____

28       [1] Documents found within the first eight-volume record are
    cited as SNFPA, followed by the Bates-stamp number.

diameter or logging that would reduce canopy cover by more than 10 percent. SNFPA 328. Even within the "general forest" areas, the 2001 Framework prohibited logging of trees over 20 inches in diameter. SNFPA 336. It was only within the intermix zones that no canopy restrictions were imposed and logging of trees up to 30 inches was permitted. SNFPA 333, 315.

Although the Forest Service ultimately affirmed adoption of the 2001 ROD despite receipt of approximately 200 administrative appeals, it nonetheless directed the Regional Forester to conduct an additional review with respect to specific concerns like wildfire risk and the Forest Service's responsibilities under the Herger-Feinstein Quincy Library Group Forest Recovery Act ("HFQLG Act"), a congressional mandate which established a Pilot Program for fire suppression through a combination of fire breaks, group selection logging and individual logging. SNFPA 1918. A management review team was assembled by the Regional Forester for this purpose.

In March 2003, the team concluded that the 2001 ROD's "cautious approach" to active fuels management had limited its effectiveness in many treatment areas. The management review team further found that revisions to vegetation management rules would decrease flammable fuels while protecting critical wildlife habitat by guarding against the risk of stand-replacing wildfire. See SNFPA 1918, 1926. Moreover, with respect to the California Spotted Owl ("CASPO" or "owl"), the team felt that the 2001 ROD had unnecessarily "took a worst case approach to estimating

///

///

effects" on the owl.  SNFPA 1968.[2]  In addition to citing recent research indicating that habitat losses resulting from fuel treatments were less than previously believed, the team further found that the 2001 ROD's extensive reliance on maintaining extensive canopy cover was impracticable to implement.

Following receipt of the team's findings, the Regional Forester ordered that management strategy alternatives in addition to those considered in the 2001 FEIS be considered.  A draft supplemental environmental impact statement ("DSEIS") was thereafter released to the public in January 2004.  While the same five areas of concern were targeted in the DSEIS as in its 2001 predecessor, in 2004 a new action alternative was identified (Alternative S2), in addition to the alternative selected by the 2001 Framework (Alternative S1) and the seven alternatives that had previously been considered before adoption of the 2001 Framework (Alternatives F2-F8).[3]  Following the public comment period after dissemination of the DSEIS, the SEIS in final form also included response to various issues raised, including comments by the United States Fish and Wildlife Service, by the

---

[2] The 2001 Framework's CASPO analysis was largely predicated on a July 1992 report (the "CASPO Report") that recommended establishment of a 300-acre Protected Activity Center ("PAC") around all known owl nest sites, a complete prohibition of logging within the PACs, more limited logging prohibition of trees over 30 inches in diameter in all habitat suitable for owl nesting and foraging, and a prohibition on logging that would reduce canopy cover below 40 percent in owl nesting habitat. SNFPA 1037-40.

[3] The DSEIS also considered seven additional alternatives in addition to those considered in detail but eliminated the seven from extensive consideration because they were found to be inconsistent with the purpose and need of the DSEIS.  SNFPA 3163-65.

1  United States Environmental Protection Agency, by California

2  resources protection agencies, and by the Science Consistency

3  Review ("SCR") team.[4]

4       By adopting the SEIS on January 21, 2004, the Regional

5  Forester replaced the 2001 ROD with its 2004 successor and

6  amended the forest plans for all eleven national forests situated

7  in the Sierra Nevada.  SNFPA 2987-3061.  The 2004 ROD reasoned

8  that the 2001 Framework "prescribed technical solutions that do

9  not produce needed results, or offered methods we often dare not

10 attempt in the current Sierra Nevada."  SNFPA 2995.  The 2004

11 Framework reasoned that the methods as adopted in 2001 fail to

12 reverse the damage, and growing threat, of catastrophic fires

13 quickly enough.  Id.

14      The Chief of the Forestry Service ultimately affirmed the

15 2004 ROD,[5] with the direction that details of the ROD's adaptive

16 management be submitted to him within six months.  SNFPA 3997-

17 4305.  The Regional Forester submitted that supplemental

18 information to the Chief on March 31, 2005.

19      Through the present lawsuit, Plaintiffs allege that the 2004

20 Framework as ultimately adopted runs afoul of both the NFMA and

21 NEPA on a programmatic basis.  Specifically, Plaintiffs contend

22 that the 2004 Framework violates the NFMA both because it fails

23 to maintain viable populations of CASPOs as well as Pacific

24  _____

25      [4] The SCR consisted of eleven scientists convened by the
Pacific Southwest Research Station in Davis, California, and
26 included experts in fire and fuels management, forest ecology,
and species viability.  SNFPA 3503.

27      [5] In so affirming, Forest Service Chief Dale Bosworth denied
6,241 separate administrative appeals of the 2004 Framework.
28 SNFPA 3998.

Fishers and American Martens, small forest carnivores t7hat, like

the owls, prefer old-growth forest habitats.  Moreover,

Plaintiffs also argue that the 2004 Framework runs afoul of NEPA

because it was adopted without either adequate disclosure of its

significant environmental impacts or consideration of reasonable

alternatives to the selected approach.

In addition to their general challenge to the 2004

Framework, Plaintiffs also target a site-specific plan adopted

following the 2004 ROD, the Basin Group Selection Project

("Basin Project").  That Basin Project area is located within the

Plumas National Forest ("PNF") and encompasses some 38,893 acres

south and west of Bucks Lake and north of the Middle Fork of the

Feather River.  BASIN 3665.[6]  The Project incorporates vegetation

treatments designed to fulfill the management direction of the

PNF's Land and Resource Management Plan ("LRMP"), as amended by

the HFQLG Act.  BASIN 3666.  The Basin Project envisions groups

selection logging on 1,215 acres (in 800 one-to-two acre plots)

and individual tree selection on another 80 acres, in which high-

risk or crowded trees may be individually harvested while meeting

established canopy-cover standards.  BASIN 3643  Road changes

within the Basin Project are also envisioned, as are improvements

at road-stream crossings so as to reestablish fish passage and

restore watershed connectivity.  BASIN 3672-73.  Implementation

of the Project is anticipated over a five-year period.  BASIN

3136.

---

[6] Documents prepared in conjunction with the Basin Project
are contained within the second ten-volume portion of the record
on file herein, and are cited as "BASIN", followed by the Bates-
stamped number.

7

1        A scoping letter for the Basin Project was sent to
2    interested parties on December 19, 2003.  BASIN 3044, 3673.
3    Thereafter, on March 3, 2004, the Forest Service initiated a
4    formal 30-day notice and comment period by publishing a notice in
5    a Quincy, California, newspaper.  BASIN 3155.  Also on March 3,
6    2004, a detailed description of the proposed project was sent to
7    interested parties who had already requested notification with
8    respect to proposed activities.  Once comment letters were
9    received, response to comments was prepared, and a public open
10   house to facilitate discussion of the Project was held, the
11   Forest Service prepared an Environmental Assessment ("EA") for
12   the Basin Project.  BASIN 3657-3749.  The EA considered two
13   alternatives in detail: the no action alternative and its
14   proposed action alternative.  BASIN 3677.  Seven other options
15   were considered but eliminated from detailed consideration.  The
16   EA identified environmental resources subject to impact and
17   considered the effects on each resource by the two alternatives
18   scrutinized in detail.  BASIN 3683-3722.

19       Following consideration of the EA, the Forest Supervisor
20   issued a Finding of No Significant Impact ("FONSI") on August 25,
21   2004 and adopting the Basin Project pursuant to the EA.  BASIN
22   3638-3656.

23       On October 12, 2004, one of the Plaintiffs herein, SNFPC,
24   appealed the Basin Project decision.  BASIN 2713.  After the
25   Forest Service's decision was affirmed, Plaintiffs brought the
26   present action, which as stated above contends that the the 2004
27   Framework and the Basin Project violate the NFMA and NEPA both on
28   a programmatic and site-specific basis.

1                          **PROCEDURAL FRAMEWORK**

2

3          Congress enacted NEPA in 1969 to protect the environment by

4   requiring certain procedural safeguards before an agency takes

5   action affecting the environment.  The NEPA process is designed

6   to "ensure that the agency ... will have detailed information

7   concerning significant environmental impacts; it also guarantees

8   that the relevant information will be made available to the

9   larger [public] audience."  <u>Blue Mountains Biodiversity Project</u>

10  <u>v. Blackwood</u>, 171 F.3d 1208, 121 (9th Cir. 1998).  The purpose of

11  NEPA is to "ensure a process, not to ensure any result."  <u>Id.</u>

12  "NEPA emphasizes the importance of coherent and comprehensive

13  up-front environmental analysis to ensure informed decision-

14  making to the end that the agency will not act on incomplete

15  information, only to regret its decision after is it too late to

16  correct."  <u>Center for Biological Diversity v. U.S. Forest Serv.</u>,

17  349 F.3d 1157, 1166 (9th Cir. 2003).  Complete analysis under

18  NEPA also assures that the public has sufficient information to

19  challenge the agency's decision.  <u>Robertson v. Methow Valley</u>

20  <u>Citizens</u>, 490 U.S. 332, 349 (1989); <u>Idaho Sporting Cong. v.</u>

21  <u>Thomas</u>, 137 F.3d 1146, 1151 (9th Cir. 1998).

22         NEPA requires that all federal agencies, including the

23  Forest Service, prepare a "detailed statement" that discusses the

24  environmental ramifications, and alternatives, to all "major

25  Federal Actions significantly affecting the quality of the human

26  environment."  42 U.S.C. § 4332(2)(c).  An agency must take a

27  "hard look" at the consequences, environmental impacts, and

28  adverse environmental effects of a proposed action within an

1  environmental impact statement ("EIS"), when required.  Kleppe v.
2  Sierra Club, 427 U.S. 390, 410, n.21 (1976).  To determine
3  whether an EIS is required, an agency may first prepare an
4  environmental assessment ("EA").  The objective of an EA is to
5  "[b]riefly provide sufficient evidence and analysis to
6  determining whether to prepare" an EIS.  40 C.F.R.
7  § 1508.9(a)(1).  If the EA indicates that the federal action may
8  significantly affect the quality of the human environment, the
9  agency must prepare an EIS.  40 C.F.R. § 1501.4; 42 U.S.C.
10 § 4332(2)(C).

11      In the event an agency determines that an EIS is not
12 required, it must, as the Forest Service did here with respect to
13 the Basin Project, issue a FONSI detailing why the action "will
14 not have a significant effect on the human environment."
15 40 C.F.R. § 1508.13.  As is customary, the FONSI in this case is
16 contained within the project EA.  The EA must support the
17 agency's position that a FONSI is indicated.  Blue Mountains,
18 161 F.3d as 1214.

19      NEPA does not mandate that an EIS be based on a particular
20 scientific methodology, nor does it require a reviewing court to
21 weigh conflicting scientific data.  Friends of Endangered
22 Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985).
23 An agency must be permitted discretion in relying on the
24 reasonable opinions of its own qualified experts, even if the
25 court might find contrary views more persuasive.  See, e.g.,
26 Kleppe, 427 U.S. at 420, n.21.  NEPA does not allow an agency to
27 rely on the conclusions and opinions of its staff, however,
28 without providing both supporting analysis and data.  Idaho

1  Sporting Cong., 137 F.3d at 1150.  Credible scientific evidence

2  that contraindicates a proposed action must be evaluated and

3  disclosed.  40 C.F.R. § 1502.9(b).

4       In addition to arguing that the Forest Service violated NEPA

5  in this case, Plaintiffs also contend that the Basin Plan

6  violates the NFMA, which requires that "resource plans and

7  permits, contracts, and other instruments for the use and

8  occupancy of National Forest Systems lands shall be consistent

9  with the land management plans."  16 U.S.C. § 1604(i).

10 Consequently, all activities in Forest Service forests, including

11 timber projects, must be determined to be consistent with the

12 governing forest plan, which is a broad, programmatic planning

13 document.  See, e.g., Wilderness Society v. Thomas, 188 F.3d

14 1130, 1132 (9th Cir. 1999).  If an EA or EIS adequately discloses

15 such effects, NEPA's goal is satisfied.  Inland Empire Pub. Lands

16 Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996)

17 (emphasis in original).

18      Because neither NEPA nor NFMA contains provisions allowing a

19 private right of action (see Lujan v. National Wildlife

20 Federation, 497 U.S. 871, 882 (1990) and Ecology Center Inc. v.

21 United States, 192 F.3d 922, 924 (9th Cir. 1999) for this

22 proposition under NEPA and NFMA, respectively), a party can

23 obtain judicial review of alleged violations of NEPA only under

24 the waiver of sovereign immunity contained within the

25 Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Earth

26 Island Institute v. U.S. Forest Serv., 351 F.3d 1291, 1300 (9th

27 Cir. 2005).

28 ///

1    Under the APA, the court must determine whether, based on a
2  review of the agency's administrative record, agency action was
3  "arbitrary and capricious," outside the scope of the agency's
4  statutory authority, or otherwise not in accordance with the law.
5  Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356
6  (9th Cir. 1994).  Review under the APA is "searching and
7  careful."  Ocean Advocates, 361 F.3d at 1118.  However, the court
8  may not substitute its own judgment for that of the agency.  Id.
9  (citing Citizens to Preserve Overton Park, Inc. v. Volpe,
10 401 U.S. 402 (1971), overruled on other grounds by Califano v.
11 Sanders, 430 U.S. 99 (1977)).

