1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11   SIERRA FOREST LEGACY, et al.,          No.  2:05-cv00205-MCE-GGH and

12              Plaintiffs,                      2:05-cv-00211-MCE-GGH

13         v.
                                             **MEMORANDUM AND ORDER**
14   HARRIS SHERMAN in his official
     capacity as Under Secretary of
15   Agriculture, et al.,

16                 Federal Defendants.

17   and

18   TUOLUMNE COUNTY ALLIANCE
     FOR RESOURCES &
19   ENVIRONMENT, et al., and QUINCY
     LIBRARY GROUP, et al.,
20
                   Defendant-Intervenors.
21   _____

22   ///

23   ////

24   ///

25   ///

26   ///

27   ///

28   ///

                                          1

1  PEOPLE OF THE STATE OF
   CALIFORNA,
2
                  Plaintiff,
3
        v.
4

5  UNITED STATES DEPARTMENT OF
   AGRICULTURE, et al.
6

7                  Federal Defendants.

8  and

9  TUOLUMNE COUNTY ALLIANCE
   FOR RESOURCES &
10 ENVIRONMENT, et al., and QUINCY
   LIBRARY GROUP, et al.
11
                  Defendant-Intervenors.
12

13

14        Presently before this Court is the question of the appropriate remedy for the legal

15 deficiencies this Court found in the Supplemental Environmental Impact Statement

16 ("SEIS") the Forest Service prepared pursuant to the National Environmental Policy Act

17 ("NEPA") for the 2004 Sierra Nevada Forest Plan Amendment (also referred to as the

18 "2004 Framework" or the "SNFPA").

19        As set forth below, the Court denies the request by Plaintiffs Sierra Forest Legacy

20 and People of the State of California (hereinafter collectively referred to as "Plaintiffs"

21 unless otherwise indicated) to vacate the 2004 Framework.  The Court further denies

22 plaintiffs' request for injunctive relief against existing projects.  The Forest Service is

23 directed to prepare a supplemental EIS addressing the deficiencies in the 2004 SEIS not

24 later than August 30, 2013.

25 ///

26 ///

27 ///

28 ///

                                         2

1

2

**BACKGROUND**

3        The 2004 Framework, which amended the Forest Plans for 11 National Forests

4    covering 11.5 million acres within the Sierra Nevada region, represents the Forest

5    Service's attempt at the "unenviable task" of balancing protection of old-forest dependent

6    wildlife species with effective reduction of hazardous fuels in order to decrease the risk

7    of stand-replacing wildfire.  Sierra Nevada Forest Prot. Campaign ("SNFPC") v. Rey, 573

8    F. Supp. 2d 1316, 1338 (E.D. Cal. 2008).  Four separate lawsuits were ultimately filed

9    challenging the 2004 Framework.  Those cases were subsequently related and all

10   asserted various deficiencies under NEPA and the National Forest Management Act

11   ("NFMA").  Plaintiffs in SNFPC v. Rey (now Sierra Forest Legacy ("SFL") v. Sherman)

12   also challenged the Basin Project, a vegetation management project on the Plumas

13   National Forest, alleging the project violated NEPA and NFMA.

14       In August and September 2008, this Court issued summary judgment opinions in

15   all four related cases.  SNFPC v. Rey, 573 F. Supp. 2d 1316 (E.D. Cal. 2008); California

16   ex rel. Lockyer ("California") v. U.S. Dep't of Agric., No. 05-211, 2008 WL 3863479 (E.D.

17   Cal. Aug. 19 and Sept. 3, 2008); Pacific Rivers Council ("PRC") v. U.S. Forest Serv.,

18   No. 05-953, 2008 WL 4291209 (E.D. Cal. Sept. 18, 2008) rev'd in part, 668 F.3d 609

19   (9th Cir. 2012); California Forestry Ass'n ("CFA") v. Bosworth, No. 05-905, 2008 WL

20   4370074 (E.D. Cal. Sept. 24, 2008).  In evaluating the adequacy of the SEIS prepared

21   for the 2004 Framework, this Court found, with one exception, that the SEIS complied

22   with the law and this Court granted summary judgment in favor of the Forest Service.

23   The inadequacy found in the SEIS pertained to the analysis of alternatives under NEPA.

24   SNFPC, 573 F. Supp. 2d at 1348; California at *28.

25       After additional proceedings on remedy and based on a proposal from the Forest

26   Service, this Court directed the Forest Service to prepare a new supplemental EIS

27   addressing the range of alternatives deficiency.

28   ///

3

1   Sierra Forest Legacy v. Rey, 670 F. Supp. 2d 1106 (E.D. Cal 2009).[1]  Pending

2   completion of that new SEIS, the Court left the 2004 Framework in place and directed

3   the Forest Service to include a non-commercial funding alternative in its NEPA analysis

4   of new fuel-reduction projects.  See ECF No. 304 at 14.

5          Plaintiffs in SFL v. Sherman and the State appealed.[2]  In a consolidated opinion

6   addressing both appeals, the Court of Appeals affirmed this Court's decisions with

7   regard to NEPA, but remanded to this Court several of SFL's claims under NFMA.

8   Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1169 (2011).  With regard to remedy,

9   however, the Court of Appeals found that while this Court was correct to conduct the

10  traditional equitable analysis to determine the proper scope of injunctive relief, in doing

11  so, it gave undue deference to the government's experts based on their affiliation with

12  the Forest Service.  Id. at 1185.  The Court of Appeals therefore vacated this Court's

13  remedy and remanded the matter "for analysis of the requirements of a permanent

14  injunction without deference to the Forest Service's experts simply because of their

15  relationship with the agency."  Id. at 1186.