12    In reviewing an agency's actions, then, the standard to be
13 employed is decidedly deferential to the agency's expertise.
14 Salmon River, 32 F.3d at 1356.  Although the scope of review for
15 agency action is accordingly limited, such action is not
16 unimpeachable.  The reviewing court must determine whether there
17 is a rational connection between the facts and resulting judgment
18 so as to support the agency's determination.  Baltimore Gas and
19 Elec. v. NRDC, 462 U.S. 87, 105-06 (1983), citing Bowman Trans.
20 Inc. v. Arkansas-Best Freight Sys. Inc., 419 U.S. 281, 285-86
21 (1974).  An agency's review is arbitrary and capricious if it
22 fails to consider important aspects of the issues before it, if
23 it supports its decisions with explanations contrary to the
24 evidence, or if its decision is either inherently implausible or
25 contrary to governing law.  The Lands Council v. Powell, 395 F.3d
26 1019, 1026 (9th Cir. 2005).
27 ///
28 ///

12

1

2

**STANDARD**

3          Summary judgment is an appropriate procedure in reviewing

4     agency decisions under the dictates of the APA.  See, e.g.,

5     Northwest Motorcycle Assn. v. U.S. Dept. Of Agric., 18 F.3d 1468,

6     1471-72 (9th Cir. 1994).  Under Federal Rule of Civil Procedure

7     56, summary judgment may accordingly be had where, viewing the

8     evidence and the inferences arising therefrom in favor of the

9     nonmovant, there are no genuine issues of material fact in

10    dispute."  Id. at 1472.  In cases involving agency action,

11    however, the court's task "is not to resolve contested facts

12    questions which may exist in the underlying administrative

13    record," but rather to determine whether the agency decision was

14    arbitrary and capricious as defined by the APA and discussed

15    above.  Gilbert Equipment Co., Inc. v. Higgins, 709 F. Supp.

16    1071, 1077 (S.D. Ala. 1989); aff'd, Gilbert Equipment Co. Inc. v.

17    Higgins, 894 F.2d 412 (11th Cir. 1990); see also Occidental Eng'g

18    Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985).  Consequently, in

19    reviewing an agency decision, the court must be "searching and

20    careful" in ensuring that the agency has taken a "hard look" at

21    the environmental consequences of its proposed action.  Ocean

22    Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 858-59

23    (9th Cir. 2005);  Or. Natural Res. Council v. Lowe, 109 F.3d 521,

24    526 (9th Cir. 1997).

25    ///

26    ///

27    ///

28    ///

**ANALYSIS**

**I.  NFMA CLAIMS**

    **A.  Applicable Regulations**

    In analyzing the viability of Plaintiff's NFMA claims against both the Framework and the Basin Project, the Court must first determine the applicable NFMA regulations that apply in assessing the propriety of the Forest Service's actions.

    First, with respect to the 2004 Framework, the Forest Service has conceded that the 1982 Rules apply to issuance of the Framework.  See Fed. Defs.' Mem. in Supp. of Cross Mot. for Summ. J. at p. 16, n.17.

    Because the 2004 Framework was initiated before the transition period established by the 2005 regulations,[7] the Forest Service elected to use the 1982 regulations to guide the plan amendment process.  See, e.g., SNFPA 4056 ("The Responsible Official elected to remain under the 1982 regulations.  The transition provisions of the 2000 Regulations, which were in effect when the Forest Service proposed and adopted the 2004 Framework, authorized the Regional Forester to continue or initiate forest plan amendments under the 1982 regulations.")  See 36 C.F.R. § 219.35 (2004); 67 Fed. Reg. 35,431, 35,434

---

    [7] See 68 Fed. Reg. 16758 (April 7, 2003) (notice of intent filed to consider amendment to the 2001 Framework); 36 C.F.R. § 219.14(c) (defining "initiation" to mean the issuance of the notice of intent).

1  (May 20, 2002).  Because the 2005 regulations provide the Forest

2  Service with discretion to apply the 1982 plan amendments

3  initiated prior to January 5, 2005 transition period for applying

4  the new regulations, it was clearly not improper for the Forest

5  Service to apply the 1982 regulations to the 2004 Framework.  <u>See</u>

6  36 C.F.R. § 219.14(e) (plan amendments initiated before said

7  transition period "may continue to use the provisions of the

8  planning regulations in effect before November 9, 2000... or may

9  conform to the requirements" of the 2005 regulations).

10      The record indicates that the Regional Forester made the

11  decision to apply the 1982 regulations that applied before 2000.

12  <u>See</u> SNFPA 3010 ("My decision confirms with the 1982 planning

13  regulations (36 CFR 219) that implement [NFMA].");  SNFPA 4056

14  ("The 2004 [Framework] was prepared under the NFMA and the 1982

15  implementing regulations of the NFMA.").

16      The Ninth Circuit has consequently confirmed that the 1982

17  regulations apply to the 2004 Framework.  In <u>Natural Res. Def.</u>

18  <u>Council v. Forest Serv.</u>, 421 F.3d 797, 800 n.3 (9th Cir. 2005),

19  the court applied the 1982 regulations in reviewing the forest

20  plan, for the Tongass National Forest, a programmatic document

21  similar to the 2004 Framework at issue here.  More recently, in

22  <u>Earth Island Institute v. U.S. Forest Serv.</u>, 442 F.3d 1147, 1153

23  (9th Cir. 2006), the Ninth Circuit stated unequivocally that "we

24  conclude that NFMA regulations promulgated in 1982 apply to the

25  2001 Framework and 2004 Supplement."

26      While providing clear guidance on the applicability of NFMA

27  regulations to the 2004 Framework, the 2005 regulations fail to

28  specifically address what regulations govern site-specific

1  projects, like the Basin Project, that were approved prior to the

2  transition period.   In the absence of that regulatory guidance,

3  the Forest Service urges the Court to apply case law suggesting

4  that statutes and regulations may be applied retroactively if

5  doing so would not impact interests already vested through

6  reliance on previous provisions.   See, e.g., Landgraf v. USI Film

7  Products, 511 U.S. 244 (1994).

8      The Forest Service explicitly developed the Basin Project

9  pursuant to the 1982 NFMA regulations, however.   See BASIN 3726

10  (stating that the Basin Project is consistent with the 1982

11  regulations "which remain in effect at this time").   This makes

12  it unnecessary to resort to the guidelines delineated in

13  Landgraf, which do not apply where the proper reach of new rules

14  has already been expressly prescribed, since in that instance

15  "there is no need to resort to judicial default rules."   Id. at

16  280.   Ninth Circuit law also indicates that the 1982 regulations

17  govern judicial review of the Basin Project.   See, e.g., Oregon

18  Natural Resources Council Fund v. Goodman, 505 F.3d 884, 889 (9th

19  Cir. 2007); Environmental Prot. Info. Ctr. v. United States

20  Forest Serv., 451 F.3d 1005, 1017 n.8 (9th Cir. 2006).

21      Even were the 2005 regulations to be applicable, which the

22  Court does not believe to be the case, those regulations have

23  recently been enjoined on a nationwide basis by the Northern

24  District.   In Citizens for Better Forestry v. U.S. Dep't of

25  Agric., 481 F. Supp. 2d 1059, 1076, 1090, 1097 (N.D. Cal. 2007),

26  the court held that the Forest Service's adoption of the 2005

27  regulations violated both NEPA and the Endangered Species Act,

28  ///

16

1   and enjoined the Service from implementing or utilizing the 2005
2   rules on a nationwide basis.[8]

3        Given the Court's conclusion that the 1982 regulations apply
4   both on the programmatic level of the 2004 Framework and the
5   site-specific focus of the Basin Project, it must next consider
6   to what extent claims made in the context of the 1982 rules are
7   ripe for adjudication.

8

9        **B.  Ripeness**

10

11       Several parties intervening in this litigation[9] have argued
12   that Plaintiffs' NFMA challenges are not ripe because they
13   constitute challenges to the entire 2004 Framework, rather than
14   justiciable site-specific challenges.  (See, e.g., CSIA's Opp. to
15   Pls.' Mot. for Summ. J., pp. 6-9).  The judicial ripeness
16   doctrine is properly invoked to ensure that courts avoid
17   premature adjudication of disputes by refraining from any
18   judicial interference until a administrative decision has been
19   formalized and causes concrete ramifications to the challenging
20   parties.  Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733
21   (1998); Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49
22   (1967).  By leaving programmatic decisions and relief to the two

23   _____

24       [8] A later decision by the Citizens for Better Forestry court
     made it clear that the injunction applied on a nationwide basis.
25   See Citizens for Better Forestry v. U.S. Dep't of Agric, 2007 WL
     1970096 at *19 (N.D. Cal. July 3, 2007).
26

27       [9] Intervenors include the California Cattlemen's
     Association, the California Ski Industry Association ("CSIA"),
28   Quincy Library Group and Plumas County, and the Tuolumne County
     Alliance for Resources and Environment ("TuCare"), among others.

1   political branches of government, and addressing only site-

2   specific challenges with real and palpable ramifications, the

3   appropriate deference to the separation of powers vital to our

4   system of government is properly respected.  See Lujan v. Nat'l

5   Wildlife Fed'n, 497 U.S. 871, 891-94, 899 (1990).

6        With this analytical structure in mind, we turn to the NFMA

7   claims asserted by Plaintiffs against both the 2004 Framework and

8   the Basin Project.  The Supreme Court, in Ohio Forestry Ass'n v.

9   Sierra Club, 523 U.S. 726, has held that an NFMA-based facial

10  challenge to the overall provisions of a forest plan is not ripe

11  when premised on allegations of potential environmental hardship.

12  By permitting judicial review in a later as-applied challenge to

13  a specific implementation of the plan, judicial review and relief

14  may still be granted in advance of any concrete environmental

15  injury.  Id. at 734.  Similar NFMA challenges to forest planning

16  rules in the abstract, divorced from the parameters of intended

17  action, are similarly unripe.  Citizens for Better Forestry v.

18  U.S. Dep't of Agric., 341 F.3d 961, 977 (9th Cir. 2003).  In

19  addition, forest-wide monitoring claims are also not yet

20  appropriate for judicial review, since the wildlife information

21  the Forest Service has at any given point in time does not

22  produce direct injury in any meaningful way unless and until

23  ground-disturbing activities are imminent.  Ecology Ctr. v. U.S.

24  Forest Serv., 192 F.3d 922 (9th Cir. 1999).  To find otherwise

25  would permit the court to engage in theoretical speculation about

26  the possibility of future injury -- just the sort of "abstract

27  disagreement over administrative policies that the ripeness

28  doctrine seeks to avoid.  Ohio Forestry, 523 U.S. at 736.

18

1   With respect to the 2004 Framework, this means that

2   Plaintiffs' challenge to the overall 2004 Framework, to the

3   extent that program wide non-compliance with wildlife viability

4   and population monitoring are alleged, is unripe.  The fact that

5   the Basin Project raises issues stemming from the 2004 Framework

6   does not render the entire Framework amenable to judicial review

7   and relief.  The Supreme Court, in Lujan, supra, made this clear:

8   "[T]he flaws in the entire 'program.... cannot be
    laid before the courts for wholesale correction under
9   the APA, simply because one [implementing] action' is
    ripe for review [and] adversely affects one of
10  [plaintiff's] members.  The case-by-case approach that
    this requires is understandably frustrating to an
11  organization... [whose goal is] across-the-board
    protection of ....wildlife and the streams and forests
12  that support it.  But this.... remains the normal, mode
    of operation of the courts..... [W]e intervene in the
13  administration of the laws only when, and to the extent
    that, a specific 'final agency action' has an actual or
14  immediately threatened effect.

15  Lujan v. NWF, 497 U.S. at 893-94.

16   To the contrary, the only ripe suit entails "site-specific

17  actions as the focus of the challenge," and a showing of a "site-

18  specific injury causally related to an alleged defect in the

19  forest plan" is required before the court considers the legality

20  of a programmatic document like the Framework in the context of

21  the site-specific challenge.  Wilderness Soc'y v. Thomas, 188

22  F.3d 1130, 1133-34 (9th Cir. 1999).  Any relief accorded by the

23  court is limited to the scope of the justiciable site-specific

24  controversy.  Lujan v. NWF, 497 U.S. at 894 (review and relief

25  "only... to the extent" required to adjudicate a site-specific

26  action).

27   Here, the effects of forest treatments contemplated by the

28  Basin Plan represent a tangible, rather than theoretical injury.

19

1  Moreover, to the extent that the lawfulness of the Basin Plan

2  hinges on whether or not site specific practices are premised on

3  the propriety of forest-wide management practices, both the Basin

4  Plan itself and the 2004 Framework upon which it relies may be

5  scrutinized.  <u>Neighbors of Cuddy Mtn. v. Alexander</u>, 303 F.3d

6  1059, 1067 (9th Cir. 2002).

7      As <u>Cuddy Mountain</u> recognizes, it must nonetheless be

8  emphasized that not all forest-wide practices can be challenged

9  on the coattails of a site-specific action; there must be a

10  causal relationship between the lawfulness of the site-specific

11  action and the practice challenged.  <u>Id.</u>

12      As a practical matter, this means that the 2004 Framework

13  may be challenged under NFMA only to the extent its provisions

14  are implicated within Plaintiff's challenge to the site-specific

15  Basin Project.  All other general challenges to the 2004

16  Framework as a programmatic document are unripe.

17

18      **C.  Failure to Maintain Viable Species Populations**

19

20      Plaintiffs maintain that the record in this case

21  demonstrates the inadequacy of the 2004 Framework to maintain

22  viable species, and particularly targets the inadequacy of the

23  Framework to ensure sufficient populations of the California

24  spotted owl, the Pacific fisher, and the American marten.

25  Plaintiffs point to the fact that the 1982 NFMA regulations

26  require the Forest Service to manage wildlife habitat so as "to

27  maintain viable populations of existing native and desired non-

28  native vertebrate species in the planning area."  36 C.F.R.

20

1  § 219.19; <u>see also</u> <u>Oregon Natural Desert Ass'n v. U.S. Forest</u>
2  <u>Serv.</u>, 2004 WL 1592606 at *2 (D. Or. 2004) ("[NFMA] imposes a
3  substantive duty on the Forest Service to provide sufficient
4  habitat to maintain viable, well-distributed populations of
5  wildlife species throughout their existing ranges.").  By
6  enforcement of these alleged NFMA violations under NEPA,
7  Plaintiffs urge the Court to find the 2004 Framework arbitrary
8  and capricious, and to set aside all projects approved in
9  accordance with the Framework, including the Basin Project.  <u>See</u>
10  <u>Idaho Sporting Congress v. Rittenhouse</u>, 305 F.3d 957, 966 (9th
11  Cir. 2002) ("If the forest plan's [viability] standard is
12  invalid... then the timber sales that depend upon it to comply
13  with [NFMA] are not in accordance with law and must be set
14  aside.").