16         After the Court of Appeals remanded the case, the Forest Service withdrew the

17  decision for the Basin Project and the parties stipulated to the dismissal of SFL's NFMA

18  claims against the Basin Project and the 2004 Framework.  ECF No. 337.  The parties

19  agree that the sole issue before the Court on remand is the proper remedy for the NEPA

20  deficiency in the SEIS for the 2004 Framework.  Following additional oral argument with

21  regard to that remedy on November 29, 2012, the Court took the matter under

22  submission.

23  ///

24  ///

25  _____

26     [1] This Court subsequently stayed the preparation of the new SEIS pending SFL and California's appeal from the rulings on summary judgment.  ECF No. 319 at 21.

27     [2] Pacific Rivers Council ("PRC") pursued a separate appeal. On February 3, 2012, the Ninth Circuit issued a decision affirming in part and reversing in part this Court's decision in the PRC case.
28  Pacific Rivers Council v. U.S. Forest Serv., 689 F.3d 1012 (9th Cir. 2012).

1

**ANALYSIS**

2

3       Plaintiffs Sierra Forest Legacy, et al. ("SFL") and the State of California ask this

4   Court to vacate the 2004 Framework, reinstate the 2001 Framework, and enjoin all

5   existing projects in the Sierra Nevada National Forests outside the Wildland Urban

6   Intermix ("WUI").[3]  Federal Defendants urge the Court to leave the 2004 Framework in

7   place, let previously authorized projects move forward, and direct the agency to prepare

8   a supplemental EIS addressing the narrow NEPA deficiency identified by the Court;

9   namely, Defendants' failure to properly analyze project alternatives.

10

11      **A.      Vacatur of the 2004 Framework**

12

13      Vacatur is a species of equitable relief.  As the Ninth Circuit explained in Nat'l

14  Wildlife Fed'n v. Espy:

15

16      Although the district court has power to do so, *it is not required to set aside
        every unlawful agency action*.  The court's decision to grant or deny
17      injunctive or declaratory relief under the APA is controlled by principles of
        equity.

18

19   45 F.3d 1337, 1343 (9th Cir. 1995) (emphasis added).  It is well established in this

20  Circuit that a Court is not mechanically obligated to vacate an agency decision that it

21  finds invalid.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  _____
            [3] The WUI is generally a 1.5 mile buffer zone around human communities.  SNFPA 03030.

1    See, e.g., Humane Soc'y v. Locke, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) (stating that

2    a court may remand without vacatur to allow the agency action to remain in force until

3    the action can be considered or replaced);  Pit River Tribe v. U.S. Forest Serv., 615 F.3d

4    1069, 1080-81 ("Our courts have long held that relief for a NEPA violation is subject to

5    equity principles.");  Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir.

6    1995) ("[W]hen equity demands, the regulation can be left in place while the agency

7    follows the necessary procedures.");  W. Oil and Gas Ass'n v. EPA, 633 F.2d 803, 813

8    (9th Cir. 1980) ("[G]uided by authorities that recognize that a reviewing court has

9    discretion to shape an equitable remedy, we leave the challenged designations in

10   effect.").  Nothing in the Administrative Procedure Act, which provides the basis for

11   review of the 2004 Framework SEIS, restricts the range of equitable remedies available

12   to the Court, including the issuance of declaratory relief without setting aside the agency

13   action.  See 5 U.S.C. § 702 ("[n]othing herein . . . affects . . . the power of duty of the

14   court to dismiss any action or deny relief on any other appropriate legal or equitable

15   ground"); 5 U.S.C. § 703 (authorizing suit for declaratory or injunctive relief).

16          Vacatur is clearly a form of equitable relief that the Court may award, withhold,

17   and craft to fit the circumstances of the case before it.   Plaintiffs have suggested that

18   vacatur is the presumptive remedy, and argue the Court may decline to vacate a

19   decision only when Defendants demonstrate that vacatur would cause "serious

20   irreparable environmental injury."  Plaintiffs also, however, urge the Court  to employ the

21   two-part test first articulated by the D.C. Circuit in Allied-Signal, Inc. v. NRC, under which

22   "[t]he decision whether to vacate depends on [1] 'the seriousness of the order's

23   deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2]

24   the disruptive consequences of an interim change that may itself be changed.'" 988 F.2d

25   146, 150-51 (D.C. Cir. 1993) (quoting Int'l Union, UMW v. FMSHA, 920 F.2d 960, 966-67

26   (D.C. Cir. 1990)).  Indeed, the Allied-Signal factors were recently recognized by the Ninth

27   Circuit as controlling, for purposes of assessing vacatur, in Cal. Communities Against

28   Toxics v. EPA,  688 F.3d 989, 992 (9th Cir. 2012).

1   Significantly, too, the Ninth Circuit's <u>Communities Against Toxics</u> decision also

2   recognizes that "'when equity demands, [a decision] can be left in place while the

3   agency follows the necessary procedures' to correct its action." <u>Id</u>., citing <u>Idaho Farm</u>

4   <u>Bureau Fed'n v. Babbitt</u>, 58 F.3d at 1405.  According to Federal Defendants, then, the

5   Court's consideration need not be limited to considerations of relative environmental

6   harm, since the <u>Allied-Signal</u> factors now adopted by the Ninth Circuit suggest on their

7   face that an equitable weighing process must be employed.   A curable NEPA defect can

8   be addressed absent vacatur if neither <u>Allied-Signal</u> factor has been established.  <u>See</u>,

9   e.g., <u>Home Builders Ass'n of N. Cal. v. U.S. Fish and Wildlife Serv.,</u> 2007 WL 201248 at

10  *6-7 (E.D. Cal. 2007).