15      As discussed above, however, assessment of the validity of
16  such viability standards is necessarily limited by the scope of
17  the site-specific project at issue.  The plan-level challenge to
18  the Framework is therefore confined to the plan-level issues
19  found in the Basin Project.  <u>See</u> <u>Ohio Forestry</u>, 523 U.S. at 734.
20  Since we have also established that the 1982 planning regulations
21  apply, we hence analyze the viability issues raised by the Basin
22  Project, with the 2004 Framework coming into play only to the
23  extent its planning directives in that regard are manifested by
24  Basin.

25      Another fundamental concept that guides our viability
26  assessment is the notion that forest management cannot be guided
27  by a single, overarching objective that eclipses consideration of
28  other legitimate forest uses.  Such multiple use compromises are

21

1  implicit in the overall mandate of the NFMA.  See 16 U.S.C.

2  § 1604(g)(3)(B) (species diversity to be addressed in light of

3  "overall multiple-use objectives"); 36 C.F.R. § 219.27(a)(6)

4  (2000) (species habitat to be maintained and improved "to the

5  degree consistent with multiple-use objectives"); 36 C.F.R.

6  § 219.26 (provide for diversity consistent with multiple-use

7  objectives of the planning area); 36 C.F.R. § 219.27(a)(5)

8  (forest plans should "maintain diversity of plant and animal

9  communities to meet overall multiple-use objectives"); see also

10  Lands Council v. McNair, __ F.3d __, 2008 WL 264001 at *6 (9th Cir.

11  2008) (Congress has "consistently acknowledged that the Forest

12  Service must balance competing demands in managing National

13  Forest Service lands"); Seattle Audubon Soc. v. Moseley, 80 F.3d

14  1401, 1404 (9th Cir. 2006).

15      In examining the viability of the three species Plaintiffs'

16  claim is compromised by the Basin Plan, and in turn its

17  programmatic blueprint, the 2004 Framework, then, considerations

18  of multiple use must be kept in mind.  The Forest Service has

19  substantial discretion in how to balance multiple resource use on

20  its lands, even to the extent that such uses intersect with

21  viability concerns.  See 16 U.S.C. § 529 (directing Secretary of

22  Agriculture to administer forest lands for multiple uses and

23  sustained yield); Lands Council v. McNair, 2008 WL 2640001 at 6

24  ("[T]he NFMA is explicit that wildlife viability is not the

25  Forest Service's only consideration when developing site-specific

26  plans for National Forest System lands"); Perkins v. Bergland,

27  608 F.2d 803, 806 (9th Cir. 1979).

28      Significantly, as long as all relevant considerations are

1  properly weighed and analyzed, the Forest Service can decide not

2  to adopt a course intended to facilitate viability to the

3  greatest extent possible if such a course would compromise other

4  multiple use objectives.  See Seattle Audubon Soc. v. Moseley,

5  80 F.3d at 1404.  The language of the 1982 NFMA regulations

6  themselves, at 36 C.F.R. § 219.19, requires only that sufficient

7  habitat be managed to maintain a "viable population" of desired

8  species, with that term defined one which has a sufficient number

9  of reproductive individuals to insure that the species'

10  "continued existence is well distributed in the planning area."

11  This does not require that species' numbers be maximized by

12  adoption of the most protective forest management measures.

13  Instead, the Ninth Circuit has recognized that § 219.19 simply

14  sets a minimum threshold for ensuring enough reproductive

15  individuals "so that the species can survive."  Idaho Sporting

16  Congress, Inc. v. Rittenhouse, 305 F.3d 957, 963 (9th Cir. 2002).

17      The Basin Project's BA/BE analyzed the amount of suitable

18  wildlife habitat currently available within the project area and,

19  after comparing that assessment with habitat changes resulting

20  from implementation of the project, concluded that 72 percent of

21  the acreage comprising the Basin planning area would remain good

22  owl, fisher and marten habitat even after contemplated fuel

23  treatment activities had been completed.  See BASIN 3539 and 3553

24  (owl PACs, SOHA,[10] and additional nesting and foraging habitat

25  total 37,833 acres in the 52,570 acre analysis area); BASIN 3695

26

27      [10] Spotted Owl Habitat Areas ("SOHA") are defined as
28  designated stands of owl habitat, comprising at least 1,000 acres
   located within a 1.5 mile radius of a nesting site.

1  (projected changes in CWHR[11] habitat types).

2      This number in and of itself suggests that completion of the

3  Basin Project will leave vast amounts of suitable habitat

4  untouched, a factor which would appear to bode well for continued

5  viability of the three species at issue within the area of the

6  Basin Project.  Significantly, the Ninth Circuit's recent

7  decision in <u>Lands Council v. McNair</u> reaffirms that the amount of

8  suitable habitat for a particular species may properly be used as

9  a proxy for the viability of that species.  2008 WL 2640001 at

10 *12.

11     Importantly, too, other factors considered by the Forest

12 Service in approving both the Framework and the project itself

13 bolster that conclusion.  With regard to the California spotted

14 owl, the 2003 Meta-analysis of all existing demographic data

15 found the owl to be, within a 95 percent confidence level, a

16 stable population and not declining as was previously believed.

17 BASIN 3720.  Moreover, the latest research considered by the

18 Forest Service in considering the 2004 Framework indicated 1)

19 that owls utilize a wider variety of habitat for foraging

20 (namely, habitats with canopy coverage of 40 percent or greater)

21 than previously thought; 2) that owls are being protected on

22 private timberlands pursuant to state law; 3) that owls are not

23 suffering from any demonstrable population declines; and 4) that

24 owls are suffering habitat loss from wildfires.  SNFPA 3099,

25 3213-18.

26     The Herger-Feinstein Quincy Library Group ("HFQLG") Act, of

27 _____

28     [11] The California Wildlife Habitat Relationship ("CWHR")
    system assigns categories based on tree size and canopy cover.

1   which the Basin Project is a part, is more protective of owls

2   than either the 2001 or 2004 Frameworks because it completely

3   prohibits logging in owl PACs.  BASIN 1077.  Because owls appear

4   to be widely distributed throughout both the Plumas National

5   Forest and the Basin Project area (BASIN 1168, 3694), and given

6   the protection accorded to the most crucial habitat area (PACs

7   and SOHA), the Forest Supervisor reasonably concluded that owl

8   viability could be achieved while also carrying out the multi-use

9   objectives of the HFQLG Act.  BASIN 3644-45.  This was believed

10  to be particularly true inasmuch as overall owl habitat is

11  projected to increase under the 2004 Framework (see SNFPA 3340),

12  with a larger number of old trees resulting from both tree

13  retention and, by virtue of anticipated forest thinning, a

14  decreased loss of large trees to stand-replacing fire. See SNFPA

15  3346, 3316.  By decreasing the risk of catastrophic wildfire

16  through such selective thinning, lesser amounts of suitable old-

17  growth owl habitat are subject to destruction while at the same

18  time promoting multiple-use objectives like timber production and

19  protection to human community resources.  This multi-use synergy

20  is consistent with NFMA mandates, and approval of the Basin

21  Project does not run afoul of statutory viability standards

22  applicable to the California spotted owl under these

23  circumstances.

24      As indicated above, the other two species implicated by

25  Plaintiffs, the American marten and the Pacific fisher, are both

26  forest carnivores.  Although the BA/BE for the Basin Project

27  discussed both population and habitat data concerning four forest

28  carnivores, including both the fisher and marten, only the marten

25

1   has been sighted at locations within the Plumas National Forest

2   where the Basin Project is situated.  BASIN 3353.   The BA/BE

3   explains that systematic surveys of the project area,

4   encompassing "approximately 50% of the forest, have failed to

5   reveal either the presence of fisher[12] or the other two absent

6   furbearer species, the Sierra Nevada red fox and the wolverine."

7   BASIN 3554.

8       Because the fisher does not appear to inhabit the Basin

9   Project only, it was unnecessary for the Forest Service to have

10  analyzed the impacts to the Fisher as to that site-specific

11  project, and for the reasons stated above any generalized

12  challenge to the 2004 Framework as a whole with respect to

13  fishers would be unripe.   Nonetheless, as the Framework points

14  out, the owl and fisher share many of the same preferred old-

15  growth habitat attributes, and hence the protections afforded to

16  the owl as would appear to benefit any potential fisher

17  population as well.  See SNFPA 2997, 3315.

18      With regard to the marten, the Forest Service looked at the

19  fact that marten will use harvested areas for habitat, as long as

20  adequate ground cover and downed logs remain onsite.   SNFPA 3325.

21  This corresponds with the group selection units which figure

22  prominently in the Basin Project as well the HFQLG Act area as a

23  whole, and the SEIS concluded that those units were "within the

24  size range of openings used by marten."   SNFPA 3329.   In

25

26      [12] Data contained within the 2004 Framework indicates that
    numerous survey efforts on an even larger scale for the fisher
    have "failed to find.... this species on Forest Service lands in
27  the area between Mount Shasta and Yosemite National Park."   SNFPA
    986.  See also SNFPA 957 (fishers are "absent north of Yosemite
28  National Park").

1  addition, a network of high quality habitat for forest

2  carnivores, including martens, has been delineated within the

3  SEIS, which "provide[s] connectivity to marten populations to the

4  north and south of the HFQLG" area.  Id.  Additionally,

5  Scientific Analysis team guidelines applicable to the HFQLG Act

6  establish treatment buffers around riparian areas, which are of

7  "high importance to marten and are often used as corridors.

8  SNFPA 3329; 16 U.S.C. § 2104 note, Sec. 401(c)(2)(a).

9       Perhaps most importantly, in concluding that viability for

10  all three species would be maintained by the Basin Project, the

11  Forest Service relied upon the fact that forested habitats

12  affected by the project would be a relatively small 3.6 percent

13  of the total project areas.  Additionally, surveys are required

14  for both owl, fisher, and marten prior to commencement of a site-

15  specific project like Basin.  SNFPA 3698, 3699.  If any new owl

16  territories of fisher or marten dens are located, the Forest

17  Service has developed an adaptive plan to respond to such

18  findings, a plan that could include changing treatment

19  prescriptions, excluding project activity from implicated harvest

20  units, or proceeding under limited operating periods ("LOPs"),

21  which are designed to reduce potential harm to wildlife during

22  critical seasons like nesting or fawning.  Id., see also SNFPA

23  3537.

24       Because the Basin Project was deemed to be fully consistent

25  with the terms of the 2004 Framework, the Basin EA  properly

26  tiered its analysis to the 2004 Framework SEIS, and could

27  maintain viability standards by following the 2004 Framework

28  standards and guidelines discussed above.  See BASIN 3645, 3663,

27

3683; see 40 C.F.R. § 1502.20 (encouraging tiering to "eliminate repetitive discussion about the same issues and to focus on the actual issues ripe for decision"); see also Portland Audubon Soc'y v. Lujan, 884 F.2d 1233, 1239 (9th Cir. 1989 (upholding an Environmental Assessment's tiering to a programmatic EIS).)

    In sum, given the relatively small percentage of suitable habitat affected by the Basin Project for any of the species implicated by Plaintiffs in their NFMA challenge to the Basin Project, as well as the consideration accorded for multiple use objectives, the Forest Service did not act arbitrarily or capriciously in finding that the Project would maintain species viability concurrently with meeting other multiple-use objectives.  The mandates of NFMA was therefore satisfied and the Forest Service is entitled to summary adjudication as to Plaintiffs' First and Fourth Claims, which allege that the Forest Service failed to maintain viable populations of California spotted owls, Pacific fishers and American martens throughout the Sierra Nevada planning area.


### D.  **Population Monitoring**


    Plaintiffs also allege that the Forest Service adopted the 2004 Framework, and thereafter the Basin Project, in the absence of information required under the NFMA for Management Indicator Species ("MIS") and Species at Risk ("SAR").  Plaintiffs point to the fact that under the 1982 NFMA regulations, the Forest Service is required to monitor population trends for each MIS.  See 36 C.F.R. § 219.19(a)(6) ("Population trends of MIS "will be

1  monitored and relationships to habitat changes determined.").

2  According to Plaintiffs, the application regulation requires MIS

3  population inventories consisting of quantitative data.

4  36 C.F.R. § 219.26 ("Inventories shall include quantitative data

5  making possible the evaluation of diversity in terms of its prior

6  and present condition.").

7      Consistent with the regulations, the 2001 Framework

8  designated certain MIS for the Sierra Nevada planning area in

9  Exhibit E of its final EIS.  Appendix E goes on to indicate the

10 specific species "for which population trend data is expected to

11 be obtained" by way of population monitoring.  FEIS Vol. 4 at

12 E-64-66, 76, 98-100.  The Forest Service incorporated and

13 re-adopted Appendix E from the 2001 FEIS when it approved the

14 2004 Framework.  See SNFPA 3060.

15     While Plaintiffs attempt to challenge the Forest Service's

16 purported failure to perform the required monitoring on a

17 Framework-wide basis, as stated above the only ripe NFMA claims

18 are those that relate specifically to the Basin Project as a

19 site-specific plan.[13]  Accordingly, the only MIS or SAR at issue

20 are those that are found within the Plumas National Forest plan

21 in which the Basin plan area is located.  Species not identified

22 in the Plumas Forest Plan do not "play[] a causal role" in the

23

24     [13] The Court disagrees with Plaintiffs' assertion that the
   Forest Service had a duty to collect quantitative population
25 monitoring data prior to the promulgation of a forest plan
   amendment like the 2001 or 2004 Framework.  The applicable 1982
26 regulations state only that population trends "will be monitored
   and relationships to habitat change determined," not that
27 population monitoring must be conducted before even approving
   directives for future forest management.  See 36 C.F.R.
28 § 219.19(a)(6) (2000).

1  Basin Project.  Ohio Forestry, 523 U.S. at 734.  Consistent with

2  this conclusion, the SEIS itself recognizes that "MIS are

3  identified in the Land and Resource Management Plans of each

4  national forest ..." SNFPA 3238, emphasis added.  Therefore, as a

5  fundamental matter, there can be no duty to obtain or consider

6  population monitoring data for MIS that are not found within the

7  Plumas National Forest plan.  The Plumas Forest Plan lists

8  fifteen species and species groups as MIS: bald eagle, golden

9  eagle goshawk, peregrine falcon, prairie falcon, spotted owl,

10  Canada goose, woodpecker group, deer group, gray squirrel,

11  marten, trout group, largemouth bass, sensitive plant group, and

12  willow-alder community.  BASIN 2917.  The Basin EA considered

13  effects upon the habitat of all of these fifteen Plumas MIS.