11          The Court agrees with Federal Defendants that the determination of when to

12  remand without vacatur should not be limited to situations where it is necessary to avoid

13  environmental harm, but should instead be based on a broader examination of the

14  equities.  For example, the Ninth Circuit considers "competing claims of injury . . . and

15  the effect on each party [and third parties] of the granting or withholding of the requested

16  relief," <u>Nat'l Wildlife Fed'n v. Espy</u>, 45 F.3d at 1343 (quotations omitted), "the possibility

17  of undesirable consequences which we cannot now predict that might result from

18  invalidation of [the unlawful decisions]," <u>W. Oil & Gas Ass'n v. EPA</u>, 633 F.2d 803, 813

19  (9th Cir. 1980), and a "desire to avoid thwarting in an unnecessary way the operation of

20  [a statute] during the time the deliberative process is reenacted" <u>Id.</u>  If vacatur in the face

21  of a NEPA violation was virtually automatic as Plaintiffs herein appear to suggest, then

22  the Ninth Circuit would not have remanded to this Court for further equitable

23  consideration of the appropriate remedy, and instead would have simply directed that

24  the 2004 Framework be set aside and the 2001 Framework be substituted in its place.

25  ///

26  ///

27  ///

28  ///

1    For purposes of this case, however, the Court need not resolve the precise

2  question of the proper equitable inquiry courts should follow in determining whether

3  vacatur of an agency decision is the appropriate remedy for a NEPA procedural error,

4  because even assuming the applicability of Plaintiffs' more onerous standard, the

5  evidence before the Court still makes clear that the 2004 Framework should not be

6  vacated pending correction of the NEPA error in the SEIS.[4]

7    With regard to the relative environmental harms, the record before this Court

8  demonstrates that the 2004 Framework is environmentally preferable to returning

9  management of the Sierra Nevada to the 2001 Framework.

10    First, the Court finds that the 2004 Framework is superior to the 2001 Framework

11  with regard to reducing the threat of catastrophic wildfire.  This conclusion is based both

12  on the administrative record and on consideration of the remedy-phase declarations

13  submitted by the parties.  As this Court has previously concluded, "the record does

14  contain support for the Forest Service's conclusion that the 2004 Framework would

15  better address fire and fuels concerns than its predecessor."  California, 2008 WL

16  3863479, at *8.  See also id. at *9 ("[T]here is adequate support in the record for the

17  proposition that the 2004 Framework would better meet the Forest Service's goal of

18  moving forest landscapes toward a natural fire regime which, in the long run, would

19  result in more effective fuels management."); SNFPC, 573 F. Supp. 2d at 1340 (noting

20  the 2004 Framework decreases acres of habitat lost to wildfire more than 2001

21  Framework).

22    The parties have submitted extensive remedy-phase declaration testimony

23  regarding the relative efficacy of the two Frameworks in reducing the threat of

24  catastrophic wildfire.

25  ///

26

27    [4] To the extent other equitable factors should be included in the vacatur analysis, as discussed below in addressing plaintiffs' request for injunctive relief, a broad range of factors—including implementation of the HFQLG Pilot Project and socio-economic impacts to local communities—favor

28  leaving the 2004 Framework in place.

1   After considering those declarations without deference to the agency's experts based on

2   their relationship to the Forest Service, the Court concludes that the Forest Service's

3   experts have persuasively shown, contrary to plaintiffs' experts, that the 2001

4   Framework does not permit sufficient treatment to effectively reduce the risk of

5   catastrophic wildfires and that 2004 Framework best enables the Forest Service to

6   pursue its goals of effectively reducing the risk of catastrophic wildfire and re-

7   establishing the historical fire regime. The Court finds that the 2004 Framework not only

8   provides the Forest Service with the flexibility to design effective fuel treatments under a

9   wide range of circumstances, but also allows the agency to reduce fuel loading across a

10  larger geographic area than the 2001 Framework by permitting the harvest of more

11  commercially-valuable timber, which results in more cost-effective fuel treatments at a

12  larger scale.

13         The Court further finds that the 2004 Framework is superior to its 2001

14  predecessor with regard to protecting and creating habitat for old-forest species like the

15  California spotted owl, American marten and Pacific fisher.  The Forest Service's experts

16  have presented persuasive declaration testimony that habitat modification as a result of

17  severe wildfire poses a greater risk to the owl, marten and fisher than does management

18  under the 2004 Framework.[5]  Indeed the record shows significant losses of owl habitat

19  as a direct result of severe wildfire:  between 1999 and 2002, 18 owl Protected Activity

20  Centers (PACs) were lost to wildfire, and between 2003 and 2008, 33 more PACs had

21  more than 75% of their area burn at moderate to high severity.   In the long-term, by

22  reducing the risk of catastrophic wildfire, the 2004 Framework creates more of the old-

23  forest habitat used by all three species than does the 2001 Framework.