14  Since it appears uncontroverted that actual quantitative

15  population monitoring was not performed,[14] however, the question

16

17      [14] The Forest Service admits in the FSEIS for the 2004
    Framework, for example, that population data exists only "for
18  some of the species considered in the analysis" and is "generally
    lacking" for MIS.  SNFPA 3242.  With respect to the owl, however,
19  ongoing demographic studies were analyzed in the SEIS, and fisher
    monitoring data were collected during the field seasons falling
20  within fiscal years 2002 and 2003.  SNFPA 3151-52, 3156.  The
    documents prepared in support of the Basin Project are similarly
21  devoid of much quantitative data demonstrating population trends
    for most species.  With regard to the California spotted owl,
22  however, the Basin Project record indicates that Forest Service
    researchers have been monitoring owl populations in the Basin
23  Project area and other administrative study areas annually since
    2002.  BASIN 3551.  The results of these and other pre-project
24  owl surveys are disclosed in the BA/BE at BASIN 3551-52.  (3151-
    52, 3156).  In addition, the Basin BA/BE discloses that protocol-
25  level surveys of the Basin Project area in 2003-04 showed no sign
    of the presence of forest carnivores.  Hence, at least with
26  regard to the three species focused on by Plaintiffs with regard
    to monitoring, the spotted owl, American marten and Pacific
27  fisher, it appears that monitoring was performed, and that
    monitoring in conjunction with minimal disturbance to suitable
28                                                    (continued...)

1  remains whether the Forest Service's failure in that regard
2  violates the NFMA.

3       The Forest Service initially argues that it met its
4  monitoring requirements by engaging in an assessment of species
5  habitat as a proxy for changes in population.  See Native
6  Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1250-51
7  (9th Cir. 2005); Inland Empire, 88 F.3d at 759, 763; Utah
8  Environmental Congress v. Bosworth, 372 F.3d 1219, 1224 (10th
9  Cir. 2004).  Although habitat assessment may suffice for actual
10 population monitoring in some situations (where for example some
11 actual population data has already been obtained), here there
12 appears to be a paucity of numerical data, and in that instance
13 NFMA requirements are not ordinarily satisfied.  See Sierra Club
14 v. Martin, 168 F.3d 1, 4-6 (11th Cir. 1999).  This is
15 particularly the case given the fact that Appendix E to the 2001
16 and 2004 Frameworks appears to require population monitoring as
17 opposed to habitat analysis.  See Eubanks, 335 F. Supp. 2d at
18 1082.

19      The Court nonetheless recognizes that the Ninth Circuit has
20 indicated that monitoring directives contained in forest plans
21 like the 2001 and 2004 Frameworks are not judicially enforceable.
22 See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 67-72
23 (2004) (species monitoring in designated areas, "like the other
24 'will do' projections of agency action set forth in land use
25 plans —— are not a legally binding commitment").  On the other

26

27      [14](...continued)
28 habitat was sufficient for the Forest Service to rely on habitat
   with regard to those species.

1  hand, however, a slightly more recent Ninth Circuit decision,

2  Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1153 (9th

3  Cir. 2006), appears to suggest otherwise.  In finding that

4  approval and implementation of a site-specific project was

5  contrary to the NFMA and governing provisions of the forest plan,

6  the Earth Island court explained that because the Frameworks

7  expressly required population monitoring, "it is difficult to see

8  how distribution data could effectively be gathered in the

9  absence of actual population monitoring."  Id. at 1175-76.

10      The recent enactment of a new forest plan amendment

11  applicable to all the national forests in the Sierra Nevada

12  region (the "2007 Amendment"), however, removes any uncertainty

13  in this regard, since the 2007 revision expressly removes the

14  population monitoring requirements contained in the 2001 and 2004

15  Frameworks.[15]  The 2007 Amendment is authorized by NFMA

16  provisions that permit the Forest Service to amend forest plans

17  "in any manner whatsoever."  16 U.S.C. § 1604(f)(4).  This broad

18  delegation of authority gives the Forest Service discretion to

19  determine whether forest plan amendments can be applied

20  retroactively.  See Forest Guardians v. Dombeck, 131 F.3d 1309,

21  1312 (9th Cir. 1997) ("Congress intended to grant the Secretary

22  discretion in amending existing forest plans, including the

23  discretion to determine how those amendments will be

24  implemented," whether prospectively or retroactively).

25

─────────────────

26      [15] The 2007 Amendment was issued following preparation of an
    environmental impact statement and after the public was afforded
27  the appropriate opportunity for involvement through commentary
    and feedback.  See 2007 Amendment, Ex. "A" to Fed. Defs.'
28  February 7, 2008 Notice of Changed Circumstances, p. 9-10.

1   The 2007 Amendment recognizes that current MIS lists and

2   associated monitoring "are simply not working for a variety of

3   reasons, including inclusion of species whose population changes

4   are not clearly related to habitat changes on National Forest

5   lands, and inclusion of species not present in sufficient numbers

6   to allow collection of meaningful information."  The 2007

7   Amendment changes the standard for evaluating whether a site-

8   specific project like the Basin Project complies with MIS forest

9   plan requirements in general, and further provides a specific

10  exemption for pending projects like Basin where an EA has been

11  completed and a decision made.  For those projects, the 2007

12  Amendment makes it clear that

13      "obligations relating to MIS will have been met if the
        project record discloses impacts the project may have
14      on MIS habitat or populations, using the MIS list in
        effect at the time the MIS analysis was conducted.  No
15      other project-level analysis or disclosure requirements
        shall apply to these project, including any particular
16      requirements related to MIS set forth in Appendix E of
        the 2001 Sierra Nevada Forest Plan Amendment FEIS or
17      the individual forest plans covered by this amendment.
        All such requirements are superseded by this
18      direction."

19  2007 Amendment, Ex. "A" to Fed. Defs.' Notice of Changed
    Circumstances, p. 15.
20

21      With regard to Species at Risk ("SAR"), a classification

22  with respect to which Plaintiffs argue that Forest Service also

23  ran afoul of NFMA provisions, the 2007 Amendment states

24  unequivocally that there are no legal requirements for monitoring

25  SAR.  Id. at 13.

26      Given the unfettered discretion granted by Congress to the

27  Forest Service, pursuant to 16 U.S.C. § 1604(f), to amend forest

28  plans "in any manner whatsoever", and the fact that such

33

discretion has been expansively interpreted by the Ninth Circuit
as permitting amendment either prospectively or retroactively
(Dombeck, 131 F.3d at 1312), this Court concludes that the 2007
Amendment renders any monitoring controversy concerning the Basin
Project moot.  See Colorado Off Highway Vehicle Coalition v. U.S.
Forest Serv., 357 F.3d 1130, 1133-34 (10th Cir. 2004)(arguments
based on failure to comply with earlier version of Forest Plan
rendered moot by issuance of new Plan which superseded its
challenged predecessor); see also Forest Guardians v. U.S. Forest
Serv., 329 F.3d 1089, 1096 (9th Cir. 2003)(challenge to earlier
biological opinion rendered moot by issuance of superseding
version).

     Plaintiffs' attempt to distinguish the Colorado Off Highway
case on grounds that in that case, unlike the present matter, the
Plaintiff failed to challenge the validity of the amended plan.
The Court does not view that factor as dispositive given
Colorado's fundamental holding that no legal attack can be made
against an administrative decision superseded by issuance of a
new Forest Plan.  That mootness holding applies equally to this
case.  Colorado Off Highway Vehicle Coalition, 357 F.3d at at
1134.

     The Court is similarly unpersuaded by Plaintiffs'
contention that the monitoring issue remains viable because
retroactive application of the 2007 Amendment regarding MIS
monitoring is contrary to NFMA and because the Amendment itself
is inconsistent with the applicable regulations.  See Pls.' Reply
to Notice of Changed Circumstances, 3:25-4:2.  First, as already
indicated, retroactive application of the applications if

34

1  permissible given the broad sweep of 16 U.S.C. § 1604(f) and the
2  Ninth Circuit's interpretation of the statute in <u>Dombeck</u>.
3  Additionally, as also stated above, the 1982 regulations require
4  that population trends of MIS "will be monitored and
5  relationships to habitat changes determined." 36 C.F.R.
6  § 219(a)(6).  The regulation does not specifically dictate how
7  monitoring should be accomplished, and the Ninth Circuit has
8  held, even in the face of the 1982 regulations, that actual
9  monitoring need not be conducted where the Forest service has
10 utilized a reliable alternative methodology instead.  <u>See</u> <u>Inland</u>
11 <u>Empire Pub. Lands Council v. U.S. Forest Serv.</u>, 88 F.3d 754, 763
12 (9th Cir. 1996) (finding that the Forest Service did not violate
13 NFMA in analyzing habitat instead of conducting actual population
14 monitoring); <u>see also</u> <u>Native Ecosystems Council v. U.S. Forest</u>
15 <u>Serv.</u>, 428 F.3d 1233, 1250-51 (9th Cir. 2005)(recognizing
16 circumstances where Forest Service need not conduct actual
17 population monitoring); <u>Idaho Sporting Cong. v. Thomas</u>, 137 F.3d
18 1146, 1154 (9th Cir. 1998) (identifying instances where habitat
19 analysis can be used as a proxy for population monitoring).
20 Consequently Plaintiffs' argument that anything less than
21 monitoring cannot satisfy NFMA is misplaced.  Defendants are
22 entitled to summary adjudication as to Plaintiffs' Second Claim,
23 which alleges that the 2004 Framework and Basin Project were
24 adopted in the absence of required population trend data.
25
26 **II.  NEPA CLAIMS**
27
28      As set forth above, since Plaintiff's NFMA claims are

substantive in nature, their NFMA challenges to the 2004
Framework as a whole are only ripe for review to the extent a
site-specific project like Basin brings specific provisions of
the Framework to the forefront.  NEPA, however, unlike NFMA,
imposes procedural rather than substantive requirements.
Consequently, the 2004 Framework can be properly scrutinized in
toto to ensure that those procedural mandates have been
satisfied.

As also indicated above, NEPA only requires that federal
agencies establish a consistent process for considering
environmental impacts, and take a "hard look" at the consequences
of such impacts.  Vermont Yankee Nuclear Power v. NRDC, 435 U.S.
519, 558 (1978).  So long as "the adverse environmental effects
of the proposed action are adequately identified and evaluated,
the agency is not constrained by NEPA from deciding that other
values outweigh the environmental costs."  Id.

### A.   Failure to Adequately Consider Direct and Indirect Impacts to Old-Forest Species

Plaintiffs' Fifth Claim alleges that the 2004 Framework
violates NEPA by not adequately analyzing impacts to species like
the owl, fisher and marten, which all prefer old-growth forest
conditions.  Pls.' Second Am. Compl., ¶¶ 113-119.

In analyzing whether the Forest Service was deficient in
this regard, it is important to initially consider the extent to
which the 2004 Framework is expected to impact old-growth
habitat.  The record discloses that any such effect apears
minimal.  No treatments under the Framework are projected for

36

some 86 percent of Old Forest Emphasis Area ("OFEA").  SNFPA
3332.  Treatment in Protected Activity Centers ("PACs"), which,
as indicated above, comprise 300 acre parcels around each known
owl nest or roosting site, are very limited throughout the
Framework area[16] and virtually nonexistent in the HFQLG area
where most of the logging is scheduled to take place.  SNFPA
2997; 3121-3122; 3336.  Moreover, no treatment of any kind will
occur within 80 percent of the 1,000 acre Home Range Core Areas
("HRCAs") set aside in conjunction with each PAC, and to the
limited extent such treatments occur they are permitted only
outside a 500 acre radius surrounding the PAC.  Id., see also
SNFPA 3334.  Even outside of HRCAs and PACs, the more intensive
vegetation treatments under the 2004 Framework are likely to
reduce canopy cover to 40 percent on only 8 percent of acres
treated currently at 50 percent canopy cover or greater.  SNFPA
3344.  Treated areas will retain landscape features recognized as
being important to old-forest dependent species, like larger
trees (in excess of 30 inches in diameter), snags, and 40 percent
plus canopy.  SNFPA 2995; 2997; 3341.

    Finally, in comparing the 2001 and 2004 Frameworks, there is
a negligible difference in the short run between 2001 and 2004
Frameworks as to the available acres of late seral stage forest,

---

    [16] Under the 2004 Framework, the maximum of PAC acres that
could be affected is 5 percent per year and 10 percent per
decade.  SNFPA 3334.  Only 4 percent of PAC acres under 2004
Framework would be treated within 26 percent of existing PACs.
SNFPA 3350.  All known owl nesting sites would be protected and
PACs would be established for newly discovered sites.  SNFPA
3334.  With respect to the 1,321 existing PACs established
through 2002, they would be retained and treatment avoided to the
extent possible.  SNFPA 2997; 3121-3122; 3336.

1  with an overall increase in the long term (60 plus years).  SNFPA
2  3327.

3      On the basis of the quantified habitat impact disclosed by
4  the 2004 Framework, then, the effect of the 2004 Framework on
5  old-forest species appears negligible.  Plaintiffs nonetheless
6  claim that the short-term effects upon such species have not
7  adequately been disclosed for purposes of NEPA.

8      Any consideration of the effects of vegetation treatments in
9  the Sierra Nevada necessarily involves a difficult balancing act
10  between the short-term risk that some old-growth species may be
11  displaced by any habitat disturbance, and the longer term risk
12  that without reducing forest density through thinning and logging
13  operations, stand-replacing wildfires may eliminate suitable
14  habitat in its entirety.  The FSEIS for the 2004 Framework
15  specifically recognizes that it is a very difficult task to find
16  the best way to protect old forest dependant species and to
17  increase and perpetuate old forest ecosystems, while at the same
18  time addressing the desperate need for forest intervention to
19  reduce the risk of fuel loads feeding catastrophic fires.  SNFPA
20  2995.  A thinning program to reduce the risk of catastrophic
21  wildfire will reduce the likelihood of stand-replacing fires in
22  old growth areas in the future.  SNFPA 2995, 3083; 3266, 3336.