24  ///

25  ///

26  _____

27         [5] Significantly, this testimony is consistent with the independent conclusions of the U.S. Fish and
    Wildlife Service, which concluded in 2006 that catastrophic wildfire is a far greater risk to spotted owl
    viability than any short-term effects of fuel management activities on owl habitat.  71 Fed. Reg. 29,886,

28  29,897 (May 24, 2006).

1    The Court also finds that the 2004 Framework is superior to the 2001 Framework

2  in addressing non-fire related threats to forest health, including drought, insect

3  infestation and climate change.  This conclusion is based both on the record and on the

4  parties' remedy-phase declarations.  In prior proceedings this Court found that "the 2004

5  Framework offers better long-term forest health."  ECF No. 304 at 10.  See also ECF No.

6  319 at 16 ("In order to effectively design management activities to address these forest

7  health concerns, the Forest Service needs the flexibility to remove trees of larger

8  diameter than allowed under the 2001 Framework and to reduce canopy cover below the

9  levels allowed in the 2001 Framework.").  Having reviewed the declaration testimony

10  submitted during the remedy proceedings without granting deference to the Forest

11  Service's experts based on their relationship to the agency, the Court finds its prior

12  conclusion to be valid.  The Forest Service's experts have credibly and convincingly

13  demonstrated that to effectively address the intertwined threats of climate change,

14  drought and insect infestation, the agency must in some instances cut trees of larger

15  diameter and create greater reductions in stand density than is allowed under the 2001

16  Framework.  The record before the Court indicates that due to a century of fire

17  suppression, past management practices, and a changing climate, there are simply too

18  many trees competing for limited resources in various locations in the Sierra Nevada.

19  The 2004 Framework provides the agency with sufficient management flexibility to thin

20  these stands and increase their health; the 2001 Framework does not.

21    In short, the evidence makes clear that the 2004 Framework is environmentally

22  superior to the 2001 Framework.  Thus, vacatur of the 2004 Framework is not warranted

23  under the first of plaintiffs' suggested tests.

24    It must further be emphasized that the Forest Service, under both Democratic and

25  Republican Administrations, has backed the 2004 Framework, has concluded that the

26  2001 Framework is largely unimplementable, and has found that the 2004 Framework

27  offers greater fire-reduction and wildlife benefits.  See 2012 Francine, Krueger, Yasuda,

28  Macfarland, Morse Stine and Grulke Declarations (ECF No. 339).

1    This Court finds that the Forest Service's assessments in this regard under two

2    Administrations to be more persuasive that Plaintiffs' competing perspective.

3       Vacatur is also not warranted under the Allied–Signal factors.  The first Allied-

4    Signal factor looks to "'the seriousness of the [agency action's] deficiencies.'" 988 F.2d at

5    150 (quotations omitted).  As this Court has previously observed, the defect in the NEPA

6    analysis for the 2004 Framework is "relatively minor."  670 F. Supp. 2d at 1111.  The

7    error identified relates to the comparisons of the 2004 Framework to the non-selected

8    alternatives from the 2001 EIS, not the comparison of the 2004 and 2001 Frameworks,

9    or to the disclosure of the effects of the 2004 Framework.  The Court also finds that the

10    Forest Service has presented credible and uncontested evidence that the changes in

11    modeling of alternatives between the 2001 EIS and the 2004 SEIS made no significant

12    difference in the model outputs, and thus the modeling changes did not have any impact

13    on the ability of the public or the agency to fairly compare 2001 alternatives with the

14    2004 alternatives. This is not a case where the "governmental decisionmakers ma[de] up

15    their minds without having before them an analysis (with public comment) of the likely

16    effects of their decision on the environment."  Sierra Club v. Bosworth, 510 F.3d 1016,

17    1034 (9th Cir. 2007) (quotations omitted).  See also Laguna Greenbelt v. U.S. DOT,

18    42 F.3d 517, 527 (9th Cir. 1994) ("[E]ven where there is a violation of NEPA's procedural

19    requirements, relief will not be granted if the decision-maker was otherwise fully informed

20    as to the environmental consequences and NEPA's goals were met.") (citations omitted).

21    While the Court orders that the NEPA deficiency in the 2004 SEIS be corrected, it does

22    not believe the NEPA error raises serious doubts that the "agency chose correctly."

23    Allied-Signal, 988 F.2d at 150.

24       Under the second Allied-Signal inquiry, the evidence shows that an interim return

25    to the 2001 Framework will have extremely "disruptive consequences."  988 F. 2d at

26    150.  Vacatur would disrupt numerous projects presently in the decision-making pipeline,

27    obligating the agency to reconfigure and reanalyze projects that have in some cases

28    been in the planning process for several years.

1   Uncontroverted evidence in the record demonstrates that reanalyzing large projects

2   developed under the 2004 Framework for possible re-issuance under the 2001

3   Framework would be extremely expensive and time consuming.  The Court concludes

4   that the likely result of vacatur of the 2004 Framework is a virtual shut-down of the

5   project development pipeline for the entire region while the agency either reconfigures

6   and reanalyzes those projects under the 2001 Framework, or suspends further project

7   planning while it corrects the procedural deficiency.   In either case, the impacts would

8   unquestionably be severely disruptive both in terms of expenditure of public resources

9   and the harm to public of the delay in conducting needed vegetation management

10   projects.  See Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d at 1405-06  (noting

11   significant expenditure of public resources constitutes equitable concern weighing

12   against vacatur).