23      Significantly, as the FSEIS also recognizes, recent fire
24  seasons illustrate the risks from inaction as the number and
25  severity of acres burned in wildfires continues to increase, with
26  tragic losses to communities, their people and resources, as well
27  as to wildland firefighters.  Moreover, to the extent that
28  forests are overstocked and drought conditions are present, an

1  overall lack of sufficient moisture makes forest drier and not
2  only more susceptible to fire but also prone to insect and
3  disease damage.  SNFPA 2996.  The Forest Service has the
4  unenviable task of attempting to simultaneously weigh these
5  significant competing considerations with the risks, both long
6  and short term, to old-forest species like the owl, fisher and
7  marten.

8      Despite Plaintiffs' claim that the 2004 Framework fails to
9  provide enough analysis of its likely impacts to wildlife,
10  especially in short run, the SEIS does recognize the importance
11  of addressing short term impacts.  The importance of
12  consideration short term impacts on the owl is specifically
13  recognized.  See SNFPA 3327, 3337 ("With regard to owl population
14  persistence, the short-term effects of management activities are
15  believed to be most relevant.... and are highlighted in this
16  effects analysis."), see also SNFPA 3339-3345.  The FSEIS
17  additionally recognizes that logging treatments "over the short-
18  term (20 years) may introduce some unknown level of risk to the
19  California spotted owl population."  SNFPA 3340.

20      The 2004 Framework nonetheless attempts to mitigate that
21  risk, while at the same time meeting not only the long term
22  objective of long-term habitat preservation through the reduced
23  risk of stand-replacing fire, but also the other multi-use
24  considerations enumerated above.  Although uncertainty remains
25  concerning rangewide population trends, there is no definitive
26  evidence that overall owl populations are decreasing across the
27
28

1  Sierra Nevada.  SNFPA 3214.[17]   The 2003 meta-analysis conducted

2  by spotted owl biologists, which includes the only demographic

3  studies of owl population trends, survival and reproduction over

4  the previous 7 to 12 years, recommends adaptive management

5  experiments to evaluate the effects on the owl of silvicultural

6  treatments designed to reduce fire risk.  SNFPA 3152.  Adaptive

7  management strategies are "intended to improve scientific

8  knowledge regarding the fire and fuels strategy as well as

9  habitat relationships and vegetation management effects on

10 California spotted owls."  SNFPA 3608.  Adaptive management

11 encourages scientific scrutiny so that elements of the plan can

12 be adjusted to "better balance management of the California

13 spotted owl with management for other resources and activities.

14 Id.

15    The 2004 Framework does adopt adaptive management

16 strategies, which permit the Forest Service to respond to any

17 short-term impacts as they are ascertained.  The California

18 Spotted Owl Response Module, for example, is designed to provide

19 information on treatment effects at both the individual site and

20 population level scales in addressing numerous issues, including

21

22    [17] In addition, the United States Fish and Wildlife Service
   ("FWS") concluded from an analysis conducted by both the FWS and
23 the Forest Service that "there was no clear statistical evidence
   to show that the [California spotted] owl was decreasing across
24 its range."  SNFPA 3995.  FWS determined that in the absence of
   demonstrated effects of fuel treatments in PACs and foraging
25 areas, and considering that any potential negative impacts are
   also accompanied by positive effects from fire risk reduction and
26 faster development of high quality habitat, we find that 2001
   Framework does not constitute a significant threat to CASPO at
27 this time.  SNFPA 3258  Based on both the 2004 SEIS and its
   accompanying BE the Forest Service concluded that while the 2004
28 Framework decision "may affect individuals, but [is] not likely
   to trend toward Federal listing."  SNFPA at 3946.

population density, trends, habitat suitability, reproduction and
survival using radio telemetry and sampling techniques.  SNFPA
3155.  The 2004 Framework indicates that funds have been provided
to execute a total of five modules that comprise this integrated
research project, which significantly includes examination of
effects not only on the owl but also on small mammal habitat
associations (presumably including the fisher and marten) and
vegetation response to fuel treatments in general.  Id.

     In addition to using adaptive management strategies as a way
of managing short-term impacts, the 2004 Framework also utilizes
modeling projections to aid in a thorough assessment of such
impacts.  A comparative analysis was conducted on late-seral
stage forest in the short term, including years 0 through 20.
SNFPA 3326-3327.  Through such projections, the Forest Service
predicted that the amount of old forest is projected to increase
across the bioregion in the short term, "despite treatments in
approximately 14 percent of old forest emphasis areas."   SNFPA
2996, 3602.

     While the Forest Service's use of modeling projections to
predict both short and long-term impacts is criticized by
Plaintiffs as unreliable, in fact the FSEIS includes an appendix
that discloses potential errors in modeling projections.  SNFPA
3649-50.  Modeling is a legitimate projection tool where
supported by a reasonable scientific basis, and the Court
concludes that such basis is present here.  See Lands Council v.
McNair, 2008 WL 2640001 at *8.

     The Forest Service's decision to proceed forward with
vegetation management even in the face of some short-term

41

1  uncertainty as to owl impacts also must be viewed in conjunction
2  of the very real short-term risk occasioned by habitat loss due
3  to wildfire.  According to the 2004 Framework, an annual average
4  of 2.5 PACs a year have been lost or severely modified by
5  wildfire since 1998.  SNFPA 3336.  Over the last four years,
6  however, the annual loss has increased to 4.5 PACS, and according
7  to the FSEIS, mechanical thinning planned under the 2004
8  Framework is expected to reduce rate at which habitat within PACs
9  and SOHAs is lost to wildfire.  Id.

10      The FSEIS also addresses specific areas of concern
11  identified by owl scientists as representing potential areas
12  where future problems would be greatest if owl's status in Sierra
13  Nevada were to deteriorate.  SNFPA 3341.  Despite the cumulative
14  benefits of reducing devastating wildfire as discussed above, the
15  FSEIS nonetheless recognizes that the management prescriptions
16  adopted by the 2004 Framework do risk the reduction of owls and
17  owl habitat in some areas of concern.  SNFPA 3342.  This also
18  constitutes a recognition of short-term impacts.

19      Significantly, too, in terms of short-term impact, the
20  record also contains Lee and Irwin's article on assessing risks
21  to spotted owls from forest thinning, which recognizes that
22  "modest fuels treatments are compatible with territory-level
23  canopy cover needs for spotted owl reproduction in the Sierra
24  Nevada."  See SNFPA 2654.

25      Additionally, in terms of acreage, over the last 30 years
26  wildfire in the Sierra Nevada has burned an average of about
27  43,000 acres per year, whereas in the last ten years, that
28  average has risen to about 63,000 acres per year.  SNFPA 3083.

42

1   Projections comparing the anticipated effects of the 2001
2   Framework versus its 2004 successor show a decrease from 63,000
3   acres to 60,000 during the first decade.  That figure decreases
4   to 49,000 acres in the fifth decade, with implementation of the
5   2004 Framework estimated as accounting for a 22 percent decrease
6   in the acreage lost due to wildfire as opposed to only 2 percent
7   with the 2001 version.  Id.  To the extent that the hypothesized
8   trend of increasingly large, high severity wildfires is correct,
9   the rate of loss of PACs would be expected to mirror this
10  increase.  That suggests a severe short-term risk.

11      According to the FSEIS, any short-term decreases in certain
12  owl habitat are counterbalanced by longer term cumulative
13  increases in all suitable habitat types.  SNFPA 3336.  Moreover,
14  because of the risk of negatively affected CASPOs in the short
15  term by mechanical treatments, the FSEIS directs line officers
16  to proceed with extreme caution when proposing and vegetation
17  management within PACs and to attempt to avoid such treatment
18  wherever possible.  SNFPA 3350.

19      The fisher's habitat needs are similar to that preferred by
20  owls.  SNFPA 3314.  Although the 2004 Framework predicts that
21  fisher habitat attributes will also trend upwards over time
22  (SNFPA 3320), Plaintiffs nonetheless claim that the extent of
23  short term habitat degradation not properly analyzed.  Plaintiffs
24  further contend that the short-term impact of forest management
25  over the next 10-20 years is also of primary concern for the
26  fisher, because "[g]iven the current low density of fishers in
27  the Sierra Nevada.... the loss of even a small number of fishers
28  could significantly impact the population."  FEIS Vol. 3. Ch. 3,

43

1  pt. 4.4 at 9.

2      The FSEIS for the 2004 Framework does analyze short-term

3  impacts to the fisher as summarized in the section entitled

4  "Habitat Conditions in the Short-Term and Long-Term.  SNFPA 3314.

5  The Forest Service determined that short-term impacts on snag

6  levels, down wood debris, and fisher prey would not be

7  significantly different between the treatment alternative chosen

8  under the 2004 Framework and its 2001 predecessor.  SNFPA 3318-

9  19.  In analyzing the short-term effects from reduced canopy

10 closure, the Forest Service found that the proposed thinning of

11 the canopy "should not limit connectivity between stands of

12 higher canopy cover, denning-quality habitat, because proposed

13 treatment would only affect approximately 25-30 percent of the

14 forested area.  SNFPA 3317.[18]

15     As to marten, the Forest Service analyzed short-term impacts

16 in finding that the short-term impacts on large live trees,

17 snags, downed woody debris and meadow and riparian habitats would

18 not be significantly different under the 2004 Framework as

19 compared to the 2001 Framework.  SNFPA 3323-3330.  Although

20

21     [18] While Plaintiffs cite an August 1, 2005 article by Truex
   and Zielinski as support for the proposition that logging
22 practices like that proposed by the 2004 Framework do in fact
   have significant short-term impacts on fisher habitat quality
23 (see Ex. B to the Loarie Decl. in Supp. of Summ J.), that 2005
   study was obviously not presented to the Forest Service prior to
24 January of 2004, the time of the 2004 decision.  With several
   limited exceptions not applicable here, such post-decisional
25 information should not be considered in evaluating the pertinent
   inquiry under NEPA; namely, whether the agency acted arbitrarily
26 on the basis of information it had at the time its decision was
   rendered.  Consequently the Court declines to consider the Truex
27 and Zielinski article here.  See Southwest Center for Biological
   Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir.
28 1996).

1   canopy cover will be impacted under both frameworks, the Forest

2   Service found that adequate levels of ground cover and downed

3   logs would remain to provide suitable marten habitat.  SNFPA

4   3325.  Because suitable habitats for the marten are currently

5   either broadly distributed or highly abundant because of the

6   relatively minimal impact either Framework will have on the

7   marten, both the 2001 and 2004 Frameworks are expected to result

8   in a broad distribution of marten.  SNFPA 3330.  At any rate, the

9   effect of fuels treatment proposed by the 2004 Framework upon

10  marten habitats is expected to be minimal in any event because

11  marten typically occupy habitats at higher elevations than most

12  of the proposed treatment areas.  SNFPA 3325.

13       Additionally, examination of the Framework shows that more

14  emphasis of short-term effects was added to the FEIS in response

15  to public comments.  As the Forest Service stated, "the FEIS

16  discusses short-term impacts of the Alternatives on CASPOs and

17  considered the tradeoffs of treatments to protect and enhance

18  long-term sustainability of resources, species viability, and

19  impacts on multiple resources.  It is the responsibility of the

20  Responsible Official to weigh this information and select the

21  alternative that best balances risk, uncertainty, effects to

22  resources, and public welfare and safety."  SNFPA 3517.  The SEIS

23  recognizes that there is continuing scientific uncertainty

24  regarding habitat relationships and population trends of the

25  California spotted owls.  The SEIS also recognizes that there is

26  considerable concern for the long-term habitat loss and

27  fragmentation caused by large high severity wildfires."  SNFPA

28  3606.

45

1   In sum, Plaintiffs' arguments that the SEIS does not
2   adequately consider short-term effects upon old forest species
3   reflect a desire to see a level of detail that is not expected
4   for a programmatic EIS, and a level of certainty that is not
5   required by NEPA.  The Ninth Circuit's decision in Ecology Center
6   v. Austin, 430 F.3d 1057 (9th Cir. 2004), relied upon by
7   Plaintiffs, involved a project decision, not a programmatic
8   decision, which requires less detailed analysis.[19]  See Salmon
9   River Concerned Citizens v. Robertson, 32 F.3d 1346, 1357-58 (9th
10  Cir. 1994).  Defendants are entitled to judgment in their favor
11  on Plaintiffs' Fifth Claim, to the extent it alleges that the
12  2004 Framework failed to adequately consider its direct and
13  indirect impacts to old-forest species.

15      **B.   Failure to Adequately Consider Opposing Scientific
              Viewpoints and Acknowledge Scientific Uncertainty**

18      In alleging that the Forest Service did not adequately
19  consider the effects of the 2004 Framework on old-forest species
20  like the owl, fisher, and marten, Plaintiffs also contend that
21  the Forest Service failed to take the requisite "hard look" at
22  opposing scientific viewpoints to species impacts, and
23  consequently violated NEPA on that ground as well.  Plaintiffs
24  further allege that the Forest Service did not properly consider

26      [19]Additionally, to the extent that the Ecology Center case
27  mandated the use of specific scientific tools (like actual on-
    the-ground analysis with demonstrated reliability), the Ninth
    Circuit has since overruled the case.  Lands Council v. McNair,
28  2008 WL 264001 (9th Cir. 2008).

scientific uncertainty in formulating the 2004 Framework, and
identify that alleged shortcoming as yet another violation of
NEPA.

We turn first to scientific uncertainty.  With respect to
the owl, Plaintiff allege that the 2004 Framework does not
acknowledge what it describes as the "overwhelming scientific
opposition" of owl biologists to the Framework.  See Pls.' Mem.
In Support of Summ. J., 36:4-6.  To support that contention,
Plaintiffs point to statements made by owl biologists Monica Bond
and Dr. Jared Verner.  According to Dr. Verner, "the FSEIS fails
to adequately address many of the concerns we expressed [by
letter] ... [and] in meetings... regarding the [DSEIS]."  BASIN
687; see also BASIN 895 (noting "little evidence that the various
concerns and suggestions brought forth by the owl scientists are
reflected" in the DSEIS).  Monica Bond similarly claims that the
FSEIS failed to respond to her detailed critique of owl proposals
made in the DSEIS.  BASIN 722.