13        In sum, even assuming the applicability of the plaintiffs' suggested vacatur

14   standards, the record demonstrates that the 2004 Framework should not be vacated

15   while the agency addresses the deficiency in its NEPA analysis.

16

17        **B.     Injunctive Relief Against Existing Projects**

18

19        In addition to their request for prospective relief in the form of vacatur, the

20   plaintiffs ask this Court to retroactively enjoin all previously-approved projects not

21   consistent with the 2001 Framework, except for the portions of those projects within the

22   WUI.

23        To qualify for a permanent injunction, a plaintiff must demonstrate:
     (1) that it has suffered an irreparable injury; (2) that remedies available at
24   law . . . are inadequate to compensate for that injury; (3) that, considering
     the balance of hardships between the plaintiff and defendant, a remedy in
25   equity is warranted; and (4) that the public interest would not be disserved
     by a permanent injunction.
26

27   SFL, 646 F.3d at 1184 (quoting eBay Inc. v. MercExchange, 547 U.S. 388, 391 (2006)).

28   ///

1  The Court of Appeals reiterated that even in NEPA cases "no 'thumb on the scale is

2  warranted'" when weighing the equities.  Id. (quoting Monsanto Co. v. Geertson Seed

3  Farms, 130 S. Ct. 2743, 2757 (2010).  When it is awarded, equitable relief must be

4  carefully tailored to "be no more burdensome to the defendant than necessary to provide

5  complete relief to the plaintiffs."  Califano v. Yamasaki, 442 U.S. 682, 702 (1979).

6

7           **1.      Irreparable Injury**

8

9           Plaintiffs claim a variety of irreparable injuries from continued implementation of

10  previously approved projects region-wide, including adverse impacts to the California

11  spotted owl, Pacific fisher and American marten, procedural injury, and injury from the

12  harvest of large trees.  Plaintiffs have not, however, carried their burden of

13  demonstrating that these alleged injuries constitute the irreparable injury needed to

14  justify any injunctive relief beyond preparation of a supplemental EIS, much less the

15  region-wide injunction they request.

16

17           **a.      Injury to California Spotted Owl, American Marten or
                    Pacific Fisher**

18

19           The record before the Court makes clear that continued implementation of

20  projects issued consistent with the 2004 Framework will not cause irreparable harm to

21  the California spotted owl, the American marten or the Pacific fisher.  This Court has

22  previously determined, based on review of the administrative record, and without

23  consideration of the declarations submitted by the parties during the remedy phase, that

24  "the effect of the 2004 Framework on old-forest species appears negligible."  SNFPC,

25  573 F. Supp. 2d at 1338; see also id. at 1339, 1340 (noting that the amount of old forest

26  habitat used by owl, fisher and marten is projected to increase in the region under the

27  2004 Framework); California, 2008 WL 3863479 at *17 (impacts to owl habitat under the

28  2004 Framework will be "minimal").

The Court's earlier conclusions are bolstered by the evidence presented by the parties during remedy proceedings and briefly discussed in the vacatur section of this decision.  Both the Forest Service and plaintiffs in SFL v. Sherman proffered extensive affidavit testimony regarding the impacts of the 2004 Framework on the owl, fisher and marten.  Reviewing that evidence without deferring to the Forest Service's experts based on their relationship to the agency, the Court concludes the 2004 Framework strikes an appropriate balance between restricting management activities to ensure the retention of habitat elements most important to old-forest species and providing management flexibility so that the agency can implement vegetation management projects that improve and protect habitat in the long-term.  The record before the Court indicates that this balance will avoid irreparable harm to old-forest species and plaintiffs' interests in those species.

### b.      Procedural Injury

Both SFL and the State assert that irreparable injury flows from the NEPA deficiency itself, as there is a risk that the agency will act without full consideration of the environmental impacts of its actions.  The Court finds this claim fails to qualify as an irreparable injury for purposes of the injunctive relief inquiry.

A procedural injury alone is insufficient to establish injury-in-fact for standing purposes, much less to demonstrate the irreparable injury required to justify injunctive relief.  See Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation — a procedural right in vacuo — is insufficient to create Article III standing."); Wilderness Soc'y v. Rey, 622 F.3d 1260 (9th Cir. 2010) ("[P]rocedural injury, standing on its own, cannot serve as an injury-in-fact."). See also Ctr. for Food Safety v. Vilsack, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, … a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it.").

1    Moreover, not every NEPA violation indicates that the agency acted without full

2    knowledge of the risk "of the likely effects of [its] decision on the environment."  Sierra

3    Club v. Bosworth, 510 F.3d 1016, 1034 (9th Cir. 2007) (citation omitted).  Here, as noted

4    in the discussion of vacatur, the error in the analysis of alternatives identified by this

5    Court does not indicate that the agency is acting without full knowledge of the effects of

6    the 2004 Framework and its alternatives.  First, the error related to the non-selected

7    alternative, not the selected alternative, so the effects of the 2004 Framework were fully

8    known and disclosed.  Second, the Forest Service has presented compelling evidence

9    that the change in modeling between 2001 and 2004 made no significant difference in

10   the model outputs, and thus did not impair the ability of the agency or the public to

11   compare the 2001 alternatives with the 2004 alternative.