The record shows, however, that Regional Forester Jack
Blackwell conducted extensive meetings with the owl scientists
relied upon by Plaintiffs in order to listen to their concerns.
SNFPA 2432.  Blackwell was informed at those meetings that owl
distribution and density in the Sierra Nevada had been stable for
the last ten years with no decline (SNFPA 2433) and that owl
population "will never exhibit large increases because it is
already at carrying capacity."  SNFPA 2439.  Nonetheless, in
response to concerns voiced concerning the FSEIS, Blackwell
wanted to ensure that the Framework was scientifically credible
and accordingly asked that a Scientific Consistency Review

47

1   ("SCR") be undertaken by an independent team of scientists to

2   ensure the scientific credibility of the Framework.  The results

3   of the SCR were used by the interdisciplinary team preparing the

4   FSEIS in order to improve its environmental analysis and

5   acknowledge scientific uncertainty and differing points of view.

6   SNFPA 2578-89; 2590-2601; 3002.  Blackwell adopted the SCR's

7   recommendation that adaptive management be employed and noted

8   that the Forest Service has a long history of investing in

9   monitoring data and research activities, like the California

10  spotted owl demographic studies conducted for the past 15-20

11  years.  SNFPA 3002.  While Plaintiffs object to the scientific

12  utility of adaptive management under the circumstances of this

13  case, the Ninth Circuit's recent McNair decision makes it clear

14  that choosing between and validating scientific methodologies is

15  "not a proper role" for a federal court.  Lands Council v.

16  McNair, 2008 WL 2640001 at *4.

17       In addition to engaging in the SCR process and conducting

18  agency meetings with scientists as discussed above, examination

19  of the 2004 Framework also shows that it looked at the

20  demographic data on the owl collected and described in the 2003

21  Meta-Analysis (SNFPA 2086, 2089) and that published research was

22  divulged and assessed (SNFPA 2638-57).  The SEIS specifically

23  recognized scientific controversy regarding the owl[20], but at the

24  same time acknowledged concern for long-term habitat loss and

25  fragmentation caused by large high severity wildfires.  3606.

26

27       [20] See SNFPA 3340 ("There is conflicting science about the
    effects of canopy cover reductions from fuels treatments on the
28  California spotted owl."); see also SNFPA 3144.

48

1    All this points to a conclusion that the Forest Service took a
2    hard look at impacts to the California spotted owl as required by
3    NEPA.

4         Contrary to Plaintiffs' contention, contrary scientific
5    opinion was disclosed.  The FSEIS specifically recognizes owl
6    biologist Jared Verner's 1992 conclusion that given spotted owl
7    preferences for old growth features like significant canopy
8    cover, large trees and snags, any activities that would degrade
9    or remove any of these habitat attributes are believed to pose
10   some level of risk to owl occupancy and production.  SNFPA 3335.
11   The FSEIS goes on to acknowledge uncertainty as to whether
12   benefits of treating PACs to reduce their susceptibility to
13   wildfire will outweigh the potential negative effects of the
14   treatments on owl occupancy and habitat quality.  <u>Id.</u>[21]  In
15   addition, it explicitly recognizes conflicting science about the
16   effects on the spotted owl of canopy cover reduction caused by
17   fuel treatments, like Hunsaker's 2002 study showing that owl
18   productivity negatively correlated with a canopy cover less than
19   50 percent.  SNFPA 3337.  The FSEIS goes on to compare this
20   analysis with a contrasting 2003 Lee and Irwin article which
21   found that concerns about proposed fuel treatments having a
22   negative effect on owls were not supported by either their
23   analysis or other published information.  SNFPA 3340.

24        While the Forest Service recognizes Lee and Irwin's research
25   finding that lethal fire simulations produced a pronounced and

26   _____

27   [21] <u>See also</u> SNFPA 3342 (citing Blakesley & Noon's 1999 study
     for the notion that certain activities "would increase
28   uncertainties associated with successful dispersal and mate
     finding").

1  lasting negative effect on the owl (SNFPA 2639), as indicated

2  above it also concludes that the pace and intensity of mechanical

3  thinning planned under the alternative chosen by the 2004

4  Framework is expected to reduce the rate at which habitat within

5  PACs and SOHAs is lost to wildfire.  SNFPA 3336.

6       In addition to disclosing the existence of opposing science

7  in citations contained within the SEIS, the Forest Service also

8  addressed scientific controversy in its responses to numerous

9  public comments engendered by the draft SEIS.  See, e.g., SNFPA

10  3600-3616 (owl).

11      Because the fisher's habitat needs are similar to that

12  preferred by owls as discussed above (SNFPA 3314), and because

13  there is virtually no evidence that the fisher has populated the

14  Northern Sierra Nevada area where most of the fuel treatments

15  proposed by the 2004 Framework in any event, no further

16  discussion of scientific controversy concerning the effects of

17  the proposed forest management measures is necessary at this

18  time.

19      As indicated above, the effects of the 2004 Framework on

20  marten habitat would also appear to be minimal given evidence

21  that the species occupies habitats at higher elevations than most

22  of the proposed treatment areas.  SNFPA 3325.  Nonetheless, the

23  the FSEIS recognizes competing science with respect to marten

24  preferences for percentage of canopy cover.  It cites Bull and

25  Heater's research, which concluded that radio-collared martens in

26  their study area avoided all harvested and unharvested forest

27  stands with less than 50 percent canopy closure.  Id.  At the

28  same time, however, three other previous studies were disclosed

50

1  which reached conclusions suggesting that 30 percent was a more

2  appropriate guideline. (SNFPA 3325, citing Koehler et al. 1975,

3  Steventon et al. 1982, Spencer 1981).  The FSEIS goes on to

4  recognize that yet another study, by Kucera in 2000, indicates

5  that marten home ranges have an average of only 20 percent canopy

6  cover.  Id.

7       Having determined that scientific controversy is adequately

8  disclosed in the 2004 Framework, we next turn to the question of

9  whether the extent of scientific uncertainty associated with the

10 species in question is properly addressed.  Despite Plaintiff's

11 contention to the contrary, scientific uncertainty about the

12 effect of proposed fuel treatments on the species in question is

13 disclosed throughout the SEIS with specific literature

14 references.  See, e.g., SNFPA 3313, 3314, 3315 (including

15 literature citations for research on fisher); SNFPA 3337 (citing

16 Self and Kerns, 2001 Kucera, 2000, Spencer, 1981, SNFPA 3325))

17 for the marten); SNFPA 3337, 3340, 3342 (citations for the owl).

18      The 2004 Framework recognizes that there is continuing

19 scientific uncertainty regarding habitat relationships and

20 population trends of the California spotted owls.  Scientific

21 uncertainty regarding the owl, fisher and marten are discussed

22 throughout the SEIS.  See, e.g.,  SNFPA 3143-48, 3212

23 (uncertainty regarding marten distribution); see also SNFPA 3145

24 (acknowledging the "relatively little information" about key

25 habitat elements for fisher).

26      In addition to disclosing scientific uncertainty and

27 opposing viewpoints through the SEIS, its response to public

28 comments, and the SCR, the Forest Service also acknowledged

51

scientific uncertainty in its ROD for the 2004 Framework.  SNFPA
3002 (explaining that the SCR was used to improve the SEIS and to
"acknowledge scientific uncertainty and differing points of
view").

Scientific uncertainty is also addressed at some length in
the Scientific Consistency Review requested by the Forest
Service, which included analysis of 1) whether applicable and
available scientific information had been considered; 2) whether
scientific information had been interpreted reasonably and
accurately; 3) whether uncertainties associated with the
scientific information had been acknowledged; and 4) whether
risks and uncertainties had been identified and documented.
SNFPA 3504, 3526; see also SNFPA 2356, 3503-24 (explaining how
SEIS was improved based on SCR).

The Forest Service refined its analysis and discussion of
the spotted owl based on the SRC team's commentary.  See SNFPA
2578-2589; 2590-2601.  The Forest Service stated that "[m]ore
emphases and discussion on short-term effects and associated risk
[to the California spotted owl] was added to the SEIS and is
considered in the Adaptive Management Process."  SNFPA 2601.

In sum, after carefully examining the record, the Court
determines that the 2004 Framework was adequately considered
contradictory opinions through its acknowledgment of scientific
controversy and uncertainty concerning potential impacts of the
treatment proposals on the owl, fisher and marten.  That
consideration including references to applicable literature in
the SEIS, the SCR, and the ROD all prepared in conjunction with
the Framework.  The requirements of NEPA are consequently

satisfied.  See Seattle Audubon Soc'y v. Lyons, 871 F. Supp.
1291, 1321 (W.D. Wash. 1994) (The agency having engaged in
numerous studies and analyses on the owl satisfied NEPA's
requirement to take a "hard look" at available data).

     The fact that an agency's approach has been critiqued, or
that alternative methodologies have been disclosed, does not
render an EIS arbitrary.  See Edwardsen v. U.S. Dept. Of
Interior, 268 F.3d 781, 786 (9th Cir. 2001).  It is well
recognized that "disagreement among the experts is inevitable
when the issues are at the 'very frontiers of scientific
knowledge,' and such disagreement does not preclude [courts] from
finding that the [agency's] decisions are adequately supported by
evidence in the record."  Lead Indus. Ass'n, Inc. v. EPA, 647
F.2d 1130, 1160 (D.C. Cir. 1980).  So long as contrary opinion is
adequately disclosed, an agency "is under no obligation to
conduct new studies in response to issues raised in the comments,
nor is it duty-bound to resolve conflicts raised by opposing
viewpoints."  See California v. Block, 690 F.2d 753, 773 (9th
Cir. 1982).

     Additionally, the existence of uncertainty does not preclude
the agency from taking action, so long as that uncertainty has
been identified.  See Village of False Pass v. Clark, 733 F.2d
605, 614 (9th Cir. 1984), citing Sierra Club v. Sigler, 695 F.2d
963, 970 (5th Cir. 1983) ("the unavailability of information,....
should not be permitted to halt all government action... This is
particularly true when information may become available at a
later time and can still be used to influence the agency's
decision.").  The Ninth Circuit's recent McNair decision also

1   makes it clear that judicial intervention to resolve every

2   possible scientific uncertainty is not the court's proper role.

3   Lands Council v. McNair, 2008 WL 264001 at *4.  Moreover, just

4   because Plaintiffs may disagree with the Forest Service's impact

5   assessment does not mean that the court can "substitute its

6   judgment for that of the agency as to the environmental

7   consequences of its actions."  Kleppe v. Sierra Club, 427 U.S.

8   390, 410 n.21 (1976).  Instead, because its Framework adequately

9   disclosed and addressed competing scientific viewpoints, the

10  Forest Service's decision merits deference, and Plaintiffs' NEPA

11  challenge must accordingly be rejected.  See Earth Island Inst.

12  v. U.S. Forest Serv., 351 F.3d 1291, 1301 (9th Cir. 2003) ("[An]

13  agency is entitled to wide discretion in assessing the scientific

14  evidence, so long as it takes a hard look at the issues and

15  responds to reasonable opposing viewpoints.").  Based on the

16  foregoing, the Court concludes that the 2004 Framework

17  satisfactorily addressed, for purposes of complying with NEPA,

18  both scientific opposition and uncertainty with regard to its

19  impacts on the owl, the fisher and the marten.

20

21        **C.   Failure to Consider Cumulative Effects to Old Forest**

22             **Species**

23        Plaintiff's Sixth Claim also targets the owl, fisher and

24  marten, contending that the 2004 Framework also runs afoul of

25  NEPA by failing to analyze the cumulative impacts to those

26  species occasioned by implementing both the Framework, the Basin

27  Plan, and the Giant Sequoia National Monument Management Plan

28  ("GSNM Plan").  Pls.' Am. Compl., ¶ 116-119.  We first analyze

54

1  Plaintiffs' NEPA challenge involving the 2004 Framework as a
2  whole.

3      Plaintiffs concede that as much as the 2004 Framework
4  establishes management direction for the rest of the Sierra
5  Nevada, the GSNM Plan sets policy for managing the Giant Sequoia
6  National Monument, an entity created by presidential proclamation
7  in 2000 and covering some 327,769 acres in the southern Sierra
8  Nevada.  See Pls.' Mem. In Support of Mot. Summ. J., 39:15-18;
9  see also GSNM ROD at 3 (Ex. C to Loarie Decl.).  Consequently it
10 appears that both the Framework and the GSNM Plan are broad
11 programmatic documents rather than site-specific proposals for
12 actual logging and fuels treatment.

13     Plaintiffs point out that the GSNM Plan, like the Framework,
14 authorizes logging of trees up to 30 inches in diameter.
15 Plaintiffs claim that the FSEIS for the Framework violates NEPA
16 because it fails to adequately consider the cumulative impact of
17 such logging under the 2004 Framework and the GSNM Plan upon old
18 forest species, and particularly the fisher and, apparently to a
19 lesser extent, the spotted owl.  Pls.' Mem. in Support of Mot.
20 Summ. J., 39:10-12, 39:23-40:2.

21     The Forest Service disagrees, first noting case law that
22 grants considerable deference to an agency's determination of the
23 proper scope of a NEPA analysis, including the scope of its
24 cumulative effects review.  Kleppe, 427 U.S. at 414; Native
25 Ecosystems Council v. Dombeck, 304 F.3d at 893-94; Neighbors of
26 Cuddy Mtn., 303 F.3d at 1071.  The Forest Service goes on to
27 argue that it reasonably tailored its cumulative effects analysis
28 of the 2004 Framework vis-a-vis the GSNM Plan to issues relating

1  to wildfires.  The FSEIS states unequivocally that the "largest
2  events affecting viability of the fisher population in the
3  southern Sierra appear to be large stand replacing wildfires."
4  SNFPA 3320.  Given the primacy of that concern, the Forest
5  Service points out that the 2004 SEIS does discuss the cumulative
6  effects of treatment under the GSNM Plan to reduce the risk of
7  stand replacing fires, and further projects the cumulative
8  effects of other proposals, including the GSNM Plan, through
9  modeling.