12       Where, as here, a NEPA error has not resulted in an agency decision-maker

13   acting without being fully informed, the Ninth Circuit has declined to enjoin the

14   challenged decision.  See, e.g., Laguna Greenbelt v. U.S. DOT, 42 F.3d 517, 527 (9th

15   Cir. 1994) ("[E]ven where there is a violation of NEPA's procedural requirements, relief

16   will not be granted if the decision-maker was otherwise fully informed as to the

17   environmental consequences and NEPA's goals were met."); Warm Springs Dam Task

18   Force v. Gribble, 621 F.2d 1017, 1022 (9th Cir. 1980) ("Notwithstanding our conclusion

19   that the Corps violated NEPA . . . we decline to hold that the district court should be

20   reversed and an injunction issued on this ground.").

21

22                    c.        Injury from the Harvest of Large Trees

23

24       Both SFL and the State assert they are irreparably injured by the fact that old

25   forest habitat will be harvested under the 2004 Framework.  To the extent that plaintiffs

26   are alleging injury from the harvest of trees independent of the wildlife habitat impacts of

27   such harvest, they have failed to show a particularized injury to their interests rather than

28   an abstract injury to the environment.

1    Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000)

2    (Article III remedies must redress an "injury to the plaintiff" rather than an "injury to the

3    environment").  To show such an injury, a plaintiff must identify specifically planned

4    tree-cutting, link the proposed tree-cutting to its members' specific interests, and

5    demonstrate how the proposed tree-cutting will harm those interests.  Here, that means

6    that SFL must identify tree-cutting within a particular area of a National Forest that its

7    members plan to use in the future and demonstrate that the proposed tree-cutting will

8    harm their interests.  Similarly, the State must identify specifically-proposed tree-cutting

9    and demonstrate how that tree-cutting would harm state interests, such as state-owned

10   land or water.  Wilderness Soc'y v. Rey, 622 F.3d at 1256-57.[6]  Here, neither SFL nor

11   the State has identified any imminent harvest of trees in any specific area and explained

12   how such harvest will harm their interests.  Such broad and untethered allegations of

13   harm cannot serve as the irreparable injury required to demonstrate the need for

14   injunctive relief.[7]

15         In sum, plaintiffs fail to carry their burden of demonstrating that they will suffer

16   irreparable injury in the absence of their requested injunctive relief.

17   ///

18   ///

19   ///

20   ///

---

21         [6] While Wilderness Soc'y v. Rey addressed standing, establishing injury-in-fact for purposes of
     standing is less demanding than demonstrating irreparable harm to obtain injunctive relief.  See Caribbean
22   Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988) (finding that to demonstrate irreparable
     harm, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing").  See
23   also Ctr. for Food Safety v. Vilsack, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, . . . a plaintiff may
     establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to
24   obtain it.").

25         [7] SFL initially tied its injury to three projects, Basin, Empire and Slapjack.  The Basin project has
     now been withdrawn and thus is not a source of injury to plaintiffs.  On Slapjack, 92 percent of the
26   remaining work is in the WUI, and on Empire all remaining work is in the WUI. Thus neither project is the
     source of irreparable injury that would justify plaintiffs' requested injunction, as both can proceed
27   consistent with the injunction, and it would make little sense for a court to conclude a plaintiff will suffer
     irreparable injury from actions that are consistent with the remedy the plaintiff has proposed.  And, neither
28   project supports the need a blanket region-wide injunction against all existing projects.

16

1

### 2.    Other Remedies at Law

2

3      Plaintiffs' request for injunctive relief also fails because they have not

4  demonstrated that other remedies available at law are inadequate to compensate for

5  their injury.  eBay Inc. v. MercExchange, 547 U.S. at 391.  Specifically, in this case, the

6  Court's finding of a procedural deficiency in the Framework can be fully remedied by

7  declaratory relief.  When, and if, the Forest Service authorizes a project under the 2004

8  Framework that plaintiffs believe will cause them injury, they can bring a challenge to

9  that project based on the weight of that declaratory relief and ordinary principles of stare

10  decisis.  See, e.g., United States v. Am. Friends Serv. Comm., 419 U.S. 7, 11 (1974)

11  (finding that a full and fair opportunity to litigate claims in a separate suit constitutes an

12  adequate remedy at law, thereby undercutting "the existence of irreparable injury"). [8]

13

14

### 3.    Balance of Equities and Public Interest

15

16      Finally, the Court finds that considering the balance of equities and the public

17  interest, the 2004 Framework should remain in place while the agency addresses the

18  limited procedural defect in the 2004 SEIS.

19      Before considering the equities individually, it is necessary to address the multiple

20  practical impediments that are embedded in plaintiffs' requested injunction.  While SFL's

21  injunction sounds simple on paper, the agency has presented convincing evidence that

22  implementing existing projects pursuant to the 2004 Framework in the WUI and

23  modifying them to be consistent with the 2001 Framework outside the WUI would prove

24  extremely difficult and costly.

25  ///

26      [8] The Court's finding that plaintiffs have failed to carry their burden of demonstrating irreparable

27  harm and that they have adequate remedies at law is not essential to the Court's conclusion that plaintiffs are not entitled to their requested injunction.  Even assuming irreparable harm and a lack of adequate

28  remedies at law, the balance of the equities and consideration of the public interest demonstrate that the injunctive relief sought by plaintiffs is inappropriate.

1   First, with relation to project components outside the WUI, the agency would have to

2   review and potentially modify the NEPA documents for such projects to insure the

3   impacts of implementation consistent with the 2001 Framework were addressed.   Even

4   absent the need to do additional NEPA work, existing contracts are based on the 2004

5   Framework, so the Forest Service and the timber contractors will have to engage in the

6   expensive and time-consuming determination of whether the contract can be modified to

7   terms compliant with the 2001 Framework outside the WUI.  If such modifications render

8   the contract economically infeasible, then work would not proceed on the project.