10     The 2004 Framework FSEIS contains an entire section
11  addressing the Giant Sequoia National Monument.  That section is
12  contained within the FSEIS' discussion of the Framework's effects
13  upon the fisher.  The cumulative effects analysis concludes that
14  protective treatments under the GSNM Plan are designed to reduce
15  the risk of catastrophic fire and ultimately increase the amount
16  of large trees and thereby improve the quantity and quality of
17  old forest habitat.  SNFPA 3322.  The particular challenges of
18  moving giant sequoia groves towards desired conditions, a task
19  quite different from the remainder of the Sierra Nevada
20  encompassed by the 2004 Framework, is also addressed.  By
21  reducing tree density, however, the analysis notes larger trees
22  will be better able to escape severe damage or death from fire
23  and grow more rapidly than under denser stand conditions.  Id.
24  Additionally, the amount and/or vigor of younger trees less than
25  thirty years old is also projected to increase under the GSNM
26  Plan, with thinning designed to protect such trees from excessive
27  fire mortality.  Id.  Moreover, as indicated above, elsewhere in
28  the FSEIS modeling projections are employed, which include the

1  expected cumulative effects of green tree harvest volume not only

2  by each National Forest in the Sierra Nevada region but also by

3  the Giant Sequoia National Monument.  SNFPA 3389, see also SNFPA

4  3472 (discussing th modeling assumptions for acres of treatment

5  applicable to the GSNM).

6      Given the deference accorded an agency's assessment of the

7  breadth of a cumulative effects analysis, and particularly in

8  light of the fact that both the Framework and the GSNM Plan were

9  formulated for management purposes, the Court cannot find fault

10  with the Framework's discussion of the cumulative effects

11  associated with the GSNM Plan for failing to provide the

12  "quantified or detailed assessment" of impacts stemming from

13  implementation of logging under the GSNM plan, as Plaintiffs

14  advocate.  Pls' Mem. In Support of Summ. J., p. 40.  Because the

15  Framework's programmatic scope does not include site-specific

16  project proposals, the Forest Service did not have to quantify or

17  detail the environmental impacts of on-the-ground logging

18  projects not yet proposed.  Ohio Forestry, 523 U.S. at 729-733.

19  The law is clear that NEPA does not require an agency to

20  "quantify every risk."  Salmon River Concerned Citizens v.

21  Robertson, 32 F.3d 1346, 1359-60 (9th Cir. 1994).  The FEIS

22  acknowledges the difficulty of estimating the number of fisher

23  territories that might be affected at a programmatic level.  See

24  SNFPA 3318.  Making those judgments must instead wait for the

25  prescribed scope of an imminent on-the-ground plan limited to a

26  particular area.  Neither the 2004 Framework of the GSNM Plan by

27  definition constitute such site-specific activity.

28      Given these factors, it was not arbitrary for purposes of

57

1  NEPA for the Framework to concentrate on the cumulative effects
2  of habitat reduction by stand-replacing fires, as well as the
3  concomitant increase in old-forest conditions engendered by such
4  reduction.   As made clear above, such conditions are key in
5  maintaining the viability not only of the fisher but also of the
6  California spotted owl.

7       In sum, despite the fact that the GSNM Plan was not selected
8  until December of 2003, after the 2004 Framework FSEIS was
9  prepared,[22] because the GSNM proposal was nonetheless expected
10 the Framework proceeded to consider what it reasonably could in
11 terms of its cumulative effects.   Under the circumstances, the
12 Forest Service took the "hard look" at cumulative impacts
13 occasioned by the GSNM Plan as required by NEPA.[23]  Consequently,
14 Defendants are entitled to judgment in their favor as to
15 Plaintiff's Sixth Claim insofar as that claim targets the 2004
16 Framework for failing to adequately consider its cumulative
17 impact in conjunction with the GSNM Plan.

18 ///
19 ///
20 ///
21 ///

22

23

24      [22] See SNFPA 3322 ("The final environmental impact statement
   will be available in late 2003").

25      [23] While Plaintiffs cite The Lands Council v. Powell, 395
26 F.3d 1019, 1027 (9th Cir. 2005) for the proposition that the
   Forest Service did not provide enough detail concerning the
27 cumulative effect that the 2004 Framework and the GSNM Plan will
   have on old forest species like the fisher and owl, that case
28 deals with the requirements applicable to a site-specific project
   and is therefore distinguishable from this matter.

1        **D.   Failure to Consider Reasonable Range of Alternatives**

2

3        For a Seventh Claim, Plaintiffs contend that the 2004

4   Framework FSEIS failed to analyze a reasonable range of

5   alternatives to the course of action ultimately adopted. Pls.'

6   Am. Compl., ¶¶ 120-126.  Plaintiffs assert that this failure

7   violates NEPA.

8        NEPA does require that federal agencies like the Forest

9   Service herein "produce an EIS that rigorously explores and

10  objectively evaluates all reasonable alternatives so that the

11  agency can sharply define the issues and provide a clear basis

12  for choice among options by the decisionmaker and the public to

13  consider alternatives to the proposed action."  <u>Kootenai Tribe of</u>

14  <u>Idaho v. Veneman</u>, 313 F.3d 1094, 1120 (9th Cir. 2002) (citing 40

15  C.F.R. § 1502.14).  As the Ninth Circuit explained, "NEPA

16  regulations describe this alternatives requirement as the 'heart'

17  of the EIS."  <u>Id.</u>  An EIS is inadequate for purposes of NEPA if

18  it fails to address "[t]he existence of a viable but unexamined

19  alternative."  <u>Natural Res. Def. Council</u>, 421 F.3d at 813.

20       According to Plaintiffs, because the 2004 Framework analyzed

21  only two alternatives in any detail (the "no-action" alternative

22  of retaining the existing 2001 Framework and the proposed

23  modification constituting its 2004 successor), the Forest Service

24  failed to consider a reasonable range of alternatives as required

25  by NEPA.  The Forest Service counters this argument by asserting

26  that because the 2004 Framework was by definition a

27  "supplemental" environmental impact statement to the original

28  2001 version, the consideration of numerous alternatives

59

1  considered in conjunction with the 2001 Framework must

2  necessarily be incorporated by reference in the 2004 version

3  presently under scrutiny.  Plaintiffs respond by alleging that

4  because the 2001 and 2004 Frameworks rely on different

5  assumptions and models to gage the environmental consequences of

6  the various alternatives, and because the alternatives developed

7  in 2001 were designed to address a significantly different

8  purpose and need than that identified in 2004, the 2004 Framework

9  cannot fall back to the alternatives analyses contained within

10  its predecessor.

11      This viability of these competing arguments has recently

12  been squarely addressed by the Ninth Circuit within the context

13  of a decision overruling this Court's denial of a preliminary

14  injunction sought by Plaintiffs to permit logging within three

15  site-specific proposals (Basin, Empire and Slapjack) approved by

16  the Forest Service for logging.  In Sierra Forest Legacy v. Rey,

17  ___ F.3d ___, 2008 WL 2097150 (9th Cir. May 15, 2008), the Ninth

18  Circuit looked specifically at whether or not the 2004 Framework

19  rigorously explored and objectively evaluated all reasonable

20  alternatives in analyzing whether Plaintiffs had demonstrated a

21  probability of success on the merits for purposes of their

22  entitlement to preliminary injunctive relief.  It unequivocally

23  concluded that the Forest Service "cannot rely on its discussion

24  of alternatives in the 2001 FEIS to satisfy its requirement [that

25  reasonable alternatives be evaluated] for the 2004 FEIS.  Id. at

26  *2.

27      In reaching this conclusion, the Sierra Forest Legacy court

28  reasoned that because the Forest Service altered its modeling

60

1  techniques between the issuance of the 2001 FEIS and the 2004
2  SEIS but failed to update its analysis of the 2001 FEIS
3  alternatives to reflect these new techniques, changed
4  circumstances were present that rendered improper any reliance by
5  the 2004 Framework on its 2001 predecessor. Id.  As the court
6  stated, "where changed circumstances affect the factors relevant
7  to the development and evaluation of alternatives," the Forest
8  Service "must account for such change in the alternatives it
9  considers. Id., citing Natural Res. Def. Council, 421 F.3d at
10 813-14.

11      Given the Ninth Circuit's clear precedent on the very issue
12 presently before this Court, summary adjudication in Plaintiffs'
13 favor must be granted as to the Seventh Cause of Action.

14

15      **E.    Adequacy of Public Participation in the Basin Project's**
         **Draft Environmental Assessment**
16

17      Having addressed Plaintiffs' NEPA challenges to the 2004
18 Framework as a whole, we now turn to the site-specific challenges
19 mounted by Plaintiffs to the Basin Project.[24]  First, in their
20 Twelfth Cause of Action, Plaintiffs assert that the Forest
21 Service violated NEPA by not ensuring adequate public
22 participation in the Basin Project's Draft Environmental
23 Assessment ("EA").

24 ────────────────────

25      [24] After briefing on the summary judgment motions presently
26 before the Court was concluded, Plaintiffs obtained leave of
   court to file a Second Amended Complaint that added the so-called
27 Empire and Slapjack Projects to the Basin Project that previously
   had been the only site-specific project raised by Plaintiffs'
28 pleadings.  This Memorandum and Order addresses the Basin Project
   only.

1   Plaintiffs claim that because the draft EA for the Basin
2   Project was not specifically disseminated for public
3   consideration and comment, the approval of the EA violates the
4   public disclosure mandate of NEPA.  Alternatively, Plaintiffs
5   contend more generally that the Forest Service failed to involve
6   the public to the extent practicable in its assessment of the
7   Project's environmental impacts, as required by NEPA.
8       One of NEPA's key objectives is in ensuring active
9   involvement and access to information with regard to proposed
10  actions affecting the environment.  Price Rd. Neighborhood Ass'n
11  v. U.S. Dept. Of Transp., 113 F.3d 1505, 1511 (9th Cir. 1997);
12  see also California v. Block, 690 F.2d 753, 761 (9th Cir. 1982
13  (stating that NEPA's purposes are to "foster both informed
14  decision-making and informed public participation").  NEPA's
15  implementing regulations flush out this fundamental objective by,
16  requiring, inter alia, 1) that the public be involved, to the
17  extent practicable, in the agency's preparation of an EA and its
18  ultimate decision whether to prepare an EIS, 40 C.F.R.
19  § 1501.4(b); 2) that agencies "encourage and facilitate" public
20  involvement in decisions that affect the environment, 40 C.F.R.
21  § 1500.2(d); and 3) that agencies make "diligent efforts" to
22  involve the public in NEPA procedures, 40 C.F.R. § 1506.6.  The
23  regulations make it clear that the purpose of these and other
24  provisions is to "insure that environmental information is
25  available to public officials and citizens before decisions are
26  made and before actions are taken", with public scrutiny being
27  "essential" in satisfying NEPA's objectives.  40 C.F.R.
28  § 1500.1(b).

1    With respect to a full EIS, the NEPA rules make it clear
2    that a draft EIS must be circulated for public comment before
3    being prepared in final form.  See 40 C.F.R. § 1502.19,
4    1503.1-1503.4.  Plaintiffs, however, do not assert that the
5    Forest Service should have employed the greater detail and
6    analysis entailed by a full EIS (reserved for instances where the
7    proposed action "significantly affects" environmental quality) as
8    opposed to the EA ultimately chosen for the Basin Project.  EAs
9    are by definition simpler documents not subject to the same
10   rigorous scrutiny as an EIS.  Indiana Forest Alliance v. U.S.
11   Forest Serv., 325 F.3d 851, 856 (7th Cir. 2003).  They are
12   designed to reduce government costs, paperwork and delay through
13   a "concise" public document.  40 C.F.R. § 1508.9.  An "EA cannot
14   be both concise and brief and provide detailed answers for every
15   question."  Newton County Wildlife Ass'n v. Rogers, 143 F.3d 803,
16   809 (8th Cir. 1998).

17   Plaintiffs' primary argument that the Forest Service ran
18   afoul of NEPA by not publicly circulating the Basin Project EA is
19   based upon a statement contained within the Ninth Circuit's
20   decision in Citizens for a Better Forestry v. U.S. Dept. of
21   Agriculture, 341 F.3d 961 (9th Cir. 2003) ("CBF") to the effect
22   that "the public must be given an opportunity to comment on draft
23   EAs and EISs."  Id. at 970, quoting Anderson v. Evans, 314 F.3d
24   1006, 1016 (9th Cir. 2003).

25   The Ninth Circuit recently revisited this area in Bering
26   Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of
27   Eng'rs, 511 F.3d 1011 (9th Cir. 2008).  Despite Plaintiffs' claim
28   that CBF and Anderson established a requirement that a draft EA

1  be circulated, the Ninth Circuit in <u>Bering Strait</u> found that

2  "[o]ur law currently does not make that clear..." <u>Id.</u> at 1024.

3  The court rejected the notion that its previous holdings had

4  decided the question, describing its previous statement in

5  <u>Anderson</u>, about the circulation of a draft EA, to be simply dicta

6  (<u>Id.</u> at 1025).  That conclusion meshes with the Forest Service's

7  analysis provided here concerning the state of Ninth Circuit law

8  before <u>Bering Strait</u>.

9      The <u>Bering Strait</u> court held unequivocally that the

10  circulation of a draft EA is not required in every case.  <u>Id.</u>

11  It stressed the fact that the regulations governing public

12  involvement in the preparation of EAs, as discussed above, are

13  general in approach, and consequently that "requiring the

14  circulation of a draft EA in every case would apply a level of

15  particularity to the EA process that is foreign to the

16  regulations." <u>Id.</u>  This disposes of Plaintiffs' first

17  contention, that the Basin Project violated NEPA simply because a

18  draft EA was not circulated.