9   Finally, even if there are no NEPA obstacles and the contracts can be modified, the

10  Forest Service would have to remark the trees to be cut outside the WUI to be compliant

11  with the 2001 Framework.  Each of these steps would be time-consuming and

12  expensive, and the Forest Service has presented evidence that rather than attempting to

13  implement existing projects outside the WUI, the logical response to SFL's injunction

14  may simply be a shut-down of such work until the 2004 Framework NEPA violation can

15  be remedied.  The Forest Service has also shown that there are considerable obstacles

16  to implementation of existing projects in the WUI under SFL's requested injunction.  For

17  example, where work inside and outside the WUI is inextricably linked under the project

18  proposal or the timber contract, restrictions outside the WUI may make it economically or

19  practically infeasible to conduct the work in the WUI.  These practical concerns of the

20  cost and delay inherent in implementing plaintiffs' proposed injunction are an important

21  component of the public interest and weigh against plaintiffs' requested injunction.

22

23                    **a.       The Public Interest in Reducing the Threat of Severe
                                 Wildfire**

24

25           One of the principal purposes of the 2004 Framework is to address the risk of

26  catastrophic wildfire that has resulted from decades of fire suppression and the resulting

27  build-up of hazardous fuels.

28  ///

1   This Court has previously concluded both that the reduction of the risk of catastrophic

2   wildfire is in the public interest, and that the 2004 Framework best enables the Forest

3   Service to reduce the those risks.  See ECF No. 319 at 15; ECF No. 304 at 9.  Although

4   plaintiffs now exclude from their requested injunction previously authorized projects in

5   the WUI, the evidence still makes clear that the plaintiffs' proposed injunction will

6   significantly impair the agency's ability to address the threats posed by wildfire, and that

7   the public interest favors allowing previously-approved projects to go forward.

8        Plaintiffs' proposed injunction does not address the threat that wildfire poses to

9   the very wildlife species upon which much of their claim of injury rests.  The record

10  before the Court conclusively establishes that habitat loss from severe wildfire is the

11  primary threat to the viability of the California spotted owl, the Pacific fisher and the

12  American marten.  Thus the plaintiffs' proposal to enjoin existing projects except within

13  the WUI leaves the greatest regional threat to old-forest wildlife unaddressed.

14       Plaintiffs argue that reimposition of the 2001 Framework outside the WUI will not

15  negatively impact the Forest Service's ability to address wildfire risk because the 2001

16  Framework allows harvest of trees up to 20" in diameter, and harvest of trees larger than

17  20" is not needed to meet fuel reduction needs.  This claim mischaracterizes the 2001

18  Framework.  The record before the Court shows that the cumulative effect of the

19  overlapping standards and guidelines contained in the 2001 Framework is that that the

20  theoretical 20" maximum harvest diameter is rarely attained in practice.  As a result,

21  projects developed under the 2001 Framework generally leave too much fuel, even after

22  treatment, to effectively modify fire behavior.

23       Plaintiffs' narrow focus on diameter limits also ignores the fact that the 2004

24  Framework is superior to the 2001 Framework in reducing fire risk in ways unrelated to

25  tree diameter.  By concentrating on the size of individual trees, Plaintiffs do not

26  appreciate the overall benefit of the 2004 Framework to the forest as a whole and

27  therefore proverbially "fail to see the forest for the trees."

28  ///

1   This Court has already recognized that the 2004 Framework is far more effective than

2   the 2001 Framework at modifying fire behavior.  Pacific Rivers Council v. U.S. Forest

3   Serv., No. 05-953, 2008 WL 4291209, at 17 (E.D. Cal. Sept. 18, 2008), rev'd in part on

4   other grounds, 668 F.3d 609 (9th Cir. 2012) (noting the differences in the rate of spread,

5   flame length, scorch height and projected mortality).  This is the case because the 2001

6   Framework placed limits on mechanical treatments even within treatment areas, a

7   requirement which "can severely reduce the effectiveness of individual treatment areas

8   in modifying fire behavior," and which is not found in the 2004 Framework.  SNFPA

9   3291.

10   Finally, plaintiffs fail to recognize that addressing fire hazard on a region-wide

11   basis requires working quickly and on a large scale.  One way the 2004 Framework

12   improves the scale and pace of treatment is by allowing harvest of trees 20"-30" in

13   diameter.  While plaintiffs claim the inclusion of harvest of 20"-30" trees serves only

14   economic purposes, the evidence shows that inclusion of commercially valuable trees in

15   fuel reduction projects is related to fire risk reduction, as it enables the Forest Service to

16   complete far more fuel reduction work than it could accomplish under its limited budget,

17   and thus allows work at the scale and at pace necessary to address the region-wide

18   threat of wildfire.  See  ECF No. 270-8 at ¶ 9.  The evidence demonstrates that shifting

19   from harvest based on commercial infrastructure to work funded solely by the Forest

20   Service would likely result in a 66% to 75% reduction in the number of acres treated.  By

21   allowing for the harvest of 20-30" trees, the 2004 Framework enables the agency to

22   conduct far more fuel reduction work than it could under the 2001 Framework or the

23   plaintiffs' proposed injunction.  This increase in fuel treatments benefits both people and

24   wildlife, and is therefore in the public interest.