19      In its decision, the <u>Bering Strait</u> court cited approvingly a

20  decision from this District, <u>Sierra Nevada Forest Protection</u>

21  <u>Campaign v. Weingardt</u>, 376 F. Supp. 2d 984, 991 (E.D. Cal. 2005)

22  which also found that circulation of a draft EA is not invariably

23  required.[25]  The Ninth Circuit looked to <u>Weingardt's</u> reasoning in

24

25      [25] <u>Weingardt</u> considered a challenge to the process utilized
    by the Forest Service in approving several logging projects.
26  Although the Forest Service issued a scoping notice for public
    comment, which included a description of the proposed action as
27  well as its purpose and need and proposed mitigation measures,
    the notice contained no information or analysis concerning
28                                              (continued...)

1  addressing the next issue raised by Plaintiffs in this case;

2  namely, just "what level of public disclosure is required under

3  NEPA before issuance of a final EA?"  Bering Strait, 511 F.3d at

4  1025-26.

5       After citing language from Weingardt indicating that the

6  public should simply be provided as much environmental

7  information as is practicable prior to completion of the EA, and

8  commending that analysis, the Ninth Circuit made the following

9  pronouncement:

10      "[W]e now adopt this rule: An agency, when preparing an
        EA, must provide the public with sufficient
11      environmental information, considered in the totality
        of circumstances, to permit members of the public to
12      weigh in with their views and thus inform the agency-
        making process."

13

14 Id. at 1026.

15      In Bering Strait, although a draft EA was not circulated,

16 the court found that information about the project was

17 nonetheless widely disseminated throughout the community.  In

18 that case, the Alaska Gold Company ("AGC") requested commentary

19 from the public on its proposal for renewing the mining of gold

20 ore in an area already mined during Alaska's early Gold Rush

21 history.  After receiving comments from both individuals,

22 organizations, and federal and local agencies, AGC revised its

23 scoping notice to consider the environmental consequences of the

24

25           [25](...continued)

26 impacts to wildlife or other environmental resources and lacked
   any discussion of potential cumulative impacts.  Id. at 986-987,
27 992.  In addition, for three of the projects involved in
   Weingardt, the Agency actually withheld already-prepared analyses
28 "even though the documents were completed before the end of the
   public comment period."  Id. at 992-93.

1   project, to evaluate alternative project designs, and to review

2   commentary from the public already received.  The Ninth Circuit

3   deemed that process adequate for purposes of NEPA.  Id.

4        Here, the Forest Service gave public notice of its Basin

5   Project in December 2003 to 435 potentially interested and

6   affected parties.  BASIN 3044, 3651.  It thereafter mailed a

7   Proposed Action description with a solicitation for public

8   comment in March of 2004.  BASIN 3132-48.  A Public Notice

9   concerning the project was also published by newspaper at

10  approximately the same time.  BASIN 3155.  The Proposed Action

11  description described the proposed action, its purpose and

12  design, as well as the design to be employed and mitigation

13  measures to be undertaken.  Maps of the project area were

14  provided.  BASIN at 3134-3148.

15       Following its receipt of comments from the public to its

16  description of the project, the Forest Service reviewed and

17  responded to the comments received, including comments from

18  representatives of the Plaintiffs submitted on several occasions.

19  BASIN 3211, 3240-3258; see also 3180-3196, 3274-94.  The Forest

20  Service even accepted comments after the deadline.  BASIN 3493-

21  3519.

22       The Forest Service also provided two notices of public

23  meetings to be held at the Feather River Ranger District's

24  offices in Oroville concerning proposed projects within the

25  District's territory, including the Basin Project.  BASIN 3213,

26  3230.  Pursuant to those notices, two public scoping/open house

27  meetings were in fact held on June 15, 2004 from 5:00 to

28  8:00 p.m. and on June 16, 2004 from 6:30 a.m. to 8:30 a.m.  A map

1   of the Basin Project was available to those in attendance.

2   Forest Service employees were at the meeting to answer specific

3   questions relating to the Basin Project. <u>See</u> Decl. of Cindy

4   Roberts, ¶ 4, attached as Ex. "C" to Fed Defs.' Opp'n to Mot. for

5   Summ. J.  Additionally, at the request of Craig Thomas, a

6   representative of Plaintiff Sierra Nevada Forest Protection

7   Campaign, an additional meeting was held between Mr. Thomas and a

8   Forest Service employee in early June of 2004 regarding Thomas'

9   concerns about the Basin Project. <u>Id.</u> at ¶ 3.  Finally, the

10  Forest Service responded to requests, including those submitted

11  by Plaintiffs, by providing the final Biological

12  Assessment/Biological Evaluation ("BA/BE"), the Decision

13  Notice/FONSI and the EA itself in August 2004, following the

14  close of public comments and before either the appeal time for

15  the Basin Project had or any action on the project was attempted.

16  BASIN 3521, 3656, 3757, 3764, 3763-3766.

17       As <u>Weingardt</u> recognized, public involvement and the

18  distribution of information in a project affecting the

19  environment can take many forms. <u>Weingardt</u>, 376 F. Supp. 2d at

20  991 ("Depending on the circumstances, the agency could provide

21  adequate information through public meetings or by a reasonably

22  thorough scoping notice.").  The Court concludes that even though

23  a draft EA was not circulated, the Forest Service nonetheless

24  took other steps sufficient to meet the public participation

25  requirement of NEPA.  Summary adjudication is accordingly granted

26  in favor of Defendants as to Plaintiffs' Twelfth Claim.

27  ///

28  ///

67

1
2

**F.   Failure of the Site-Specific Basin Project to Consider Cumulative Impacts**

3        In their Ninth Claim, Plaintiffs allege that Forest Service
4   also violated NEPA in approving the Basin Project by failing to
5   take a "hard look" at the cumulative impacts of the Project
6   together with past, present and reasonably foreseeable future
7   actions.  See Native Ecosystems Council v. Dombeck, 304 F.3d 886,
8   895 (9th Cir. (2002).  Plaintiffs point out that general
9   statements about a "hard look" are not sufficient.  Instead, they
10  allege that the Forest Service had to identify or disclose the
11  expected incremental impact from each timber sale, and explain
12  how those impacts might interact in affecting the environment.
13  Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgt.,
14  387 F.3d 989, 997 (9th Cir. 2004).

15       The Basin Project is part of the QLG Pilot Project, which
16  was addressed in both the HFQLG EIS and as part of the 2004
17  Framework.  Consequently, the effects of other actions were
18  properly analyzed as an aggregate at two larger scales –– the
19  HFQLG Pilot Project area (in the HFQLG EIS) and the entire Sierra
20  (in the 2004 SEIS).  See BASIN 1168-92, 1215-36, 1237-53
21  (incorporating HFQLG BA/BE); SNFPA 3256-63.  Even Plaintiffs do
22  not assert that Basin needs another EIS.  Plaintiffs nonetheless
23  argue that Klamath Siskiyou requires, even for EAs, a detailed,
24  quantified assessment of the cumulative effects of a project on
25  the habitat of sensitive species.  Klamath-Siskiyou Wildlands
26  Ctr., 387 F.3d at 993-998.

27       The Court disagrees.  After the impacts of the regional
28  program have been addressed in a programmatic EIS, a project

68

1  implementing that program consistently with that EIS "can be
2  carried out without the agency's having to issue a new" EIS at
3  every successive stage.  Cronin v. U.S. Dep't of Agric., 919 F.2d
4  439, 447 (7th Cir. 1990); see also Headwaters, Inc. v. BLM,
5  Medford Dist., 914 F.2d 1174, 1178-79 (9th Cir. 1990).

6      Plaintiffs' attempt to impose EIS-like duties on the Basin
7  EA fails.  An EA is by definition a "concise public document"
8  which provides "brief discussions of... impacts of the proposed
9  action and alternatives.  40 C.F.R. § 1508.9.[26]  Hence EAs are
10  intended to be "rough-cut" and "low budget" and are not held to
11  the level of detail required by a full EIS.  Indiana Forest
12  Alliance v. U.S. Forest Serv., 325 F.3d 851, 856 (7th Cir. 2003).
13  Significantly, too, considerable deference is afforded to
14  agencies like the Forest Service in determining the scope of
15  review for cumulative impacts in any event.  Neighbors of Cuddy
16  Mtn., 303 F.3d at 1071.

17      While Plaintiffs contend that the Basin Project's BA/BE
18  simply concludes without any analysis that no significant
19  cumulative impacts to the fisher, marten and owl are expected as
20  a result of the project, the incremental effects of the Basin
21  Project are in fact discussed for each species.  See BASIN 3571,
22  3575-76.  The BA/BE identifies numerous other projects within the
23  analysis area, describes the silvicultural systems used
24  (predominantly thinning or salvage prescriptions), the number of
25

26      [26] While Plaintiffs rely on the Ninth Circuit's decision in
   The Lands Council v. Powell, 395 F.3d 1019 (9th Cir. 2005), that
27  case is distinguishable.  Lands Council premised on greater
   information needed in an EIS, as opposed to an EA for an action
28  significantly effecting environmental quality.  Id. at 1027-28.

1  acres treated or otherwise affected, and likely effects.  See

2  BASIN 3563-3566.  Cumulative impacts are also analyzed both for

3  individual species and at the watershed level.  See BASIN 3563-

4  70; 3575-76; 3718, 3719, 3721.

5      For cumulative effects to old forest species like the owl,

6  fisher and marten, the Basin EA could lawfully refer the reader

7  to more detailed discussion of cumulative effects within the 2004

8  SEIS.  See Native Ecosystems, 304 F.3d at 895-96 (for NEPA

9  purposes, agency can either include a cumulative effects analysis

10 or refer, or "tier" to an EIS that contains such analysis); 40

11 C.F.R. § 1502.20; see also Portland Audubon Soc'y ("PAS") v.

12 Lujan, 884 F.2d 1233, 1239 (9th Cir. 1989); Headwaters, 914 F.2d

13 at 1178.

14     The Basin EA, for example, refers to projections contained

15 within the 2004 SEIS for cumulative changes in habitat type that

16 might impact the California spotted owl.  BASIN 3720, citing to

17 SNFPA 3330-3350.  That analysis concludes that while suitable

18 foraging habitat for the owl could diminish in early decades, any

19 such reduction would later be offset.  See BASIN 3720, 3339.

20 Additionally, as indicated above, since the owl has been

21 determined to be within the 95 percent confidence limits of a

22 stable population (SNFPA 3340), the 2004 Framework reasonably

23 concluded that cumulative habitat changes would not result in a

24 loss of viability for the California spotted owl.  See BASIN

25 3720.

26     It must also be noted that impacts to suitable habitat for

27 the owl, fisher and marten within the Basin Project are expected

28 to be relatively small (3.6 percent of the project area).

1    Therefore, it was reasonable for the Basin EA to conclude that
2    cumulative impacts would be low.  BASIN 3698, 3699.  Timber
3    harvesting and new roads construction in accordance with the
4    Basin Project is not scheduled to occur in either goshawk or
5    California spotted owl PACs which together comprise most of the
6    habitat utilized by the fisher and marten.  BASIN 3698, 3699.
7    Additionally, with respect to the two forest carnivores, the
8    Basin Project concluded that there have been no known den sites
9    or a confirmed sighting of forest carnivores in the Basin
10   analysis area in any event.  BASIN 3575.  Because direct effects
11   are therefore not expected and indirect effects are also
12   anticipated to be low, the Basin BA/BE reasonably predicted
13   little cumulative impact occasioned by the Project.  BASIN 3576,
14   see also BASIN 3720, 3721 (Basin EA).

15        In assessing the Basin Project, the Forest Service was only
16   required to analyze the incremental effect of a proposed action
17   when added to effects of other actions in any event.  40 C.F.R.
18   § 1508.7; U.S. Dep't of Transp. v. Pub. Citizen, 541 U.S. 752,
19   769-70 (2005) (incremental effects of proposed action need only
20   be analyzed "in the context" of other actions).  Because the
21   Supreme Court in Public Citizen carefully limited the
22   consideration of incremental impacts to the concerned projects
23   themselves, the cumulative impact rule does not require detailed
24   consideration of the incremental impacts of prior actions.  Id.
25   It was therefore reasonable for the Basin EA to have focused only
26   upon cumulative effects pertaining particularly to the Basin
27   Project.
28   ///

1    In sum, the cumulative effects analysis in Basin satisfied
2 NEPA because it tiered to extensive analyses in two prior
3 programmatic EISs (for the 2004 Framework as well as the HFFQLG
4 Act EIS), and because the Basin Project EA contains an adequate
5 analysis of other factors actually specific to Basin.  Defendants
6 are accordingly entitled to summary adjudication in their favor
7 on Plaintiffs' Ninth Claim.

8
9                              **CONCLUSION**
10
11    Based on the foregoing, following careful review and
12 consideration of the parties' Cross-Motions for Summary Judgment
13 in this matter, the Court finds in Plaintiffs' favor as to their
14 Seventh Claim, for failure to consider reasonable alternatives to
15 the 2004 Framework as required by NEPA.  The Court otherwise
16 grants Defendants' request for summary adjudication as to the
17 remainder of the NEPA claims levied against the Framework in
18 Plaintiffs' Fifth and Sixth Claims.  In addition, with regard to
19 Plaintiffs' claims under NFMA against the Framework, the Court
20 finds in favor of Defendants as to those claims in their
21 entirety, as set forth in the First, Second and Fourth Claims.
22 That ruling is necessarily limited, however, to NFMA claims
23 implicated by the Basin Project and does not extend to the
24 so-called Empire and Slapjack Projects which were not the subject
25 of the motions now being adjudicated by the Court.  Finally, with
26 regard to Plaintiffs' allegations related specifically to the
27 Basin Project under both NEPA and the NFMA, the Court finds in
28 favor of Defendants as to those allegations, as set forth in the

                              72

1   Second, Ninth and Twelfth Claims.  As requested by the parties,

2   remedies issues with regard to the Seventh Claim shall be

3   adjudicated following further briefing.  The parties are directed

4   to propose a briefing schedule to the Court for its consideration

5   not later than ten (10) days following the date of this

6   Memorandum and Order.[27]

7        IT IS SO ORDERED.

8   Dated: August 1, 2008

9

10

11   MORRISON C. ENGLAND, JR.
     UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26      [27] At the time of oral argument in this matter, counsel for
     Plaintiffs represented to the Court that Plaintiffs were not
27   pursuing their Third, Eighth, Tenth and Eleventh Claims.  Those
     claims are accordingly moot at this time and will not be
28   considered herein.

73