25   In sum, even with an exception for work in the WUI, the plaintiffs' requested

26   injunction will compromise the Forest Service's ability to address the threats posed by

27   catastrophic wildfire.

28   ///

1   WUI logging does little to address overall forest health and instead focuses primarily on

2   the need to protect human communities from the danger and destruction occasioned by

3   wildfire.  On balance, the public interest in reducing the risk of catastrophic wildfire still

4   favors leaving the 2004 Framework in place pending preparation of an SEIS.

5

6                    **b.      The Public Interest in Forest Health**

7

8          As noted above, the 2004 Framework is superior to the 2001 Framework in

9   enabling land managers to address non-fire related issues of forest health, including the

10  stresses caused by climate change, drought and insects.  The 2004 Framework provides

11  the Forest Service with the flexibility needed to remove larger trees – including trees

12  20"-30" in diameter – which are often prime targets for bark beetles.  The 2004

13  Framework also allows the Forest Service to implement the level of forest thinning that is

14  required to reduce competition between trees for limited site resources, thereby

15  increasing the remaining trees' resistance to mortality from drought and insect attacks.

16  The record is clear that even in cases where the lighter thinning available under the

17  2001 Framework would suffice for reducing fire hazard, the heavier thinning and the

18  cutting of larger trees permitted under the 2004 Framework is at times necessary for

19  non-fire forest health purposes,

20          Enjoining all existing vegetation management work outside the WUI will have a

21  negative impact on the Forest Service's ability to address the intertwined threats posed

22  by climate change, drought and bark beetles, and is thus contrary to the public interest.

23  The Court thus finds that the public interest in forest health favors allowing the projects

24  previously planned under the 2004 Framework to proceed.

25  ///

26  ///

27  ///

28  ///

1

              **c.**     **The Public Interest in the HFQLG Act Pilot Project**

2

3        This Court previously held that the public interest in fully implementing the Herger-

4  Feinstein Quincy Library Group Forest Recovery Act ("HFQLG") Pilot Project was best

5  served by the 2004 Framework.  ECF No. 304 at 9; ECF No. 319 at 15.  This conclusion

6  was based on the administrative record, and not on deference to Forest Service experts.

7  Plaintiffs have presented no basis for revisiting that conclusion and have not shown how

8  their new injunction which exempts activities in the WUI is less harmful to

9  implementation of the Pilot Project.  The Court, therefore again finds that the 2004

10  Framework best serves the public interest in implementation of the HFQLG Pilot Project.

11

12              **d.**     **The Public Interest in Maintaining Industry Infrastructure and the Socio-Economic Benefits it Provides**

13

14        In the prior remedy proceedings, the Forest Service presented compelling

15  declaration testimony showing that the 2004 Framework best serves the public interest

16  in providing economic benefits to forest industries and communities, which not only

17  creates jobs but also sustains the infrastructure needed to properly manage forest

18  resources.  ECF No. 304 at 10.  See also ECF No. 319 at 18 ("Reducing harvest to the

19  levels contemplated in the 2001 Framework will lead to closures of some of the few

20  remaining sawmills in the Sierra Nevada as well as some biomass power plants.").

21        On remand, after considering the evidence presented by the Forest Service

22  without deference to the agency's experts based on their status as agency employees,

23  the Court finds the injunction sought by plaintiffs will negatively impact the timber and

24  forest products industry in the Sierra Nevada.  The economic health of communities and

25  industries in the Sierra Nevada is an important element of the public interest that must

26  be considered in balancing the equities.  Furthermore, in this case, the economic harm

27  to the forest products industry is not just borne by the industry and its employees.

28  ///

1   The Forest Service relies on the infrastructure provided by the private local forest

2   products industry to conduct many forest management activities that are designed to

3   serve the larger public interest.  Loss of that infrastructure would seriously limit the

4   agency's ability to implement such projects. There is thus a distinct public interest in

5   sustaining the timber and bio-mass industry and infrastructure and the socio-economic

6   benefits they provide, which weighs strongly in favor of keeping the 2004 Framework in

7   place and allowing projects issued under the 2004 Framework to proceed.

8

9               **e.     The Balance of Equities Favors Leaving the 2004
                          Framework in Place While the Agency Addresses the
10                        Deficiency in the SEIS**

11          In sum, the weight of the evidence, considered without deference to the Forest

12   Service's experts based on their relationship to the agency, makes clear that the balance

13   of equities militates strongly in favor of leaving the 2004 Framework in place and

14   allowing existing projects to go forward while the Forest Service addresses the legal

15   error in the 2004 SEIS through a supplemental EIS.

16

17   **C.     Remedy**

18

19          Based on the foregoing, the Court denies plaintiffs' request to vacate the 2004

20   Framework and to enjoin all previously authorized projects outside the WUI.

21          The Court orders the Forest Service to complete a supplemental EIS that

22   addresses the range of alternatives deficiency identified by the Court in its summary

23   judgment opinion.  SNFPC, 573 F. Supp. 2d at 1348. The final supplemental EIS should

24   be issued by August 30, 2013.

25   ///

26   ///

27   ///

28   ///

1   In the interim, the agency may continue management of National Forest Service lands in

2   the Sierra Nevada consistent with the 2004 Framework.

3        IT IS SO ORDERED.

4   DATED:  April 12, 2013

5

6

7   _____
    MORRISON C. ENGLAND, JR., CHIEF JUDGE
8   UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28